# EXHIBIT "S"

# PITTRA GB International, Inc.
6 South Street    Suite 301
Morristown, New Jersey 07960 USA
Phone 973-401-9000    Fax 973-401-9001

March 8, 2004

Aaron Vagelatos
Merrill Lynch Business Financial Services
222 N. LaSalle Street
17th Floor
Chicago, IL 60601
United States

Dear Aaron:

Enclosed you will find the original closing documents which were drafted for the Mitsui deal and will now be used for our conversion from PITTRA to PGB.

We did all of the paperwork, but never actually transferred anything from one company to the other.

I will prepare a balance sheet as of February 29, 2004 and send this to you within the next day.

Sincerely,

Arthur Kupperman

TIN # 20-0011885

# EXHIBIT "T"

## CERTIFICATION OF BEN H. BECKER

Ben H. Becker, of full age, certifies as follows:

1. I am an attorney at law of the State of New Jersey and a founding member of the law firm Becker Meisel, LLC.

2. My firm and I from time to time handled matters for PITTRA G.B. International, Inc.

3. I was recently shown a letter dated January 16, 2004, addressed to Arthur Kupperman purporting to be from Becker Meisel, LLC and purporting to bear my signature. A copy of the letter, which purports to be a "summary of the basis for, and status of, certain pending lawsuits against PITTRA G.B. International, Inc." is annexed hereto as Exhibit "A".

4. I was also recently shown a letter dated May 28, 2004, addressed to Arthur Kupperman, purporting to be from Becker Meisel, LLC and purporting to bear my signature entitled "Updated Status Letter". A copy of the letter is annexed hereto as Exhibit "B".

5. I can state categorically that <u>neither</u> letter was issued by my firm. The signatures that purport to be mine are not my signature. The initials at the bottom of the letters are not in a format typical of this firm. The secretary's initials in the letters are not those of my secretary. The letters are not "justified" on the right margin in the style of my firm. The font is also not typical of the font used by my secretary. Most importantly, the substance of the letters is wholly unknown to me. I searched our computer records and saw no similar letters.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Ben H. Becker

Dated: September 29, 2006

# EXHIBIT A

# BECKER MEISEL LLC
### ATTORNEYS AT LAW
### EISENHOWER PLAZA II
### 354 EISENHOWER PARKWAY, SUITE 2800
### LIVINGSTON, NEW JERSEY 07039

BEN H. BECKER
STACEY L. MEISEL*
MARTIN L. BOROSKO

MICHAEL A. OXMANo
ALLEN J. UNDERWOOD II
MILICA A. FATOVICH
MATTHEW S. CONNOR
MARIA N. FISHER*

OF COUNSEL
DOUGLAS A. KENT
ANTHONY J. VIZZONI

ALSO MEMBER OF PA BAR*
ALSO MEMBER OF NY BARo
ALSO MEMBER OF D.C. BAR*

TELEPHONE 973-422-1100
FACSIMILE 973-422-9122

880 THIRD AVENUE
13TH FLOOR
NEW YORK, NEW YORK 10022

January 16, 2004

Please reply to New Jersey Office

Mr. Arthur Kupperman
President
PITTRA G.B. International, Inc.
6 South Street    Suite 301
Morristown, New Jersey 07960

Dear Arthur;

In connection with a pending loan extension and credit line increase by Merrill Lynch Business Financial Services, Inc., you have requested us to prepare a summary of the basis for, and status of, certain pending lawsuits against PITTRA G.B. International, Inc. In this regard, please be advised as follows:

General background

Part of the lawsuit with each of the below captioned companies relates to direct or contingent liabilities for anti-dumping duties impose by the U.S. Department of Commerce. In order to help explain this situation, the following is a general outline of the anti-dumping case and the effects of such case.

Starting in November 1999 an anti-dumping investigation was commenced for apple juice concentrate shipped from China to the US. As a result of the investigation, anti-dumping duties from 0% to approximately 51% were imposed on Chinese producers of apple juice concentrate. Specific duties were imposed on each of 14 companies and all other companies received the maximum rate of approximately 51%. Such anti-dumping duties are reviewed on an annual basis during a period of 5 years. Furthermore, the initial anti-dumping findings were challenged by certain of the Chinese producers.

Anti-dumping duty rates are set on an annual basis by the Department of Commerce. Such rates are estimated rates subject to adjustment retroactively based on the actual

calculations prepared for a given review period. During the year, the Chinese exporter, or the importer of record, deposits estimated duties with the U.S. Customs department. Subsequent to the review period, estimated rates are revised to actual rates and adjustments are made to either refund the excess of the estimated payments or bill the Chinese exporter, or the importer of record, for any deficiency in the deposit amount as opposed to the final rate.

This case has been particularly difficult and troublesome since the initial findings by the Department of Commerce were revised on the basis of a challenge (improper surrogate country costs for operating expenses) and 3 years after the imposition of initial duties, the estimated rates were revised.

By way of further explanation, it should be understood that the primary responsibility for any anti-dumping duties are that of the Chinese producer. However, in the event of any payment default by such producer, U. S. Customs will require the importer of record to make the payment.

Changsha Industrial Products & Minerals Import & export Co., Ltd. ("Changsha")

PITTRA had a business relationship with Changsha starting in approximately 1997. As a result of the initial anti-dumping investigation, Changsha was assessed a provisional anti-dumping duty rate of 14.77% on the FOB China value of all shipments to the US. Based on the non-compliance by Changsha in certain subsequent review processes, the provisional rate of 14.77% was modified to 51.72% retroactive to November 1999. Changsha did not have the funds to pay the additional duties, so PITTRA became contingently liable for any deficiencies. In addition, shipments under contracts between Changsha and PITTRA were halted by Changsha since each contract would result in a significant loss to Changsha based on the increased duty assessment.

PITTRA estimated the potential contingent liability to be approximately $475,000. In addition, packer claims were filed by PITTRA against Changsha for non-delivery losses of approximately $120,000. Such claims were filed with the Minister of Trade for Shandong Province in China. As a result of the appeal of the initial findings as to an improper surrogate country in the initial anti-dumping duty rate assessments, the final potential contingent liability of PITTRA was estimated to be approximately $235,000.

In order to minimize any exposure, PITTRA withheld approximately $365,000 in remittances to Changsha. Such funds were specifically to be used to cover the losses incurred by PITTRA in covering the defaulted contracts and also provide a contingency fund for any assessments by U.S. Customs for anti-dumping duties.

Negotiations are proceeding with Changsha to settle this matter. It is anticipated the final settlement will be made within the next 10 days based on a payment by PITTRA of $40,000 to Changsha.

<u>ShaanXi Machinery & Equipment Import & Export Corp. ("SAAME")</u>

PITTRA had a business relationship with SAAME starting in approximately 1995. As a result of the initial anti-dumping investigation, SAAME was assessed a provisional anti-dumping duty rate of 9.45% on the FOB China value of all shipments to the US. Based on the initial review by the Department of Commerce, the provisional rate of 9.45% was modified to 21.67% retroactive to November 1999. SAAME did not escrow the funds to pay the additional duties, so PITTRA became contingently liable for any deficiencies. In addition, shipments under contracts between SAAME and PITTRA were halted by SAAME since each contract would result in a significant loss to SAAME based on the increased duty assessment.

PITTRA estimated the potential contingent liability to be approximately $235,000. In addition, packer claims were filed by PITTRA against SAAME for non-delivery losses of approximately $220,000. Such claims were filed with the Minister of Trade for ShaanXi Province in China. As a result of the appeal of the initial findings as to an improper surrogate country in the initial anti-dumping duty rate assessments, the final potential contingent liability of PITTRA was estimated to be approximately $125,000.

In order to minimize any exposure, PITTRA withheld approximately $350,000 in remittances to SAAME. Such funds were specifically to be used to cover the losses incurred by PITTRA in covering the defaulted contracts and also provide a contingency fund for any assessments by U.S. Customs for anti-dumping duties.

Negotiations are proceeding with SAAME to settle this matter. It is anticipated the final settlement will be made within the next 30 days based on a payment by PITTRA of $60,000 to SAAME.

I trust the above is a satisfactory explanation of the pending lawsuits. If you have any questions, please do not hesitate to let me know.

Best regards,

*Ben Becker*

Ben Becker

BB:gv

## PITTRA G.B. International, Inc.
### 6 South Street    Suite 301
### Morristown, New Jersey 07960 USA

*Telefax transmission*

| | |
|---|---|
| *Date*: | 1/20/04 |
| *To:* | Aaron Vagelatos |
| | Merrill Lynch Business Financial Services |
| | Phone:  [1] 312-499-3332 |
| | Fax:  [1] 312-499-3256 |
| *From:* | Arthur Kupperman |
| | Phone:  [1] 973-401-9000 |
| | Fax:  [1] 973-401-9001 |
| | E-mail:  akupperman@pittra.com |
| *Pages:* | 4, including this cover page |
| **Subject:** | **Lawyer letter** |

Attached you will find the letter from the lawyer concerning the lawsuits.

If you need any additional information, please do not hesitate to let me know.

# EXHIBIT B

# BECKER MEISEL LLC
### ATTORNEYS AT LAW
### EISENHOWER PLAZA II
### 354 EISENHOWER PARKWAY, SUITE 2800
### LIVINGSTON, NEW JERSEY 07039

BEN H. BECKER
STACEY L. MEISEL*◊
MARTIN L. BOROSKO
GEORGE CACOULIDIS◊◊

MICHAEL A. OXMAN◊
ALLEN J. UNDERWOOD II
MILICA A. FATOVICH
MATTHEW S. CONNOR
MARIA N. FISHER*
AMANDA L. SCHULTZ
MICHAEL E. HOLZAPFEL

SPECIAL COUNSEL
DANIEL J. O'HERN

OF COUNSEL
DOUGLAS A. KENT
ANTHONY J. VIZZONI
DANIEL J. O'HERN, JR.

ALSO MEMBER OF PA BAR*
ALSO MEMBER OF NY BAR◊
ALSO MEMBER OF D.C. BAR°
ALSO MEMBER OF CT BAR◊◊

TELEPHONE 973-422-1100
FACSIMILE 973-422-9122

919 MADISON AVENUE
5TH FLOOR
NEW YORK, NEW YORK 10022
TELEPHONE 212-172-4430

THE GALLERIA
2 BRIDGE AVENUE
BUILDING 1, SECOND FLOOR
RED BANK, NEW JERSEY 07701
TELEPHONE 732-576-8700

May 28, 2004

Mr. Arthur Kupperman
President
PITTRA G.B. International, Inc.
6 South Street    Suite 301
Morristown, New Jersey 07960

## UPDATED STATUS LETTER

Dear Arthur;

In connection with a pending loan extension and credit line increase by Merrill Lynch Business Financial Services, Inc., you have requested us to prepare an updated summary of the basis for, and status of, certain pending lawsuits against PITTRA G.B. International, Inc. In this regard, please be advised as follows:

General background

Part of the lawsuit with each of the below captioned companies relates to direct or contingent liabilities for anti-dumping duties impose by the U.S. Department of Commerce. In order to help explain this situation, the following is a general outline of the anti-dumping case and the effects of such case.

Starting in November 1999 an anti-dumping investigation was commenced for apple juice concentrate shipped from China to the US. As a result of the investigation, anti-dumping duties from 0% to approximately 51% were imposed on Chinese producers of apple juice concentrate. Specific duties were imposed on each of 14 companies and all other companies received the maximum rate of approximately 51%. Such anti-dumping duties are reviewed on an annual basis during a period of 5 years. Furthermore, the initial anti-dumping findings were challenged by certain of the Chinese producers.

Anti-dumping duty rates are set on an annual basis by the Department of Commerce. Such rates are estimated rates subject to adjustment retroactively based on the actual calculations prepared for a given review period. During the year, the Chinese exporter, or the importer of record, deposits estimated duties with the U.S. Customs department. Subsequent to the review period, estimated rates are revised to actual rates and adjustments are made to either refund the excess of the estimated payments or bill the Chinese exporter, or the importer of record, for any deficiency in the deposit amount as opposed to the final rate.

This case has been particularly difficult and troublesome since the initial findings by the Department of Commerce were revised on the basis of a challenge (improper surrogate country costs for operating expenses) and 3 years after the imposition of initial duties, the estimated rates were revised.

By way of further explanation, it should be understood that the primary responsibility for any anti-dumping duties are that of the Chinese producer. However, in the event of any payment default by such producer, U. S. Customs will require the importer of record to make the payment.

Approximately 3 months ago, the Department of Commerce has modified the surrogate country and certain overhead cost items and as a result they have again modified the initial anti-dumping margins and the anti-dumping margins for the second and third review periods.

In the case of Changsha Industrial Products & Minerals Import & export Co., Ltd., such margins were modified to 0% for the first review period and approximately 51% for all subsequent review periods. The refund due for the first review period will be offset against the liability for the subsequent review periods. These calculations are presently in the process of being summarized by the Department of Commerce and it is expected there will be a net refund to Changsha (primarily due to the much higher imports during the first year of the anti-dumping investigation). The net refund will be applied against the claim of Changsha Industrial Products & Minerals Import & export Co., Ltd. against PITTRA G. B. International, Inc.

In the case of ShaanXi Machinery & Equipment Import & Export Corp., the margins were reduced. Accordingly, this company will receive a refund from the U. S. Customs office based on the original assessment of 9.45% which has now been reduced to 0%. As such, the refund is being applied against the claim of ShaanXi Machinery & Equipment Import & Export Corp. against PITTRA G.B. International, Inc.

<u>Changsha Industrial Products & Minerals Import & export Co., Ltd. ("Changsha")</u>

PITTRA had a business relationship with Changsha starting in approximately 1997. As a result of the initial anti-dumping investigation, Changsha was assessed a provisional anti-dumping duty rate of 14.77% on the FOB China value of all shipments to the US.

Based on the non-compliance by Changsha in certain subsequent review processes, the provisional rate of 14.77% was modified to 51.72% retroactive to November 1999. Changsha did not have the funds to pay the additional duties, so PITTRA became contingently liable for any deficiencies. In addition, shipments under contracts between Changsha and PITTRA were halted by Changsha since each contract would result in a significant loss to Changsha based on the increased duty assessment.

PITTRA estimated the potential contingent liability to be approximately $475,000. In addition, packer claims were filed by PITTRA against Changsha for non-delivery losses of approximately $120,000. Such claims were filed with the Minister of Trade for Shandong Province in China. As a result of the appeal of the initial findings as to an improper surrogate country in the initial anti-dumping duty rate assessments, the final potential contingent liability of PITTRA was estimated to be approximately $235,000.

In order to minimize any exposure, PITTRA withheld approximately $365,000 in remittances to Changsha. Such funds were specifically to be used to cover the losses incurred by PITTRA in covering the defaulted contracts and also provide a contingency fund for any assessments by U.S. Customs for anti-dumping duties.

At this time, it is not possible to determine the net effect of the revision to the anti-dumping rates. It appears that after application of the net refund, there may be a balance of less than $10,000 due from PITTRA to Changsha.

ShaanXi Machinery & Equipment Import & Export Corp. ("SAAME")

PITTRA had a business relationship with SAAME starting in approximately 1995. As a result of the initial anti-dumping investigation, SAAME was assessed a provisional anti-dumping duty rate of 9.45% on the FOB China value of all shipments to the US. Based on the initial review by the Department of Commerce, the provisional rate of 9.45% was modified to 21.67% retroactive to November 1999. SAAME did not escrow the funds to pay the additional duties, so PITTRA became contingently liable for any deficiencies. In addition, shipments under contracts between SAAME and PITTRA were halted by SAAME since each contract would result in a significant loss to SAAME based on the increased duty assessment.

PITTRA estimated the potential contingent liability to be approximately $235,000. In addition, packer claims were filed by PITTRA against SAAME for non-delivery losses of approximately $220,000. Such claims were filed with the Minister of Trade for ShaanXi Province in China. As a result of the appeal of the initial findings as to an improper surrogate country in the initial anti-dumping duty rate assessments, the final potential contingent liability of PITTRA was estimated to be approximately $125,000.

In order to minimize any exposure, PITTRA withheld approximately $350,000 in remittances to SAAME. Such funds were specifically to be used to cover the losses

incurred by PITTRA in covering the defaulted contracts and also provide a contingency fund for any assessments by U.S. Customs for anti-dumping duties.

As SAAME will receive a refund of over-assessed anti-dumping duties as outlined above, the net settlement will now favor PITTRA G.B. and within the next 90 days we expect to file for a dismissal of the lawsuit. PITTRA and SAAME will adjust future purchase contract values to effect a refund to PITTRA for the losses suffered by PITTRA for non-delivery of contracts.

Very truly yours,
BECKER MEISEL LLC

Ben Becker

BB/gv

# EXHIBIT "U"

```
                                                                    1
 1                  UNITED STATES DISTRICT COURT
 2                    DISTRICT OF NEW JERSEY
 3                    CIV. 05-1409 (HAA)
 4    - - - - - - - - - - - - - - -
 5   EMPRESAS LOURDES, S.A.,
 6              Plaintiff,
 7       vs.                          DEPOSITION OF:
 8                                    ARTHUR KUPPERMAN
 9   PITTRA GB INTERNATIONAL, INC.,
10   and PGB INTERNATIONAL LLC,
11              Defendants.
12    - - - - - - - - - - - - - - -
13
14            TRANSCRIPT of the stenographic notes
15   of the proceedings in the above-entitled matter,
16   as taken by and before EILEEN HIMMER, a Certified
17   Shorthand Reporter and Notary Public of the State
18   of New Jersey, held at the offices of BUDD
19   LARNER, 150 John F. Kennedy Parkway, Short Hills,
20   New Jersey, on June 22, 2005, commencing at
21   10:30 a.m.
22
23
24
25
```

Page 74

1   A. Most probably, yes, and I can't tell
2   you the exact date when the transfer was made.
3   Q. Assuming the transfer had been made
4   by September 2 when you wrote this e-mail to
5   Mr. Koatz, is there a reason you did not mention
6   that in the e-mail to Mr. Koatz?
7   A. No.
8   Q. When you wrote this e-mail to
9   Mr. Koatz on September 2, 2003, you knew
10  Mr. Koatz was trying to collect a debt that
11  Empresas Lourdes -- that was owed to Empresas
12  Lourdes by Pittra GB International, Inc.?
13  A. That is correct.
14  Q. In this September 2, 2003 letter to
15  Mr. Koatz, e-mail letter to Mr. Koatz, you write,
16  "I would like to bring you," meaning Mr. Koatz,
17  "up to date as to our status."
18      Who did you mean by "our status" when
19  you wrote that letter?
20  A. Pittra GB.
21  Q. You intended the pronoun "our" to
22  refer to Pittra GB International, Inc., even
23  though at about that time it had transferred the
24  assets, as we have defined them, to PGB
25  International LLC, is that accurate?

Page 75

1   A. Correct.
2   Q. If you look at what was stamped 34,
3   which seems to be the same one we just looked at.
4   Pardon me for the record in copying.
5       If you look at the document 35, which
6   is a letter dated October 9, 2003 addressed to
7   you from Mr. Koatz stating, "We represent
8   Empresas Lourdes, S.A., (Lourdes). From March
9   2003 until August 2003 we exchanged e-mail
10  correspondence and had several telephone
11  conferences with respect to Pittra GB's, Inc.
12  (Pittra) debt to Lourdes in the amount of
13  $151,541.
14      "During that period Pittra
15  continually promised to pay Lourdes in full and
16  has repeatedly failed to do so. Pittra's silence
17  since August -- I have not received any news from
18  you since then -- is troubling and can be
19  interpreted only in the worst light: That Pittra
20  will not pay Lourdes.
21      "Please be advised that should
22  Pittra fail to wire this firm the full amount of
23  $151,541 on or before Wednesday, October 15, or
24  deliver a check in the same amount in good funds
25  drawn on a local bank, then our firm has been

Page 76

1   authorized to commence legal action to recover
2   the funds."
3       Do you recall receiving this October
4   9, 2003 letter, Mr. Kupperman?
5   A. Not specifically.
6   Q. The letter contains a threat of
7   litigation. Did you take any action as a result
8   of the threat of litigation contained in this
9   October 9, 2003 letter?
10  A. I do not recall.
11  Q. Do you recall whether, assuming you
12  received this October 9, 2003 letter, and
13  assuming you understood that Mr. Koatz is stating
14  that if payment were not made legal action would
15  be commenced, would you have shown this to your
16  attorneys?
17  A. I may have.
18  Q. Well, when you in the course of
19  Pittra GB International Inc.'s business received
20  letters from lawyers threatening legal action,
21  would you turn them over to your attorneys?
22  A. Not necessarily.
23  Q. Is there a reason you would not turn
24  over some such letters to your attorneys?
25  A. I am sure if I didn't turn it over, I

Page 77

1   am sure I had a reason for not turning it over.
2   Q. As we sit here today you can't recall
3   those reasons?
4   A. No.
5   Q. At any time, Mr. Kupperman, in 2003
6   or 2004 or 2005, did you notify either Mr. Koatz
7   or the plaintiff of the creation of PGB
8   International LLC?
9   A. Not specifically.
10  Q. During that time did you notify
11  Mr. Koatz or Empresas Lourdes that Pittra GB
12  International -- that GB International, Inc. was
13  no longer at its Madison Avenue address?
14  A. I do not recall.
15  Q. Has Pittra GB International, Inc.
16  ceased doing business?
17  A. Yes.
18  Q. As of what date?
19  A. Approximately August, September of
20  2003. I could be off by a month or two.
21  Q. Was there any notice of that
22  cessation of business given to anyone?
23  A. Not that I recall.
24  Q. Are you familiar with a certificate
25  of dissolution of a corporation?

20 (Pages 74 to 77)

Page 78

1  A. Vaguely.
2  Q. Has a certificate of dissolution for
3  Pittra GB International, Inc., been filed in any
4  state?
5  A. No, it has not.
6  Q. Was Pittra GB International, Inc.
7  authorized to conduct business in any other state
8  other than New Jersey?
9  A. No.
10 Q. To your knowledge, nothing has been
11 communicated to the Government of the State of
12 New Jersey that Pittra GB International, Inc. is
13 no longer doing business?
14 A. To the best of my knowledge, that's
15 correct.
16 Q. Did Pittra GB International, Inc.
17 file a tax return with the State of New Jersey or
18 the United States Government in 2004, if that was
19 a fiscal year for the company?
20 A. I will answer it this way: Pittra GB
21 International, Inc. is current on any of its
22 required tax filings.
23 Q. Do you, or does anyone at PGB
24 International LLC maintain any stationery bearing
25 the denomination Pittra GB International, Inc.?

Page 79

1  MR. D'ANNUNZIO: Currently?
2  Q. Currently, yes.
3  A. No. Not that I know of.
4  Q. Did Pittra GB International, Inc.
5  maintain bank accounts?
6  A. Yes.
7  Q. At which bank or banks?
8  A. When?
9  Q. In 2003, 2004 and today.
10 A. In 2004 the bank accounts were at
11 Merrill Lynch, and I am trying to think where
12 else they had an account. They had another
13 account which was closed in 2004.
14 Q. Is the Merrill Lynch account open
15 today?
16 A. No.
17 Q. Do you recall the date it was closed?
18 A. No.
19 Q. If I could sum up then, today Pittra
20 GB International, Inc. files tax returns with the
21 State of New Jersey and the Federal Government as
22 required but does not have a bank account?
23 A. That is correct.
24 Q. And does not have an office, or does
25 it have an office? I don't mean to put words in

Page 80

1  your mouth.
2  A. I don't know what you mean as to
3  whether or not they have an office.
4  Q. What I mean is, does Pittra GB
5  International, Inc., have a place that they
6  conduct their business?
7  A. How about if I answer they have a
8  mailing address. They have a mailing address,
9  that's all they have.
10 Q. Does Pittra GB international, Inc.
11 today conduct any business?
12 A. No.
13 Q. Is there a reason why if Pittra GB
14 International, Inc. does not conduct any business
15 it has a mailing address?
16 A. It still receives errant mail.
17 Q. I don't mean this to be
18 argumentative. If Pittra GB International, Inc.
19 is not doing business, is there a reason it files
20 tax returns?
21 A. I believe it's required to file tax
22 returns.
23 Q. You said that you, Paulette, E. Ross
24 Browne, Allison and Linda were shareholders in
25 Pittra GB International, Inc.?

Page 81

1  A. That is not what I said.
2  Q. Who were the shareholders, then?
3  A. Of which entity?
4  Q. Of the Inc.
5  A. Paulette Krelman and E. Ross Browne.
6     Could I go back and make one small
7  correction?
8  Q. Sure.
9  A. You asked whether Pittra GB has any
10 assets as of today, or bank accounts?
11 Q. I said bank accounts.
12 A. I opened a door for you.
13 Q. Does Pittra GB International, Inc.
14 have any assets?
15 A. Yes.
16 Q. What are they?
17 A. A receivable.
18 Q. What is that?
19 A. From a company that is bankrupt.
20 Q. It doesn't have any assets?
21 A. It has an asset from a bankrupt
22 company.
23 Q. Anybody else?
24 A. Mason County Fruit Packers.
25 Q. In what state is that located?

21 (Pages 78 to 81)

```
                                    82
 1      A.  Michigan.
 2      Q.  Is the bankruptcy proceeding in
 3  Michigan?
 4      A.  Yes, it is.
 5      Q.  Did Pittra GB International, Inc.
 6  file a proof of claim in that bankruptcy action?
 7      A.  Yes, it did.
 8      Q.  Did you do that yourself or did you
 9  have a lawyer?
10      A.  I did it myself.
11      Q.  Do you know what kind of bankruptcy
12  Mason Fruit Packers is in?
13      A.  Chapter 11.
14      Q.  What is the amount of the asset?
15      A.  The amount of the claim was a little
16  over $300,000.
17      Q.  Is Pittra GB International, Inc. a --
18  strike that.
19          Do you know whether a committee of
20  unsecured creditors has been appointed in that
21  bankruptcy action?
22      A.  Yes, I do.
23      Q.  Is Pittra GB International, Inc. a
24  member of that committee?
25      A.  Yes, it was.
```

```
                                    83
 1      Q.  Is there a reason it is no longer a
 2  member?
 3      A.  I guess technically it's still a
 4  member of the committee.
 5      Q.  Do you know whether the committee has
 6  retained an attorney?
 7      A.  Yes, I do.
 8      Q.  Do you know the identity of the
 9  attorney?
10      A.  Yes, I do.
11      Q.  Can you tell me?
12      A.  If I think hard enough I will
13  remember his name. I really don't remember his
14  name. He's in Michigan.
15      Q.  We can arrange to get that.
16          MR. GLEASON: I don't have any other
17  questions at this time, Mr. Kupperman. Thank you
18  very much.
19          (The deposition was concluded at
20  11:35 a.m.)
21
22
23
24
25
```

```
                                    84
 1                  CERTIFICATE
 2
 3      I, EILEEN HIMMER, a Notary Public and
 4  C.S.R. of the State of New Jersey, do hereby
 5  certify that prior to the commencement of the
 6  examination ARTHUR KUPPERMAN was duly sworn by me
 7  to testify the truth, the whole truth and nothing
 8  but the truth.
 9          I DO FURTHER CERTIFY that the
10  foregoing is a true and accurate transcript of
11  the testimony as taken stenographically by and
12  before me at the time, place and on the date
13  hereinbefore set forth.
14          I DO FURTHER CERTIFY that I am
15  neither a relative nor employee nor attorney nor
16  counsel of any of the parties to this action, and
17  that I am neither a relative nor employee of such
18  attorney or counsel, and that I am not
19  financially interested in the action.
20
21
    _____
22   Notary Public of the State of New Jersey
23
    Dated: August 18, 2005
24
25
```

22 (Pages 82 to 84)