HERRICK, FEINSTEIN LLP
Paul H. Schafhauser (PS - 1337)
John M. August (JA - 6451)
One Gateway Center
Newark, New Jersey  07102
(973) 274-2000
Attorneys for Defendant JPMorgan Chase Bank, N.A.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MERRILL LYNCH BUSINESS FINANCIAL SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ARTHUR KUPPERMAN, E. ROSS BROWNE, PAULETTE KRELMAN, PGB INTERNATIONAL, LLC, and JPMORGAN CHASE BANK, N.A., <br><br> Defendants, <br><br> and <br><br> JOHN DOES (1-10) and ABC CORPORATIONS (1-10), <br><br> Additionally Defendants <br> on the Crossclaim. | <u>CIVIL ACTION</u> <br><br> Civil Action No. 06-4802 (DMC) <br><br><br> **DECLARATION OF WAYNE E. OLSON IN SUPPORT OF CROSS-MOTION OF DEFENDANT JPMORGAN CHASE BANK, N.A FOR PARTIAL SUMMARY JUDGMENT AND RELATED RELIEF** |

**WAYNE E. OLSON,** declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a Vice President with the Special Credits Group for defendant JPMorgan Chase Bank, N.A. ("Chase").  I make this declaration in support of Chase's Cross-Motion for Partial Summary Judgment and Related Relief (the "Cross-Motion") in connection with the above-captioned matter.  Chase is a financial institution as defined in title 18 of the United States Code.

A.          **The Loan**

2.          Chase made a loan to defendant PGB International, LLC ("PGB") with a principal availability of $3,000,000.00 (the "Loan") pursuant to the terms and conditions contained in an Advised Line of Credit Note dated March 16, 2006 (the "Note"). The Note renewed and extended prior loans to PGB going back to October 2004. A copy of the Note is attached hereto as Exhibit A.

3.          In the Note, PGB waived any defense that it may have to the payment or performance of the liabilities evidenced by the Note.

4.          The Note, together with all of PGB's other obligations to Chase, was and remains secured by the collateral described in a certain Security Agreement dated October 8, 2004 (the "Security Agreement", and together with the Note and related documents, the "Loan Documents"). Defendant Arthur Kupperman ("Kupperman") executed the Note and Security Agreement as the Managing Member of PGB. A copy of the Security Agreement is attached hereto as Exhibit B.

5.          The Security Agreement gave Chase a first priority security interest in all of the assets of PGB. On or about October 20, 2004, Chase duly filed Uniform Commercial Code Financing Statement 1 (#22632197) to perfect its security interest in PGB's assets. Moreover, a UCC search completed on October 30, 2006 has confirmed that there is no other financing statement filed against PGB's assets.

6.          In connection with the Loan, Kupperman provided Chase the certificate of formation and operating agreement for PGB. The certificate of formation provides that PGB is a New Jersey limited liability company and the operating agreement provides that Kupperman,

2

Browne and Krelman are the members and officers of PGB. A copy of the certificate of formation and operating agreement are attached hereto as Exhibit C.

7.     PGB's books and records establish that it imports goods from overseas into New Jersey and then distributes those goods to customers throughout the United States.

8.     The Loan is guarantied by defendants E. Ross Browne ("Browne") and Paulette Krelman ("Krelman"), jointly and severally, each of whom executed and delivered to Chase an absolute and unconditional guaranty (each a "Guaranty", and collectively, the "Guaranties") on or about October 8, 2004. Browne's and Krelman's signatures on the Guarantees are notarized. The Guaranties are attached hereto as Exhibit D.

9.     The Guarantees are guaranties of payment and, accordingly, both Browne and Krelman are obligated for the full amount due to Chase from PGB.

10.     The Guarantees provide, *inter alia,* that Browne and Krelman absolutely and unconditionally guaranty the payment of all liabilities of PGB to Chase, and waive the right to assert defenses, set-offs and counterclaims in any litigation relating to the Guaranty or the Loan. Each Guaranty contains a merger clause providing that it sets forth the entire understanding of the parties, and Browne and Krelman each acknowledge that no other agreements, conditions, promises, understandings, representations or warranties exist in regard to the Guaranties except as set forth therein. Each Guaranty provides that the guarantor shall, with or without notice or demand, reimburse Chase for all expenses incurred in connection with any liabilities of PGB or the collection thereof, including reasonable attorneys' fees. Finally, each Guaranty provides that it may only be modified in writing signed by an authorized officer of Chase.

11.     In connection with the Loan and in accordance with the Guaranties, Browne and Krelman also provided annual personal financial statements to Chase. Browne and Krelman signed these personal financial statements in order to attest to their accuracy.

12.     In connection with the Loan and in accordance with the Loan Documents, PGB provided annual financial statements to Chase as follows: (i) an Independent Auditors' Report from Amper, Politziner & Mattia P.A., dated December 17, 2003; (ii) an Accountants' Review Report from Sy Helderman & Company, dated January 6, 2005; and (iii) an Accountants' Review Report from Sy Helderman & Company, dated December 21, 2005.

13.     PGB also provided interim financial statements, including a balance sheet for PGB, dated June 30, 2006. This June 30, 2006 balance sheet showed total assets of $12,387,967.00, which included accounts receivable of $9,621,813.00.

14.     PGB also provided monthly borrowing base certificates evidencing PGB's outstanding accounts receivable. Kupperman signed these monthly borrowing base certificates in order to attest to their accuracy. Over the past year, these borrowing base certificates showed an average amount of accounts receivable of between $8 million and $9 million.

15.     On or about September 15, 2006, PGB provided a borrowing base certificate, signed by Kupperman, representing that as of August 31, 2006, PGB had accounts receivable of not less than $8,067,945.59, of which $4,681,975.53 were current and $3,207,331.24 were between 31 and 60 days past due.

16.     Based upon the representations set forth in the documents provided to Chase, including the annual and interim financial statements and the borrowing base certificates, Chase made periodic advances on the Loan. A schedule of the advances is attached hereto as Exhibit E.

**B.**          **The Fraud**

17.     At or about the time that plaintiff Merrill Lynch Business Financial Services Inc. ("MLBFS") filed its Complaint and this Court issued an Order to Show Cause (the "OTSC"), Chase first learned of the existence of PITTRA G.B. International Inc. ("PITTRA") and the alleged fraud perpetrated by Kupperman, Browne and Krelman against MLBFS and other creditors of PITTRA.

18.     Immediately upon learning of the alleged fraud, Chase sent auditors (the "Auditors") to PGB's offices to verify the financial information that Kupperman, Browne and Krelman had been providing to Chase.  The Court explicitly authorized this access and directed PGB, Kupperman, Browne and Krelman to cooperate with Chase in this verification.

19.     A preliminary examination of PGB's books and records revealed that instead of having more than $8,000,000.00 of accounts receivable, as PBG and Kupperman had represented in the borrowing base certificate for the month ended August 31, 2006, PGB actually had less than $1,700,000.00 in current accounts receivable.

20.     Chase subsequently learned that all of the monthly borrowing base certificates and financial statements provided by PGB are likely materially inaccurate and fraudulent.  Among other things, the Auditors have advised that it appears that PGB's actual account receivables are likely no greater than $1,678,896.80, at least in part because PGB substantially overstated receivables by reporting the full sale amount on commission transactions, rather than reporting only PGB's commissions.  The Auditors have also advised of various other irregularities and discrepancies regarding PGB's financial condition and the representations that had been made to Chase regarding such financial condition.

21.    The Independent Auditors' Report for PGB from Amper, Politziner & Mattia P.A. to PGB's Board of Directors, dated December 17, 2003, which was provided to Chase, contains the exact same numbers for the year 2003 as an Independent Auditors' Report for PITTRA from Amper, Politziner & Mattia P.A. to PITTRA's Board of Directors, dated December 22, 2004, which was provided to MLBFS, and is likely fraudulent.

22.    Moreover, PGB and Kupperman have interfered with Chase's investigation of PGB. The Auditors have advised that, among other things: (i) despite their requests, they were provided only with payable vendor names, and not with contact information (i.e., address, phone, etc.); (ii) they were provided with few, if any, original invoices, bills of lading, or purchase orders which they had requested to verify receivables; and (iii) PGB provided documents for only approximately one-quarter of the transactions for which vendor invoices and backup information had been requested and most of the sample invoices provided were copies, rather than originals. In addition, the Auditors have advised that their task was substantially impeded by PGB and its attorneys, who refused to give the Auditors unfettered access to PGB's books and records. Instead, the practice of PGB, Kupperman and PGB's attorneys was to caucus privately after each request and then to provide only those documents which PGB and Kupperman chose to selectively produce.

23.    In these and other ways, PGB defaulted on its obligations to Chase under the Note and Security Agreement.

24.    After learning of the fraud and the fact that Chase was under-secured by more than one million dollars, by letter dated October 16, 2006 (the "Default Notice"), Chase notified PGB, Browne and Krelman that: (i) PGB had defaulted on its obligations to Chase under

the Loan Documents; and (ii) the Loan is accelerated.  A copy of the Default Letter is attached hereto as Exhibit F.

25.    As a result, PGB, Browne and Krelman are obliged to pay immediately, among other things, the principal amount due and owing on the Loan, interest at the default rate of Chase's prime rate plus 3.0%, and reasonable costs and expenses of every kind incurred, including reasonable legal fees and costs.

26.    As of November 27, 2006, the total amount due and owing on the Loan totaled $2,691,664.75, plus the costs and expenses of collection.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 27, 2006

_____
WAYNE E. OLSON

HF 3448351v.2 #04055/0002

7

# EXHIBIT  A

 **CHASE** 

Advised Line of Credit Note

$3,000,000.00
Date: March 16, 2006

**Promise to Pay.** On or before March 31, 2007, for value received, PGB International LLC (the "Borrower") promises to pay to JPMorgan Chase Bank, N.A., whose address is 695 Route 46, 1st Floor, Fairfield, NJ 07004 (the "Bank") or order, in lawful money of the United States of America, the sum of Three Million and 00/100 Dollars ($3,000,000.00) or such lesser sum as is indicated on Bank records, plus interest as provided below.

**Definitions.** As used in this Note, the following terms have the following respective meanings:

"**Adjusted LIBOR Rate**" means, with respect to a LIBOR Rate Advance for the relevant Interest Period, the sum of (i) the Applicable Margin plus (ii) the quotient of (a) the LIBOR Rate applicable to such Interest Period, divided by (b) one minus the Reserve Requirement (expressed as a decimal) applicable to such Interest Period.

"**Advance**" means a LIBOR Rate Advance or a Prime Rate Advance and "**Advances**" means all LIBOR Rate Advances and all Prime Rate Advances under this Note.

"**Applicable Margin**" means with respect to any Prime Rate Advance, 0.00% per annum and with respect to any LIBOR Rate Advance, 2.75% per annum.

"**Business Day**" means (i) with respect to any borrowing, payment or rate selection of LIBOR Rate Advances, a day (other than a Saturday or Sunday) on which banks generally are open in New Jersey and/or New York for the conduct of substantially all of their commercial lending activities and on which dealings in United States dollars are carried on in the London interbank market and (ii) for all other purposes, a day other than a Saturday, Sunday or any other day on which national banking associations are authorized to be closed.

"**Interest Period**" means, with respect to a LIBOR Rate Advance, a period of one (1), two (2), three (3) or six (6) month(s) commencing on a Business Day selected by the Borrower pursuant to this Note. Such Interest Period shall end on the day which corresponds numerically to such date one (1), two (2), three (3) or six (6) month(s) thereafter, as applicable, *provided, however,* that if there is no such numerically corresponding day in such first, second, third or sixth succeeding month(s), as applicable, such Interest Period shall end on the last Business Day of such first, second, third or sixth succeeding month(s), as applicable. If an Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next succeeding Business Day, *provided, however,* that if said next succeeding Business Day falls in a new calendar month, such Interest Period shall end on the immediately preceding Business Day.

"**LIBOR Rate**" means with respect to any LIBOR Rate Advance for any Interest Period, the interest rate determined by the Bank by reference to Page 3756 of the Moneyline Telerate Service ("MTS") (or on any successor or substitute page of the MTS, or any successor to or substitute for the MTS, providing rate quotations comparable to those currently provided on Page 3756 of the MTS, as determined by the Bank from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) to be the rate at approximately 11:00 a.m. London time, two Business Days prior to the commencement of the Interest Period for the offering by the Bank's London office, of dollar deposits in an amount comparable to such LIBOR Rate Advance with a maturity equal to such Interest Period. If no LIBOR Rate is available to the Bank, the applicable LIBOR Rate for the relevant Interest Period shall instead be the rate determined by the Bank to be the rate at which the Bank offers to place deposits in U.S. dollars with first-class banks in the London interbank market at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period, in the approximate amount of the principal amount outstanding on such date and having a maturity equal to such Interest Period.

"**LIBOR Rate Advance**" means any borrowing under this Note when and to the extent that its interest rate is determined by reference to the Adjusted LIBOR Rate.

"**Prime Rate**" means the rate of interest per annum announced from time to time by the Bank as its prime rate. The Prime Rate is a variable rate and each change in the Prime Rate is effective from and including the date the change is announced as being effective. THE PRIME RATE IS A REFERENCE RATE AND MAY NOT BE THE BANK'S LOWEST RATE.

"**Prime Rate Advance**" means any Advance under this Note when and to the extent that its interest rate is determined by reference to the Prime Rate.

"**Principal Payment Date**" is defined in the paragraph entitled "Principal Payments" below.

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor thereto or other regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

"**Reserve Requirement**" means, with respect to an Interest Period, the maximum aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed under Regulation D.

**Interest Rates.** The Advance(s) evidenced by this Note may be drawn down and remain outstanding as up to five (5) LIBOR Rate Advances and/or a Prime Rate Advance. The Borrower shall pay interest to the Bank on the outstanding and unpaid principal amount of each Prime Rate Advance at the Prime Rate plus the Applicable Margin and each LIBOR Rate Advance at the Adjusted LIBOR Rate. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. In no event shall the interest rate applicable to any Advance exceed the maximum rate allowed by law. Any interest payment which would for any reason be deemed unlawful under applicable law shall be applied to principal.

**Bank Records.** The Bank shall, in the ordinary course of business, make notations in its records of the date, amount, interest rate and Interest Period of each Advance hereunder, the amount of each payment on the Advances, and other information. Such records shall, in the absence of manifest error, be conclusive as to the outstanding principal balance of and interest rate or rates applicable to this Note.

**Notice and Manner of Electing Interest Rates on Advances.** The Borrower shall give the Bank written notice (effective upon receipt) of the Borrower's intent to draw down an Advance under this Note no later than 2:00 p.m. Eastern time, on the date of disbursement, if the full amount of the drawn Advance is to be disbursed as a Prime Rate Advance and no later than 11:00 a.m. Eastern time three (3) Business Days before disbursement, if any part of such Advance is to be disbursed as a LIBOR Rate Advance. The Borrower's notice must specify: (a) the disbursement date, (b) the amount of each Advance, (c) the type of each Advance (Prime Rate Advance or LIBOR Rate Advance), and (d) for each LIBOR Rate Advance, the duration of the applicable Interest Period; *provided, however,* that the Borrower may not elect an Interest Period ending after the maturity date of this Note. Each LIBOR Rate Advance shall be in a minimum amount of One Hundred Thousand and 00/100 Dollars ($100,000.00). All notices under this paragraph are irrevocable. By the Bank's close of business on the disbursement date and upon fulfillment of the conditions set forth herein and in any other of the Related Documents, the Bank shall disburse the requested Advances in immediately available funds by crediting the amount of such Advances to the Borrower's account with the Bank.

**Conversion and Renewals.** The Borrower may elect from time to time to convert one type of Advance into another or to renew any Advance by giving the Bank written notice no later than 2:00 p.m. Eastern time, on the date of the conversion into or renewal of a Prime Rate Advance and 11:00 a.m. Eastern time three (3) Business Days before conversion into or renewal of a LIBOR Rate Advance, specifying: (a) the renewal or conversion date, (b) the amount of the Advance to be converted or renewed, (c) in the case of conversion, the type of Advance to be converted into (Prime Rate Advance or LIBOR Rate Advance), and (d) in the case of renewals of or conversion into a LIBOR Rate Advance, the applicable Interest Period, provided that (i) the minimum principal amount of each LIBOR Rate Advance outstanding after a renewal or conversion shall be One Hundred Thousand and 00/100 Dollars ($100,000.00); (ii) a LIBOR Rate Advance can only be converted on the last day of the Interest Period for the Advance; and (iii) the Borrower may not elect an Interest Period ending after the maturity date of this Note. All notices given under this paragraph are irrevocable. If the Borrower fails to give the Bank the notice specified above for the renewal or conversion of a LIBOR Rate Advance by 11:00 a.m. Eastern time three (3) Business Days before the end of the Interest Period for that Advance, the Advance shall automatically be converted to a Prime Rate Advance on the last day of the Interest Period for the Advance.

**Interest Payments.** Interest on the Advances shall be paid as follows:

A.    For each Prime Rate Advance, on the ***LIBOR Payment Day[Sequence holder NU[COUNTER]]*** day of each month beginning with the first month following disbursement of the Advance or following conversion of an Advance into a Prime Rate Advance, and at the maturity or conversion of the Advance into a LIBOR Rate Advance;

B.    For each LIBOR Rate Advance, on the last day of the Interest Period for the Advance and, if the Interest Period is longer than three months, at three-month intervals beginning with the day three months from the date the Advance is disbursed.

**Principal Payments.** All outstanding principal and interest is due and payable in full on March 31, 2007, which is defined herein as the "Principal Payment Date".

**Default Rate of Interest.** After a default has occurred under this Note, whether or not the Bank elects to accelerate the maturity of this Note because of such default, all Advances outstanding under this Note, including all LIBOR Rate Advances, shall bear interest at a per annum rate equal to the Prime Rate, plus the Applicable Margin for a Prime Rate Advance, plus three percent (3.00%) from the

date the Bank elects to impose such rate. Imposition of this rate shall not affect any limitations contained in this Note on the Borrower's right to repay principal on any LIBOR Rate Advance before the expiration of the Interest Period for that Advance.

**Prepayment.** The Borrower may prepay all or any part of any Prime Rate Advance at any time without premium or penalty. The Borrower may prepay any LIBOR Rate Advance only at the end of an Interest Period.

**Funding Loss Indemnification.** Upon the Bank's request, the Borrower shall pay the Bank amounts sufficient (in the Bank's reasonable opinion) to compensate it for any loss, cost, or expense incurred as a result of:

A.      Any payment of a LIBOR Rate Advance on a date other than the last day of the Interest Period for the Advance, including, without limitation, acceleration of the Advances by the Bank pursuant to this Note or the Related Documents; or

B.      Any failure by the Borrower to borrow or renew a LIBOR Rate Advance on the date specified in the relevant notice from the Borrower to the Bank.

**Additional Costs.** If any applicable domestic or foreign law, treaty, government rule or regulation now or later in effect (whether or not it now applies to the Bank) or the interpretation or administration thereof by a governmental authority charged with such interpretation or administration, or compliance by the Bank with any guideline, request or directive of such an authority (whether or not having the force of law), shall (a) affect the basis of taxation of payments to the Bank of any amounts payable by the Borrower under this Note or the Related Documents (other than taxes imposed on the overall net income of the Bank by the jurisdiction or by any political subdivision or taxing authority of the jurisdiction in which the Bank has its principal office), or (b) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by the Bank, or (c) impose any other condition with respect to this Note or the Related Documents and the result of any of the foregoing is to increase the cost to the Bank of maintaining any LIBOR Rate Advance or to reduce the amount of any sum receivable by the Bank on such an Advance, or (d) affect the amount of capital required or expected to be maintained by the Bank (or any corporation controlling the Bank) and the Bank determines that the amount of such capital is increased by or based upon the existence of the Bank's obligations under this Note or the Related Documents and the increase has the effect of reducing the rate of return on the Bank's (or its controlling corporation's) capital as a consequence of the obligations under this Note or the Related Documents to a level below that which the Bank (or its controlling corporation) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy) by an amount deemed by the Bank to be material, then the Borrower shall pay to the Bank, from time to time, upon request by the Bank, additional amounts sufficient to compensate the Bank for the increased cost or reduced sum receivable. Whenever the Bank shall learn of circumstances described in this section which are likely to result in additional costs to the Borrower, the Bank shall give prompt written notice to the Borrower of the basis for and the estimated amount of any such anticipated additional costs. A statement as to the amount of the increased cost or reduced sum receivable, prepared in good faith and in reasonable detail by the Bank and submitted by the Bank to the Borrower, shall be conclusive and binding for all purposes absent manifest error in computation.

**Illegality.** If any applicable domestic or foreign law, treaty, rule or regulation now or later in effect (whether or not it now applies to the Bank) or the interpretation or administration thereof by a governmental authority charged with such interpretation or administration, or compliance by the Bank with any guideline, request or directive of such an authority (whether or not having the force of law), shall make it unlawful or impossible for the Bank to maintain or fund the LIBOR Rate Advances, then, upon notice to the Borrower by the Bank, the outstanding principal amount of the LIBOR Rate Advances, together with accrued interest and any other amounts payable to the Bank under this Note or the Related Documents on account of the LIBOR Rate Advances shall be repaid (a) immediately upon the Bank's demand if such change or compliance with such requests, in the Bank's judgment, requires immediate repayment, or (b) at the expiration of the last Interest Period to expire before the effective date of any such change or request provided, however, that subject to the terms and conditions of this Note and the Related Documents the Borrower shall be entitled to simultaneously replace the entire outstanding balance of any LIBOR Rate Advance repaid in accordance with this section with a Prime Rate Advance in the same amount.

**Inability to Determine Interest Rate.** If the Bank determines that (a) quotations of interest rates for the relevant deposits referred to in the definition of Adjusted LIBOR Rate are not being provided in the relevant amounts or for the relevant maturities for purposes of determining the interest rate on a LIBOR Rate Advance as provided in this Note, or (b) the relevant interest rates referred to in the definition of Adjusted LIBOR Rate do not accurately cover the cost to the Bank of making or maintaining LIBOR Rate Advances, then the Bank shall forthwith give notice of such circumstances to the Borrower, whereupon (i) the obligation of the Bank to make LIBOR Rate Advances shall be suspended until the Bank notifies the Borrower that the circumstances giving rise to the suspension no longer exists, and (ii) the Borrower shall repay in full the then outstanding principal amount of each LIBOR Rate Advance, together with accrued interest, on the last day of the then current Interest Period applicable to the Advance, provided, however, that, subject to the terms and conditions of this Note and the Related Documents, the Borrower shall be entitled to simultaneously replace the entire outstanding balance of any LIBOR Rate Advance repaid in accordance with this section with a Prime Rate Advance in the same amount.

3

**Obligations Due on Non-Business Day.** Whenever any payment under this Note becomes due and payable on a day that is not a Business Day, if no default then exists under this Note, the maturity of the payment shall be extended to the next succeeding Business Day, except, in the case of a LIBOR Rate Advance, if the result of the extension would be to extend the payment into another calendar month, the payment must be made on the immediately preceding Business Day.

**Matters Regarding Payment.** The Borrower will pay the Bank at the Bank's address shown above or at such other place as the Bank may designate. Payments shall be allocated among principal, interest and fees at the discretion of the Bank unless otherwise agreed or required by applicable law. Acceptance by the Bank of any payment which is less than the payment due at the time shall not constitute a waiver of the Bank's right to receive payment in full at that time or any other time.

**Authorization for Direct Payments (ACH Debits).** To effectuate any payment due under this Note, the Borrower hereby authorizes the Bank to initiate debit entries to Account Number 957-082045 at the Bank and to debit the same to such account. This authorization to initiate debit entries shall remain in full force and effect until the Bank has received written notification of its termination in such time and in such manner as to afford the Bank a reasonable opportunity to act on it. The Borrower represents that the Borrower is and will be the owner of all funds in such account. The Borrower acknowledges (1) that such debit entries may cause an overdraft of such account which may result in the Bank's refusal to honor items drawn on such account until adequate deposits are made to such account; (2) that the Bank is under no duty or obligation to initiate any debit entry for any purpose; and (3) that if a debit is not made because the above-referenced account does not have a sufficient available balance, or otherwise, the payment may be late or past due.

**Business Loan.** The Borrower acknowledges and agrees that this Note evidences a loan for a business, commercial, agricultural or similar commercial enterprise purpose, and that all advances made under this Note shall not be used for any personal, family or household purpose.

**Uncommitted Line of Credit.** The Bank has approved an uncommitted line of credit to the Borrower in a principal amount not to exceed the face amount of this Note. The execution and delivery of this Note and the acceptance by the Bank of this Note shall not be deemed or construed to create any contractual commitment to lend by the Bank to the Borrower. The line of credit is in the form of advances made from time to time by the Bank in its sole and absolute discretion to the Borrower. This Note evidences the Borrower's obligation to repay those advances. The aggregate outstanding principal amount of debt evidenced by this Note is the amount so reflected from time to time in the records of the Bank.

**Liabilities.** The term "Liabilities" in this Note means all debts, obligations, and liabilities of every kind and character of the Borrower, whether individual, joint and several, contingent or otherwise, now or hereafter existing in favor of the Bank, including without limitation, all liabilities, interest, costs and fees, arising under or from any note, open account, overdraft, credit card, lease, letter of credit application, endorsement, surety agreement, guaranty, Rate Management Transaction, acceptance, foreign exchange contract or depository service contract, whether payable to the Bank or to a third party and subsequently acquired by the Bank, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing. The term "Rate Management Transaction" in this Note means any transaction (including an agreement with respect thereto) that is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option, derivative transaction or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

**Related Documents.** The term "Related Documents" in this Note means this Note, all loan agreements, credit agreements, reimbursement agreements, security agreements, mortgages, deeds of trust, pledge agreements, assignments, guaranties, and any other instrument or document executed in connection with this Note or in connection with any of the Liabilities.

**Security.** The term "Collateral" in this Note means all real or personal property described in all security agreements, pledge agreements, mortgages, deeds of trust, assignments, or other instruments now or hereafter executed in connection with this Note or in connection with any of the Liabilities. If applicable, the Collateral secures the payment of this Note and the Liabilities.

**Bank's Right of Setoff.** In addition to the Collateral, if any, the Borrower grants to the Bank a security interest in the Accounts, and the Bank is authorized to setoff and apply, all Accounts, Securities and Other Property, and Bank Debt against any and all Liabilities of the Borrower. This right of setoff may be exercised at any time and from time to time, and without prior notice to the Borrower. This security interest in the Accounts and right of setoff may be enforced or exercised by the Bank regardless of whether or not the Bank has made any demand under this paragraph or whether the Liabilities are contingent, matured, or unmatured. Any delay, neglect or conduct by the Bank in exercising its rights under this paragraph will not be a waiver of the right to exercise this right of setoff or enforce this security interest in the Accounts. The rights of the Bank under this paragraph are in addition to other rights the Bank may have in the Related Documents or by law. In this paragraph: (a) the term "Accounts" means any and all accounts and deposits of the

4



Borrower (whether general, special, time, demand, provisional or final) at any time held by the Bank (including all Accounts held jointly with another, but excluding any IRA or Keogh Account, or any trust Account in which a security interest would be prohibited by law); (b) the term "Securities and Other Property" means any and all financial assets, securities entitlements, securities accounts, investment property and other personal property of the Borrower in the custody, possession or control of the Bank, JPMorgan Chase & Co. and their respective subsidiaries and affiliates (other than property held by the Bank in a fiduciary capacity); and (c) the term "Bank Debt" means all indebtedness at any time owing by the Bank, to or for the credit or account of the Borrower and any claim of the Borrower (whether individual, joint and several or otherwise) against the Bank now or hereafter existing.

**Representations by Borrower.** Each Borrower represents and warrants that each of the following is and will remain true and correct until the later of maturity or the date on which all Liabilities evidenced by this Note are paid in full: (a) the execution and delivery of this Note and the performance of the obligations it imposes do not violate any law, conflict with any agreement by which it is bound, or require the consent or approval of any governmental authority or other third party; (b) this Note is a valid and binding agreement of the Borrower, enforceable according to its terms; (c) all balance sheets, profit and loss statements, other financial statements and applications for credit furnished to the Bank in connection with the Liabilities are accurate and fairly reflect the financial condition of the organizations and persons to which they apply on their effective dates, including contingent liabilities of every type, which financial condition has not materially and adversely changed since those dates; and, if the Borrower is not a natural person (i) it is duly organized, and validly existing under the laws of the state where it is organized and is in good standing in each state where it is doing business; and (ii) the execution and delivery of this Note and the performance of the obligations it imposes (A) are within its powers and have been duly authorized by all necessary action of its governing body, and (B) do not contravene the terms of its articles of incorporation or organization, its by-laws, regulations or any partnership, operating or other agreement governing its organization and affairs.

**Events of Default/Acceleration.** If any of the following events occurs this Note shall become due immediately, without notice, at the Bank's option:

1. The Borrower, or any guarantor of any of the Liabilities (the "Guarantor"), fails to pay when due any amount payable under this Note, under any of the Liabilities, or under any agreement or instrument evidencing debt to any creditor.
2. The Borrower or any Guarantor (a) fails to observe or perform or otherwise violates any other term, covenant, condition, or agreement of any of the Related Documents; (b) makes any materially incorrect or misleading representation, warranty, or certificate to the Bank; (c) makes any materially incorrect or misleading representation in any financial statement or other information delivered to the Bank; or (d) defaults under the terms of any agreement or instrument relating to any debt for borrowed money (other than the debt evidenced by this Note) and the effect of such default will allow the creditor to declare the debt due before its maturity.
3. In the event (a) there is a default under the terms of any Related Document, (b) any guaranty of the loan evidenced by this Note is terminated or becomes unenforceable in whole or in part, (c) any Guarantor fails to promptly perform under its guaranty, or (d) the Borrower fails to comply with, or pay, or perform under any agreement, now or hereafter in effect, between the Borrower and JPMorgan Chase & Co., or any of its subsidiaries or affiliates or their successors.
4. There is any loss, theft, damage, or destruction of any Collateral not covered by insurance.
5. A "reportable event" (as defined in the Employee Retirement Income Security Act of 1974 as amended) occurs that would permit the Pension Benefit Guaranty Corporation to terminate any employee benefit plan of the Borrower or any Guarantor or any affiliate of the Borrower or any Guarantor.
6. The Borrower or any Guarantor becomes insolvent or unable to pay its debts as they become due.
7. The Borrower or any Guarantor (a) makes an assignment for the benefit of creditors; (b) consents to the appointment of a custodian, receiver, or trustee for itself or for a substantial part of its assets; or (c) commences any proceeding under any bankruptcy, reorganization, liquidation, insolvency or similar laws of any jurisdiction.
8. A custodian, receiver, or trustee is appointed for the Borrower or any Guarantor or for a substantial part of its assets.
9. Proceedings are commenced against the Borrower or any Guarantor under any bankruptcy, reorganization, liquidation, or similar laws of any jurisdiction, and they remain undismissed for thirty (30) days after commencement; or the Borrower or the Guarantor consents to the commencement of those proceedings.
10. Any judgment is entered against the Borrower or any Guarantor, or any attachment, levy, or garnishment is issued against any property of the Borrower or any Guarantor.
11. The Borrower or any Guarantor dies, or a guardian or conservator is appointed for the Borrower or any Guarantor or all or any portion of the Borrower's assets, any Guarantor's assets, or the Collateral.
12. The Borrower or any Guarantor, without the Bank's written consent (a) is dissolved, (b) merges or consolidates with any third party, (c) leases, sells or otherwise conveys a material part of its assets or business outside the ordinary course of its business, (d) leases, purchases, or otherwise acquires a material part of the assets of any other business entity, except in the ordinary course of its business, or (e) agrees to do any of the foregoing (notwithstanding the foregoing, any subsidiary may merge or consolidate with any other subsidiary, or with the Borrower, so long as the Borrower is the survivor).
13. Any material adverse change occurs in the business, assets, affairs, prospects or financial condition of the Borrower or any Guarantor or any subsidiary of the Borrower.

**Remedies.** If this Note is not paid at maturity, whether by acceleration or otherwise, the Bank shall have all of the rights and remedies provided by any law or agreement. The Bank is authorized to cause all or any part of the Collateral to be transferred to or registered in its name or in the name of any other person or business entity, with or without designating the capacity of that nominee. Without limiting any other available remedy, the Borrower is liable for any deficiency remaining after disposition of any Collateral. The Borrower is liable to the Bank for all reasonable costs and expenses of every kind incurred (or charged by internal allocation) in connection with the negotiation, preparation, execution, filing, recording, modification, supplementing and waiver of this Note or the Related Documents and the making, servicing and collection of this Note or the Related Documents and any other amounts owed under this Note or the Related Documents, including without limitation reasonable attorneys' fees and court costs. These costs and expenses include without limitation any costs or expenses incurred by the Bank in any bankruptcy, reorganization, insolvency or other similar proceeding.

**Waivers.** Any party liable on this Note waives (a) to the extent permitted by law, all rights and benefits under any laws or statutes regarding sureties, as may be amended; (b) any right to receive notice of the following matters before the Bank enforces any of its rights: (i) the Bank's acceptance of this Note, (ii) any credit that the Bank extends to the Borrower, (iii) the Borrower's default, (iv) any demand, diligence, presentment, dishonor and protest, or (v) any action that the Bank takes regarding the Borrower, anyone else, any Collateral, or any of the Liabilities, that it might be entitled to by law or under any other agreement; (c) any right to require the Bank to proceed against the Borrower, any other obligor or guarantor of the Liabilities, or any Collateral, or pursue any remedy in the Bank's power to pursue; (d) any defense based on any claim that any endorser or other parties' obligations exceed or are more burdensome than those of the Borrower; (e) the benefit of any statute of limitations affecting liability of any endorser or other party liable hereunder or the enforcement hereof; (f) any defense arising by reason of any disability or other defense of the Borrower or by reason of the cessation from any cause whatsoever (other than payment in full) of the obligation of the Borrower for the Liabilities; and (g) any defense based on or arising out of any defense that the Borrower may have to the payment or performance of the Liabilities or any portion thereof. Any party liable on this Note consents to any extension or postponement of time of its payment without limit as to the number or period, to any substitution, exchange or release of all or any part of the Collateral, to the addition of any other party, and to the release or discharge of, or suspension of any rights and remedies against, any person who may be liable for the payment of this Note. The Bank may waive or delay enforcing any of its rights without losing them. Any waiver affects only the specific terms and time period stated in the waiver. No modification or waiver of any provision of this Note is effective unless it is in writing and signed by the party against whom it is being enforced.

**Cooperation.** The Borrower agrees to fully cooperate with the Bank and not to delay, impede or otherwise interfere with the efforts of the Bank to secure payment from the assets which secure the Liabilities including actions, proceedings, motions, orders, agreements or other matters relating to relief from automatic stay, abandonment of property, use of cash collateral and sale of the Bank's collateral free and clear of all liens.

**Rights of Subrogation.** Any party liable on this Note waives and agrees not to enforce any rights of subrogation, contribution or indemnification that it may have against the Borrower, any person liable on the Liabilities, or the Collateral, until the Borrower and such party liable on this Note have fully performed all their obligations to the Bank, even if those obligations are not covered by this Note.

**Reinstatement.** The Borrower agrees that to the extent any payment or transfer is received by the Bank in connection with the Liabilities evidenced by this Note, and all or any part of the payment or transfer is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be transferred or repaid by the Bank or transferred or paid over to a trustee, receiver or any other entity, whether under any bankruptcy act or otherwise (any of those payments or transfers is hereinafter referred to as a "Preferential Payment"), then this Note shall continue to be effective or shall be reinstated, as the case may be, even if all those Liabilities have been paid in full and whether or not the Bank is in possession of this Note, or whether the Note has been marked paid, released or canceled, or returned to the Borrower and, to the extent of the payment, repayment or other transfer by the Bank, the Liabilities or part intended to be satisfied by the Preferential Payment shall be revived and continued in full force and effect as if the Preferential Payment had not been made.

**Governing Law and Venue.** This Note shall be governed by and construed in accordance with the laws of the State of New Jersey (without giving effect to its laws of conflicts). The Borrower agrees that any legal action or proceeding with respect to any of its obligations under this Note may be brought by the Bank in any state or federal court located in the State of New Jersey, as the Bank in its sole discretion may elect. By the execution and delivery of this Note, the Borrower submits to and accepts, for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of those courts. The Borrower waives any claim that the State of New Jersey is not a convenient forum or the proper venue for any such suit, action or proceeding.

**Renewal and Extension.** This Note is given in replacement, renewal and/or extension of, but not extinguishing the indebtedness evidenced by, that Promissory Note dated March 16, 2005 executed by the Borrower in the original principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00), including previous renewals or modifications thereof, if any (the "Prior Note"), and is not a novation thereof. All interest evidenced by the Prior Note shall continue to be due and payable until paid. If



applicable, all Collateral continues to secure the payment of this Note and the Liabilities. The provisions of this Note are effective on the date that this Note has been executed by all of the signers and delivered to the Bank.

**Miscellaneous.** Each Borrower is liable jointly and severally for the obligations represented by this Note, the term "Borrower" means any one or more of them, and the receipt of value by any one of them constitutes the receipt of value by the others. This Note binds the Borrower and its successors, and benefits the Bank, its successors and assigns. Any reference to the Bank includes any holder of this Note. Section headings are for convenience of reference only and do not affect the interpretation of this Note. Any notices and demands under or related to this document shall be in writing and delivered to the intended party at its address stated herein, and if to the Bank, at its main office if no other address of the Bank is specified herein, by one of the following means: (a) by hand, (b) by a nationally recognized overnight courier service, or (c) by certified mail, postage prepaid, with return receipt requested. Notice shall be deemed given: (a) upon receipt if delivered by hand, (b) on the Delivery Day after the day of deposit with a nationally recognized courier service, or (c) on the third Delivery Day after the notice is deposited in the mail. "Delivery Day" means a day other than a Saturday, a Sunday, or any other day on which national banking associations are authorized to be closed. Any party may change its address for purposes of the receipt of notices and demands by giving notice of such change in the manner provided in this provision. This Note and any Related Documents embody the entire agreement between the Borrower and the Bank regarding the terms of the loan evidenced by this Note and supercede all oral statements and prior writings relating to that loan. If any provision of this Note cannot be enforced, the remaining portions of this Note shall continue in effect. The Borrower agrees that the Bank may provide any information or knowledge the Bank may have about the Borrower or about any matter relating to this Note or the Related Documents to JPMorgan Chase & Co., or any of its subsidiaries or affiliates or their successors, or to any one or more purchasers or potential purchasers of this Note or the Related Documents. The Borrower agrees that the Bank may at any time sell, assign or transfer one or more interests or participations in all or any part of its rights and obligations in this Note to one or more purchasers whether or not related to the Bank.

**Government Regulation.** Borrower shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Bank from making any advance or extension of credit to Borrower or from otherwise conducting business with Borrower, or (b) fail to provide documentary and other evidence of Borrower's identity as may be requested by Bank at any time to enable Bank to verify Borrower's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

**USA PATRIOT ACT NOTIFICATION.** The following notification is provided to Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product. What this means for Borrower: When Borrower opens an account, if Borrower is an individual Bank will ask for Borrower's name, taxpayer identification number, residential address, date of birth, and other information that will allow Bank to identify Borrower, and if Borrower is not an individual Bank will ask for Borrower's name, taxpayer identification number, business address, and other information that will allow Bank to identify Borrower. Bank may also ask, if Borrower is an individual to see Borrower's driver's license or other identifying documents, and if Borrower is not an individual to see Borrower's legal organizational documents or other identifying documents.

THIS SPACE HAS INTENTIONALLY BEEN LEFT BLANK

**WAIVER OF SPECIAL DAMAGES.** THE BORROWER WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT THE UNDERSIGNED MAY HAVE TO CLAIM OR RECOVER FROM THE BANK IN ANY LEGAL ACTION OR PROCEEDING ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

**JURY WAIVER.** THE BORROWER AND THE BANK (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) BETWEEN THE BORROWER AND THE BANK ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR THE OTHER RELATED DOCUMENTS. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE BANK TO PROVIDE THE FINANCING EVIDENCED BY THIS NOTE.

Address:  6 South Street
          Morristown, NJ 07960

Borrower:

PGB International LLC

By: _____

Arthur Kupperman                    Managing Member
Printed Name                        Title

Date Signed: _____ Maen 2c. 2004 _____

Anjali Soni NJ000002000051091

8

# EXHIBIT  B

# SECURITY AGREEMENT
### (General Purpose)

This Agreement, made this *6h* day of *October*, 2004 between JPMORGAN CHASE BANK (herein called the "Bank") and _____ PGB INTERNATIONAL LLC _____ (herein called the "Borrower"), (the "Agreement").

1.    DEFINITIONS OF TERMS USED HEREIN.    (a) "Borrower" includes all individuals executing this agreement as parties hereto and all members of a partnership when the Borrower is a partnership, each of whom shall be jointly and severally liable individually and as partners hereunder. (b) "Liability" or "Liabilities" includes all liabilities (primary, secondary, direct, contingent, sole, joint or several) due or to become due, or that may be hereafter contracted or acquired, of the Borrower (including the Borrower and any other person) to the Bank, including without limitation all liabilities arising under or from any note, loan or credit agreement, letter of credit, guaranty, draft, acceptance, interest rate or foreign exchange agreement or any other instrument or agreement of (or the responsibility of) the Borrower or any loan, advance or other extension of credit or financial accommodation to the Borrower by the Bank. (c) "Proceeds" includes whatever is received when Collateral is sold, exchanged, leased, licensed, collected or otherwise disposed of and includes all distributions on account thereof, rights and claims arising therefrom and the account arising when the right to payment is earned under a contract. (d) "Security Interest" means a security interest, lien or other interest in Collateral which secures payment of a liability or performance of an obligation. (e) "Collateral" means the property described in Section 2 hereof and the following described property of the Borrower:

All personal property and fixtures whether now or hereafter existing or now owned or hereafter acquired and wherever located, including without limitation all present and future accounts receivable and all other accounts of any kind, chattel paper, commercial tort claims, deposit accounts at any depositary, documents, inventory, equipment and all other goods of any kind, instruments, securities, security entitlements, securities accounts and all other investment property of any kind, letter-of-credit rights, money, cash and cash equivalents, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, rights to sue and recover for past infringement of patents, trademarks and copyrights, computer programs, computer software, engineering drawings, service marks, customer lists, goodwill, payment intangibles, software and all other general intangibles of any kind, all additions, accessions, replacements, repairs, additions or substitutions to and all computer programs embedded in any of the foregoing (including computer programming instructions), all supporting obligations of every nature for any of the foregoing, all licenses, permits, agreements of any kind or nature pertaining to the operation or possession or use or the authority to operate, possess or use (by any person or entity) any of the foregoing, all books, records, files, documents and recorded data of any kind or nature, including any writings, plans, specifications and schematics, together with all processes (including computer programming instructions) recording or otherwise related to any of the foregoing, all insurance claims or other claims (including tort claims) against third parties for loss, damage, or destruction of or wrongful conduct with respect to any of the foregoing and any and all proceeds of any of the foregoing.

All terms used herein which are also defined in the New York or any other applicable Uniform Commercial Code as in effect from time to time shall also have at least the meanings herein as therein defined.

2.    SECURITY INTEREST.    As security for the payment of all loans and other extensions of credit or other financial accommodations now or in the future made by the Bank to the Borrower and all other Liabilities, the Borrower hereby grants to the Bank a Security Interest in the above-described Collateral and all any Proceeds arising therefrom and all and any products of the Collateral.

The Borrower represents and warrants that it is the sole lawful owner of the Collateral, free and clear of any liens and encumbrances, and has the right and power to pledge, sell, assign and transfer

**JPMorgan Chase Bank**

absolute title thereto to the Bank and that no financing statement covering the Collateral, other than the Bank's, is on file in any public office.

To further secure the Liabilities, the Borrower hereby grants, pledges and assigns to the Bank a continuing lien, Security Interest and right of set-off in and to all money, securities and all other property of the Borrower, and the Proceeds thereof, now or hereafter actually or constructively held or received by or for the Bank, J.P. Morgan Securities Inc. or any other affiliate of the Bank for any purpose, including safekeeping, custody, pledge, transmission and collection, and in and to all of the Borrower's deposits (general and special) and credits with the Bank, J.P. Morgan Securities Inc. or any other affiliate of the Bank. The Borrower authorizes the Bank to deliver to others a copy of this Agreement as written notification of the Borrower's transfer of a Security Interest in the foregoing property. The Bank is hereby authorized at any time and from time to time, without notice, to apply all or part of such money, securities, property, proceeds, deposits or credits to any of the Liabilities in such amounts as the Bank may elect in its sole and absolute discretion, although the Liabilities may then be contingent or unmatured and whether or not the Collateral security may be deemed adequate.

3.    USE OF COLLATERAL.  Until default, the Borrower may use the Collateral in any lawful manner.  If the Collateral is or is about to become affixed to realty, the Borrower will, at the Bank's request, furnish the Bank a writing executed by the mortgagee of the realty whereby the mortgagee subordinates its rights and priorities to the Bank's Security Interest in the Collateral. If the Collateral is or may become subject to a landlord's lien, the Borrower will at the Bank request, furnish the Bank with a landlord's waiver satisfactory in form to the Bank.

4.    INSURANCE. The Borrower will have and maintain insurance on the Collateral until this Agreement is terminated against all expected risks to which it is exposed, including fire, theft and collision, and those which the Bank may designate, such insurance to be payable to the Bank and the Borrower as their interest may appear; all policies shall provide for thirty (30) days' written minimum cancellation notice to the Bank.  The Bank may act as attorney for the Borrower in obtaining, adjusting, settling and cancelling such insurance.

5.    DEFAULT.  Default shall exist hereunder: (1) if the Borrower shall fail to pay any amount of the Liabilities when due or if the Borrower shall fail to keep, observe or perform any provision of this Agreement or of any note, or other instrument or agreement between the Borrower and the Bank relating to any Liabilities or if any default or Event of Default specified or defined in any such note, instrument or agreement shall occur; or (2) if the Borrower shall or shall attempt to: (a) remove or allow removal of the Collateral from the county where the Borrower now resides or change the location of its chief executive office or principal place of business or the jurisdiction under which it is incorporated or otherwise organized; (b) sell, encumber or otherwise dispose of the Collateral or any interest therein or permit any lien or Security Interest (other than the Bank's) to exist thereon or therein, (c) conceal, hire out or let the Collateral, (d) misuse or abuse the Collateral, or (e) use or allow the use of the Collateral in connection with any undertaking prohibited by law; or (3) if bankruptcy or insolvency proceedings shall be instituted by or against the Borrower; or (4) if the Collateral shall be attached, levied upon, seized in any legal proceedings, or held by virtue of any lien or distress; or (5) if the Borrower shall make any assignment for the benefit of creditors; or (6) if the Borrower shall fail to pay promptly all taxes and assessments upon the Collateral or the use thereof; or (7) if the Borrower shall die; or (8) if the Bank with reasonable cause determines that its interest in the Collateral is in jeopardy; or (9) if the Borrower should fail to keep the Collateral suitably insured .  In the Event of Default or the breach of any undertaking of or conditions to be performed by the Borrower:  (1) all Liabilities shall become immediately due and payable; and (2) the Borrower agrees upon demand to deliver the Collateral to the Bank, or the Bank may, with or without legal process, and with or without previous notice or demand for performance, enter any premises wherein the Collateral may be, and take possession of the same, together with anything therein, and the Bank shall have the rights and remedies of a secured party after default under the Uniform Commercial Code and, in addition, may sell, lease, license, collect, redeem, setoff, offset, debit, charge or otherwise dispose of or liquidate into cash, publicly or privately, the Collateral and to apply the Collateral or the Proceeds thereof to repay the Liabilities in such amounts as it may in its sole discretion may select (regardless of whether any Liabilities are contingent, unliquidated or unmatured or whether the Bank has recourse to the Borrower or any other person, entity, collateral or assets).  The Bank may modify or disclaim any warranties or other representations or recourse in connection with any such disposition or liquidation. If the Collateral is sold at public sale, the Bank may

purchase the Collateral at such sale. The Bank, provided it has sent the statutory notice of default, may retain from the proceeds of such sale all reasonable costs incurred in the said taking and sale and also, all sums then owing by the Borrower, and any surplus of any such sale shall be paid to the Borrower.

6.    GENERAL AGREEMENTS. (a) The Borrower agrees to pay the costs of filing financing statements and of conducting searches in connection with this Agreement. (b) The Borrower agrees to allow the Bank through any of its officers or agents, at all reasonable times, to examine or inspect any of the Collateral and to examine, inspect and make extracts from the Borrower's books and records relating to the Collateral. (c) The Borrower will promptly pay when due all taxes and assessments upon the Collateral or for its use of operation or upon the proceeds thereof or upon this Agreement or upon any note or other instrument or agreement evidencing any of the Liabilities. (d) At its option, the Bank may discharge taxes, liens or Security Interests or other encumbrances at any time levied or placed on the Collateral, and may pay for the maintenance and preservation of the Collateral, and the Borrower agrees to reimburse the Bank on demand for any payment made or any expense incurred by the Bank pursuant to the foregoing authorization, including outside or in-house counsel fees and disbursements incurred or expended by the Bank in connection with this Agreement. (e) The Borrower hereby authorizes the Bank to file financing statements and any amendments thereto without the signature of the Borrower. Such authorization is limited to the Security Interest granted by this Agreement. (f) The Borrower agrees that the Bank has the right to notify (on invoices or otherwise) account debtors and other obligors or payors on any Collateral of its assignment to the Bank, and that all payments thereon should be made directly to the Bank, and that the Bank has full power and authority to collect, compromise, endorse, sell or otherwise deal with the Collateral on its own name or that of the Borrower at any time. (g) The Borrower agrees to pay or reimburse the Bank on demand for all costs and expenses incurred by it in connection with the administration and enforcement of this Agreement and the administration, preservation, protection, collection or realization of any Collateral (including outside or in-house attorneys' fees and expenses). (h) The Bank shall not be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by the Borrower unless such waiver is in writing and signed by the Bank. No delay or omission on the part of the Bank in exercising any right shall operate as a waiver thereof or of any other right. A waiver upon any one occasion shall not be construed as a bar or a waiver of any right or remedy on any future occasion. All of the rights and remedies of the Bank, whether evidenced hereby or by any other Agreement, instrument or paper, shall be cumulative and may be exercised singly or concurrently. (i) **This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The Borrower and the Bank each waive trial by jury in connection with this Agreement or any dispute or other matters.** (j) This Agreement, and the Security Interests, obligations, rights and remedies created hereby, shall inure to the benefit of the Bank and its successors and assigns and be binding upon the Borrower and its heirs, executors, administrators, legal representatives, successors and assigns.

7.    EXECUTION BY THE BANK. This Agreement shall take effect immediately upon execution by the Borrower, and the execution hereof by the Bank shall not be required as a condition to the effectiveness of this Agreement. The provision for execution of this Agreement by the Bank is only for purposes of filing this Agreement as a security agreement under the Uniform Commercial Code as in effect from time to time, if execution hereof by the Bank is required for purposes of such filing.

PGB  INTERNATIONAL  LLC
(Borrower)

By _Arthur Partito Marr_

6 South Street, Suite 301
(Number and Street)

Morristown, NJ 07960
(City, County, State)

Places of business in counties other than above:

JPMORGAN CHASE BANK

By: _Wing Lee Ono  VP_
        (Name and Title)

Address: _695 Route 46 West_
           (Number, Street, City)
         _Fairfield, NJ 07004_

# EXHIBIT C

*PRIVILEGED AND CONFIDENTIAL*
*BL Draft – 5/6/03*

To: WING Loo·One

OPERATING AGREEMENT

FOR

PGB INTERNATIONAL LLC

Dated:

May 16, 2003

PREPARED BY:

BUDD LARNER GROSS ROSENBAUM GREENBERG & SADE, P.C.
150 John F. Kennedy Parkway, CN1000
Short Hills, New Jersey 07078-0999
(973) 379-4800

*PRIVILEGED AND CONFIDENTIAL*
*BL Draft – 5/6/03*

OPERATING AGREEMENT OF

PGB INTERNATIONAL, LLC

THIS OPERATING AGREEMENT, made and entered into as of the ___ day of May, 2003, by and among the parties whose names are set forth on Exhibit A attached hereto (hereinafter referred to as "**Members**").

The parties, intending to be legally bound, agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    As used in this Agreement, the following terms shall have the meanings set forth below:

(a)    "**Act**" means the New Jersey Limited Liability Company Act, as amended from time to time.

(b)    "**Additional Capital**" means, with respect to any Member, the sum of all Capital Contributions made by such Member under this Agreement.  Additional Capital shall not include any loan.

(c)    "**Agreement**" means this Operating Agreement, as the same from time to time may be amended, modified, supplemented or restated.

(d)    "**Capital Contribution**" for each Member, means the aggregate of all sums contributed to the LLC by such Member pursuant to Article IV hereof (other than as a loan to a Member under Section 5.1 or as a loan).

(e)    "**Certificate**" means the Certificate of Formation filed with respect to the LLC in the office of the New Jersey Department of Treasury, as the same may be from time to time amended, modified or supplemented in accordance with the provisions of this Agreement.

(f)    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision of any succeeding law.

(g)    "**Family Member**" with respect to any individual means a spouse or lineal descendant of such specified individual, or a trust whose beneficiaries consist solely of such individual and his or her spouse and lineal descendants.

(h)    "**LLC**" means the limited liability company to which this Agreement pertains, as such limited liability company may from time to time be constituted.

(i)    "**LLC Interest**" means a Member's entire right, title and interest in the LLC, including a Member's percentage share of any distributions of Cash Flow and proceeds from the LLC as well as the Member's right (if any) to participate in the management and affairs of the LLC.

(j)    "**Manager**" means Arthur Kupperman and any successor Manager elected in accordance with Section 6.1, in such Person's capacity as a Manager.

(k)    "**Percentage Interest**" means percentage interest as defined in Section 9.1.

(l)    "**Person**" means any individual, corporation, partnership (general or limited), association, limited liability company, trust, estate or other entity.

(m)    "**State**" means the State of New Jersey.

## ARTICLE II

## ORGANIZATION

2.1    <u>Name</u>.  The name of the LLC shall be "PGB International LLC." The LLC may conduct its business under such other fictitious names as the Manager may elect from time to time.

2.2    <u>Organization of the LLC</u>.   The LLC has been organized under the laws of the State.  The Certificate of Formation, which was executed and filed pursuant to the Act on April 30, 2003, is hereby adopted and ratified by the Members.  The Members have executed and filed such other documents and instruments with such appropriate authorities as was necessary or appropriate from time to time to comply with all requirements for the formation and operation of a limited liability company in the State.

2.3    <u>Purpose and Powers of the LLC.</u>  The purpose of the LLC is to engage in any lawful act or activity for which a limited liability company may be organized under the laws of the State of New Jersey; <u>provided</u>, <u>however</u>, that the LLC is not formed to engage in any act or activity that requires the act or approval of any state official, department, board agency or other body without such approval or consent first being obtained.  In furtherance of the foregoing purpose, the LLC shall have all powers necessary, suitable or convenient for the accomplishment thereof.

2.4    <u>Principal and Registered Office and Agent</u>.  The principal business office of the Company shall be located at 123 Madison Avenue, Madison, New Jersey 07940.  The Company's registered office in the State of New Jersey shall be located at Budd Larner Gross

Rosenbaum Greenberg and Sade, P.C., c/o Robert Loewenstein, Esq., 150 John F. Kennedy Parkway, Short Hills, New Jersey 07078, and its initial registered agent shall be Robert Loewenstein, Esq. The Members may, within their sole and unrestricted discretion, change the principal office, registered office or registered agent of the Company, and the Members may establish additional offices of the Company.

      2.5   Title to LLC Property. All of the LLC's right, title and interest in tangible property, intangible property, real property, personal property and other assets acquired by the LLC shall be held in the name of the LLC as an entity. No Member shall have an ownership interest in any property of the LLC in its individual name or right and each Member's LLC Interest shall be personal property for all purposes.

<h3 style="text-align:center">ARTICLE III</h3>

<h3 style="text-align:center">TERM</h3>

      3.1.   Term. The term of the LLC shall continue until the first to occur of the following: (a) The sale or other disposition of all or substantially all of the property of the LLC; or (b) Dissolution of the LLC pursuant to the express provisions of this Agreement.

<h3 style="text-align:center">ARTICLE IV</h3>

<h3 style="text-align:center">CAPITAL CONTRIBUTIONS OF THE MEMBERS</h3>

      4.1   Initial Capital Contributions. Upon execution of this Agreement, the Members shall make initial Capital Contributions to the LLC in the amounts set forth on Exhibit A. Except as expressly required by this Article, no Member shall have any obligation to make any contribution to the LLC or to advance any funds thereto.

      4.2   Interest Payable. Except as otherwise provided in Section 5.1, no Member shall receive any interest on any of its Capital Contributions.

      4.3   No Withdrawals. No Capital Contribution shall be withdrawn, except as hereinafter expressly provided.

      4.4   Additional Contributions.

      (a)   If the Manager determines in its good faith business judgment that the LLC is in need of additional funding for (i) payment of any operating expenses or (ii) payment of any capital expenditures, then the Manager shall cause notice to be given to the Members setting forth the purposes and amounts of such additional funding. Within thirty (30) days following the date upon which a notice is delivered, each Member shall contribute to the Company, as Additional Capital, an amount equal to the total amount so determined, multiplied by its Percentage Interest as set forth in Section 9.1 herein. Any and all funds contributed by the Members pursuant to this Section 4.4 ("**Additional Contributions**") shall be credited to their

respective Capital Accounts of the LLC and shall constitute Additional Capital for all purposes of this Agreement.

(b)    If a Member fails to contribute an amount equal to the entire amount required to be contributed by it under Section 4.4(a) on or before the date set forth (the "**Failing Member**") and if each of the other Members (the "**Non-failing Members**") makes its required contribution on or before said date and the Failing Member fails to fully remedy its failure to contribute within ten (10) days after the giving of a notice by the Manager, then one or more of the following may occur at the option of the Manager:

(i)    the Manager may require the LLC to repay immediately to the Non-failing Members all or any portion of the amount contributed by the Non-failing Members pursuant to the notice, together with interest actually earned thereon by the LLC until repayment, if any;

(ii)    the Manager may permit, but may not require, the Non-failing Members to advance to the LLC all or any portion of the amount the Failing Member failed to contributed and may elect to have the LLC treat all or any amount advanced by the Non-failing Members to the LLC pursuant to the notice, including amounts advanced on account of the Failing Member's failure to fund, as Additional Capital or as a Funding Failure Loan (as defined in Section 4.4(c)) to the Failing Member;

(iii)    the Manager may cause the LLC to be dissolved; and/or

(iv)    the Manager may permit, but may not require, the Non-failing Members to make Additional Contributions to the LLC not in excess of the amount the Failing Member failed to contribute, in which case each Member's Percentage Interest in the LLC shall be [increased or decreased as necessary in order to cause the Percentage Interest of the Members to be in proportion to their respective Capital Contributions, after giving effect to the Additional Contributions].

(c)    For purposes of this Section 4.4, "**Funding Failure Loan**" means a loan to a Failing Member which (i) bears interest at an annual rate equal to the prime rate (as published from time to time in the Wall Street Journal) as in effect from time to time plus [five (5%) percent] per annum compounded annually, from the date of such loan until it is repaid in full and (ii) is payable out of distributions that would have otherwise been due to the Failing Member pursuant to the terms of this Agreement.

4.5    Effective Change of Percentage Interest.  If the Percentage Interest of the Members are changed pursuant to the operation of this Article, or any of the other terms of this Agreement during any fiscal year, the amounts of all items to be credited, charged or distributed

2006/08/13/TUE 05:10 AM    PGB INTERNATIONAL    FAX No. 13734019001    P. 028

to such Members for such entire fiscal year in accordance with their respective Percentage Interest in the LLC shall be allocated to the portion of such fiscal year which precedes the date of such change and to the portion of such fiscal year which occurs on and after the date of such change in proportion to the number of days in each such portion and the amounts of the items so allocated to reach such portion shall be credited, charged or distributed to such Members in proportion to their respective Percentage Interest in the LLC such portion of the fiscal year in question.

     4.6    <u>Limited Liability</u>. The Members shall not have any personal liability for liabilities or obligations of the LLC except to the extent of their Capital Contributions. Notwithstanding the foregoing, (i) if any court of competent jurisdiction holds that distributions (or any part thereof) received by a Member pursuant to the provisions hereof constitute a return of capital and directs that a Member pay such amount (with or without interest thereon) to or for the account of the LLC, or any creditor thereof, such obligation shall be the obligation of said Member and not of any other Member or the LLC and (ii) a Member shall indemnify and hold harmless the LLC and each other Member from any liability or loss incurred by virtue of the assessment of any tax with respect to such Member's allocable share of the profits or gain of the LLC.

# ARTICLE V

## LOANS BY MEMBERS

     5.1    <u>Loans</u>. No Member shall obligated to lend any money to the LLC. The LLC shall not borrow any money without the approval of the Manager. If the Manager determines that it is necessary or appropriate for the LLC to borrow money from any of the Members, the Manager shall cause a notice to be sent to each of the Members (a "**Borrowing Request**") setting forth the amount to be borrowed from the Members and the purpose of the proposed loan. Each of the Members shall have the right, but not the obligation, to lend to the LLC the amount to be borrowed as set forth in the Borrowing Request multiplied by its respective Percentage Interest at the time of the Borrowing Request, which right shall be exercisable by written notice given to the LLC and the other Members within forty-five (45) days of the notice of the Manager. If any of the Members do not agree to lend the full amount set forth for it the notice of the Manager, then the other Members shall have the option to lend the balance. If any of the Members shall lend any money to the LLC, such loans shall not constitute a Capital Contribution by such Members or entitle such Members to any increase in the share of the distributions of the LLC. Each loan shall be an obligation of the LLC, provided that no Member shall be personally obligated to repay the loan and the loan shall be payable or collectible only out of the assets of the LLC. All such loans shall be on commercially reasonable terms and shall bear interest at the rate of [two (2%) percent] per annum above the prime rate (as published).

     5.2    <u>Financing</u>. In the event the LLC seeks to obtain additional financing from a third party, the Members specifically agree that the LLC may obtain any such financing. The terms of any such financing shall be as determined by the applicable lender and the Manager. If

and to the extent any such lender requires guarantees, each Member shall execute such guarantees. If the lender does not limit the liability of the Members to their respective Percentage Interest, then the Members shall enter into a contribution and indemnity agreement by which the total liability of each of the Members is limited to its respective Percentage Interest and pursuant to which the respective parties shall indemnify each other to the extent that the amounts paid by them pursuant to such guarantees shall exceed their respective proportions.

## ARTICLE VI

## MANAGEMENT AND OPERATION OF THE COMPANY

6.1    The Manager.

(a)    Subject to the provisions of this Agreement requiring the unanimous consent of all Members, the Manager shall have responsibility for all decisions to be made by or on behalf of the LLC. No action shall be taken, obligations incurred or amounts expended by the LLC without the consent of the Manager, except as expressly delegated pursuant to any agreement to which the LLC is a party.

(b)    The Manager shall be elected by affirmative vote of Members holding a majority of the Percentage Interests, and may be removed by affirmative vote of Members holding a majority of the Percentage Interests. The Manager shall initially be Arthur Kupperman.

(c)    The Manager may resign at any time by giving written notice to all Members. The resignation of the Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

6.2    Transactions Requiring Members' Consent. Notwithstanding anything to the contrary in this Agreement, the Manager shall not undertake any of the following actions without the prior written consent of all of the Members:

(a)    amend this Agreement;

(b)    deviate from any of the purposes of the LLC as set forth in Section 2.3;

(c)    engage in business in any jurisdiction which does not provide for the registration of limited liability companies;

(d)    pay fees, commissions or other compensation to a Member or Manager, except as otherwise provided in Section 6.3;

(e)    admit any other Members to the LLC;

(f)     remove any officer and appoint a successor officer;

(g)     transfer an LLC Interest, except as provided in Article X;

(h)     withdraw from the LLC, except as provided in Article X; or

(i)     sell all or substantially all of the assets of the LLC.

6.3     Officers.

(a)     Designation. The officers of the LLC shall be a president, one or more vice presidents, secretary and treasurer, and such additional officers as the Manager may from time to time deem advisable.

(b)     Term of Office. The officers shall be elected by the Manager, and shall hold office until their respective successors are elected and qualify or until their death, resignation or removal. The officers shall initially be as set forth on Exhibit B hereto.

(c)     President. The president shall be the chief executive officer of the LLC and shall preside at all meetings. He or she may sign, in the name of the LLC, contracts or other instruments as may be authorized specifically by the Manager.

(d)     Vice President. There shall be such number of vice presidents as the Managers may designate, who shall perform such duties and have such authority as from time to time may be conferred. In the absence of the president or in the event of his or her death, inability or refusal to act, the senior vice president in age shall perform the duties and be vested with the authority of the president.

(e)     Secretary. The secretary shall cause notices of all meetings to be served as prescribed in this Agreement, and shall keep the minutes of all meetings of the LLC, as well as the LLC records, including ownership and transfer of LLC Interests.

(f)     Treasurer. The treasurer shall have the custody of the funds and securities of the LLC and shall keep or cause to be kept regular books of account for the LLC. He or she shall account to the Members, whenever they may require, concerning all his or her transactions as treasurer and concerning the financial condition of the LLC. The position of treasurer may be combined with that of secretary in one office at the discretion of the Manager.

(g)     Removal or Suspension. Any officer may be removed or suspended, with or without cause, by the affirmative vote of [Members holding a majority of the Percentage Interests].

(h)     Duties. The officers shall be responsible for the operation and maintenance of the assets of the LLC and shall have such further responsibilities and duties as shall be determined by the Manager.

2006/001/13/02 09:17 AM  PGB INTERNATIONAL    FAX No. 19734019001    P.009

6.4    <u>Compensation of Manager</u>.  The Manager shall be entitled to and shall be reimbursed by the LLC for all out-of-pocket expenses incurred by the Manager on behalf of the LLC.

6.5    <u>Bank Accounts</u>.  The LLC will maintain separate bank accounts in such banks as the Manager may designate exclusively for the deposit and disbursement of all funds of the LLC.  The Manager from time to time shall authorize signatories for such accounts.

6.6    <u>Other Activities Permitted</u>.  The Members may engage in any other business, investment or profession including the investment in ownership of or operation of business activities whether or not in direct or indirect competition with the LLC.  The LLC shall have no rights in or to any such business, profession or investment or to income or profits derived therefrom.

6.7    <u>Liability of Manager</u>.  The Manager shall not be liable, responsible or accountable in damage or otherwise to the LLC or any of its Members for any failure to take any action or the taking of any action within the scope of authority conferred on it by this Agreement, made in good faith.

6.8    <u>Indemnification</u>.  The Manager shall be entitled to indemnity from the LLC on account of any claim, liability, action or damage arising from or relating to the taking of any action in good faith and on account of all reasonable attorney's fees incurred in connection therewith.  Any indemnity under this Section 6.8 or otherwise shall be paid out of and to the extent of the LLC assets only.

## ARTICLE VII

## BOOKS AND RECORDS, AUDITS, TAXES, ETC.

7.1    <u>Books; Statements</u>.  In addition to the establishment and maintenance of capital accounts, the LLC shall keep such other books and records as the Manager shall determine.  The financial statements of the LLC shall be prepared in accordance with generally accepted accounting principles consistently applied.

(a)    The LLC shall prepare or cause to be prepared a statement setting forth the calculation of Cash Flow for each period of time, but not less often than quarterly at the end of which the LLC is to make periodic distributions of cash flow as provided in Section 9.3 and the LLC shall furnish a copy of such Cash Flow statement to each Member within thirty (30) days after the end of such period.

(b)    No later than the thirtieth (30th) day of each January, April, July and October during the term of this Agreement, the LLC shall prepare and submit or cause to be prepared and submitted to each Member, an accrual basis balance sheet dated as of the end of the preceding month together with accrual basis profit and loss statement for the three calendar

month period next preceding with a cumulative calendar year accrual basis profit and loss statement to date and a statement of change in each Member's Capital Account for the quarter and year to date.

(c)    As soon as practicable after the end of each fiscal year of the LLC, a general accounting shall be taken and made by independent certified public accountants selected by the Manager and retained by the LLC, which accounting and/or audit shall cover the assets, properties, liabilities and net worth of the LLC and its dealings, transactions and operations during such fiscal year and all matters and things customarily included in such accountings and audits and a full detailed [certified] statement shall be furnished to each Member within ninety (90) days after the end of such fiscal year, showing on an accrual basis the assets, liabilities, properties, net worth, profits, losses, net income, Cash Flow, changes in the financial condition of the LLC for such fiscal year and each Member's Capital Account.

7.2    <u>Where Maintained</u>. The books, accounts and records of the LLC shall be at all times maintained at its principal office.

7.3    <u>Audits</u>. Each Member may, at its option and its own expense, conduct internal audits of the books, records and accounts of the LLC.

7.4    <u>Tax Returns</u>. The LLC shall be treated and shall file its tax returns as a partnership for federal, state, municipal and other governmental income tax and other tax purposes. The LLC shall prepare or cause to be prepared on an accrual basis all federal, state and municipal partnership tax returns required to be filed. Unless otherwise determined by the Manager, such tax returns shall be prepared by independent certified public accountants.

7.5    <u>Tax Matters Partner</u>. [Arthur Kupperman] shall be the tax matters partner, as defined in Section 6231(a)(7) of the Code, with respect to operations conducted by the LLC. The tax matters partner shall comply with the requirements of Sections 6221 through 6232 of the Code.

7.6    <u>Section 754 Election</u>. At the request of a Member, the LLC shall make and file a timely election under Section 754 of the Code (and the corresponding election under applicable or state or local) in the event of a transfer of an interest in the LLC permitted hereunder or in the distribution of property to a Member. Any adjustments resulting from such election shall be reflected in the Capital Accounts of the Members in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(m).

7.7    <u>Capital Accounts</u>. There shall be established on the books of the LLC a single capital account (the "**Capital Account**") for each Member. The Members agree and acknowledge that the initial balance of each Member's Capital Account shall be an amount equal to such Member's initial Capital Contribution as set forth on <u>Exhibit A</u> hereto.

(a)    The Capital Account of each Member shall be maintained for each Member in accordance with the rules of Regulation §1.704-1(b)(2)(iv) and this section shall be interpreted and applied in a manner consistent with said section of the Regulations. The

Company may adjust the Capital Accounts of its Members to reflect revaluations of the LLC property whenever the adjustment would be permitted under Regulation §1.704-1(b)(2)(iv)(g). In the event the Capital Accounts of the Members are so adjusted (i) the Capital Accounts of the Members shall be adjusted in accordance with Regulation §1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property, and (ii) the Member's distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Regulation Section 1.704-3(c) of the Code.

(b)    In the event Code Regulation §1.704-3(c) applies to LLC property, the Capital Accounts of the Members shall be adjusted in accordance with Regulation §1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain and loss, as computed for book purposes, with respect to such property.

(c)    Notwithstanding any provision contained herein to the contrary, no Member shall be required to restore any negative balance in its Capital Account.

(d)    The Capital Account of a Member shall carryover to the transferee of the Member to the extent of the interest assigned.

## ARTICLE VIII

### FISCAL YEAR

8.1    <u>Calendar Year</u>.  The fiscal year of the LLC shall be the calendar year, unless (subject to obtaining consent of the Internal Revenue Service) the Manager otherwise required.

## ARTICLE IX

### DISTRIBUTIONS AND ALLOCATIONS

9.1    <u>Percentage Interest in the LLC</u>.  The initial Percentage Interest of each Member shall be as set forth on <u>Exhibit A</u> hereto, each as subject to adjustment expressly provided in this Agreement.  The Percentage Interest of each Member calculated in accordance with the terms of this Section constitutes such Member's "Percentage Interest."

9.2    <u>Certain Definitions</u>.  The following terms shall have the following meanings when used herein as follows:

(a)    "Cash Flow" shall mean the net income or loss of the LLC for the fiscal period in question, as determined in accordance with generally accepted accounting

principles, consistently applied and adjusted as follows or as otherwise determined by the Manager:

        (i)    <u>Additions</u>.  There shall be added to such net income or subtracted from such loss (A) the amount charged for depreciation, amortization or any other deduction not involving a cash expenditure; (B) the amount of Capital Contributions, loans to a Member pursuant to Section 5.1 or Funding Failure Loans and (C) any amount by which cash reserves previously established by the Manager from Cash Flow prior to the applicable accounting period in order to retain sufficient working capital in the LLC or to properly reserve for actual contingent obligations of the LLC had been reduced (other than through the payment of expenses).

        (ii)    <u>Deductions</u>.  There shall be subtracted from such net income or added to such loss (A) payments made upon any loans made to the LLC, excluding Funding Failure Loans and loans by Members; (B) funds disbursed for capital expenditures; (C) any amount to establish or increase cash reserves pursuant to a determination of the Manager that such reserve in the amount thereof is necessary or appropriate in order to retain sufficient working capital in the Company or to properly reserve for other actual or contingent obligations of the LLC.

        (b)    "**Unreturned Additional Capital**" shall mean, for a Member, such Member's Additional Capital.

        9.3    <u>Cash Flow Distributions</u>.  The LLC shall distribute Cash Flow on a quarterly basis during the term of the LLC in which there is Cash Flow (such distribution being made within thirty (30) days after the end of each such quarter) to the Members as follows:

        (a)    First, subject to the terms of Section 9.4, to the Members in amounts necessary to repay (A) compound and current interest on loans, and thereafter (B) the outstanding principal balance payable on loans, all of which shall be payable as provided in Section 9.4, which distribution shall be made to the Members in proportion to the amounts owed under then outstanding loans; and

        (b)    Second, to the Members pro rata in accordance with their respective Percentage Interests.

        9.4    <u>Allocation of Gross Income, Profits and Losses For Capital Account Purposes</u>.  In general, allocations to the Members under this Agreement shall be made in compliance with requirements of §1.704-1(b) of the Code and the Regulations promulgated thereunder in a manner that reflects the distribution provisions set forth in Section 9.3. Specifically, all items of LLC income, gain, loss and deduction as determined for book purposes shall be allocated among the Members and credited or debited to the respective Capital Accounts in accordance with Regulation §1.704-1(b)(2)(iv) so as to ensure to the maximum extent possible (i) that such allocations satisfy the economic effect equivalence test of Regulation §1.704-

1(b)(2)(ii)(i), and (ii) that all allocations of items that cannot have economic effect (including credits and nonrecourse deductions) are allocated to the Members in accordance with the Member's interest in the LLC which, unless otherwise required by Code §704(b) of the Regulations promulgated thereunder shall be in proportion to their Percentage Interests. To the extent possible, items that can have economic effect shall be allocated in such manner that the balance of each Member's Capital Account at the end of any taxable year (increased by the sum of (a) such Member's share of partnership minimum gain as defined in Regulation §1.704-2(g)(1) and (b) such Member's share of partner nonrecourse debt minimum gain as defined in Regulation §1.704-2(i)(5) would be positive to the extent of the amount of cash that such Member would receive (or be negative to the extent of the amount of cash that such Member would be required to contribute to the LLC) if the LLC sold all of its property for an amount of cash equal to the book value (as determined pursuant to Regulation §1.704-1(b)(2)(iv)) of such property (reduced, but not below zero, by the amount of nonrecourse debt to which those property are subject) and all of the cash of the LLC remaining after payment of all liabilities (other than nonrecourse liabilities) of the LLC were distributed in liquidation immediately following the end of such taxable year in accordance with Section 9.3.

9.5    Allocations of Gross Income, Profits and Losses for Tax Purposes.

(a)    For Federal income tax purposes each item of income, gain, loss and deduction of the LLC shall be allocated among the Members in the same manner as its correlative item of book income, gain, loss or deduction has been allocated pursuant to Section 7.7 hereof, except to the extent otherwise required by Section 704 of the Code and the Regulations thereunder.

(b)    The Manager shall have the authority the elect the methods to be used by the LLC for allocating items of income, gain and expenses required by Section 704(c) of the Code and the Regulations thereunder and such elections shall be binding on all Members.

# ARTICLE X

# TRANSFER OF LLC INTERESTS

10.1    Bankruptcy, Insolvency or Dissolution of a Member.

(a)    The bankruptcy, insolvency, unconditional assignment for the benefit of creditors, appointment of a receiver, liquidation, dissolution or any other event that causes a Member to cease to exist as a legal entity ("**Member Terminating Event**") shall cause a dissolution of the LLC unless within ninety (90) days after such event the remaining Members elect to continue the business and affairs of the LLC in accordance with the provisions of this Agreement.

(b)    Upon the occurrence of a Member Terminating Event, the duly authorized representative of such Member shall have all the power such Member had to make an assignment of its interest in the LLC in accordance with the terms of this Agreement. No such

representative shall be admitted as a Member in the LLC except in compliance with the provisions of this Article X.

10.2    Conditions Applicable to Transfers. Notwithstanding anything to the contrary contained in this Agreement:

(a)    Any sale, assignment, pledge or other transfer (collectively, "Transfer"), whether direct or indirect, of any LLC Interest shall be made in full compliance with (i) all applicable statutes, law, ordinances, rules and regulations of all federal, state and local governmental bodies, agencies and subdivisions having jurisdiction over the LLC and (ii) the contracts, deeds of trust, mortgages, certificates, insurance policies, service agreements and any other agreements affecting the business of the LLC so that the business operation of the LLC may continue without interruption and without violation of any applicable law or any such instruments.

(b)    No Transfer of the LLC Interest of any Member shall be binding upon the LLC or any other Member unless and until (i) true copies of instruments of Transfer executed and delivered pursuant to or in connection with such transfer shall have been delivered to the LLC; (ii) the transferee shall have delivered to the LLC an executed and acknowledged assumption agreement pursuant to which the transferee assumes all of the obligations of the transferor hereunder, and agrees to be bound by all of the provisions of this Agreement (including, without limitation, if pursuant to the provisions of this Agreement, the transferee is to become, as a result of such transfer, a Member of the LLC, an acknowledgment thereof); (iii) all of the other Members shall have consented thereto; (iv) the transferee shall have executed, acknowledged and delivered any instruments required under the Act to effect such Transfer; and (v) the transferee shall have paid the LLC for any costs it incurred in making such Transfer.

10.3    Transferees by Operation of Law. If, notwithstanding the provisions of this Article X, any Person acquires all or any part of the LLC Interest of a Member in violation of this Article X by operation of law or judicial proceeding, the holder of said LLC Interest (i) shall be entitled to receive only the share of income, gain, deductions, credits and losses and the return of contributions to which said Member would otherwise be entitled, and (ii) shall have no right to participate in the management of the LLC or to vote on matters coming before the LLC.

10.4    Effective Date of Transfers. For financial and tax reporting purposes, every voluntary Transfer (as distinguished from the original issuance) of any LLC Interest or portion thereof shall be deemed to have occurred as of the close of business on the day of the month in which such event shall have in fact occurred, and every involuntary Transfer (whether by gift, bequest, inheritance, operation of law or any other method) of any interest of a Member in the LLC shall be deemed to have occurred, and shall have no prior effect, as of the close of business on the day of the calendar month in which the LLC shall have received evidence of such Transfer.

# ARTICLE XI

## DISSOLUTION AND LIQUIDATION

11.1   Dissolution.

(a)   Except as otherwise expressly provided herein, the LLC shall be dissolved upon the occurrence of any of the following events:

(i)   The divesting by the LLC of all or substantially all of its assets and any property, real or personal, that it may receive resulting from a sale, exchange or other disposition thereof;

(ii)   The agreement of the Members;

(iii)   Upon the date specified in the Certificate;

(iv)   Any other event or notice which under this Agreement would cause the termination of the LLC;

(v)   Any other event, which, under the Act, would cause the dissolution of a limited liability company unless the Manager elects to continue the business of the LLC.

(b)   Dissolution shall be effective on the date of the event giving rise to the dissolution, but the LLC shall not terminate until the assets thereof have been distributed in accordance with the provisions hereinafter set forth.

11.2   Liquidating Trustee.

(a)   Upon dissolution of the LLC, the liquidating trustee (who shall be selected by the Manager) shall proceed diligently to wind up the affairs of the LLC and distribute its assets in the following order of priority:

(i)   To the payment of the debts and liabilities of the LLC (other than those to Members) and the expenses of liquidation;

(ii)   To the setting up of such reserves as the liquidating trustee may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the LLC arising out of or in connection with the LLC; provided that any such reserve shall be paid over by the liquidating trustee to a Person (if an individual, not a Member or one in the employ of any Member), as escrowee, to be held by such Person (or designated successor) for the purpose of disbursing such reserves in payment of any of the aforementioned contingencies and, at the expiration of such period as the liquidating trustee shall deem advisable, to distribute the balance thereafter remaining in the manner hereinafter provided;

     (iii)    To the repayment of any advances that may have been made by any of the Members to the LLC, but if the amount available for such repayment shall be insufficient, then pro rata in accordance with the amounts of such advances; and

     (iv)    To the Members as provided in Section 9.3, subject to a credit for any Distributions previously made to the Members.

     (b)    Pending such distribution, the liquidating trustee shall continue to exploit the rights and properties of the LLC consistent with the liquidation thereof, exercising in connection therewith all the power and authority of the Members as herein set forth.

     11.3   <u>Accounting on Dissolution</u>. Upon dissolution of the LLC, the liquidating trustee shall cause the LLC's accountant to make a full and proper accounting of the assets, liabilities, and operation of the LLC, as of and through the last day of the month in which the dissolution occurs.

     11.4   <u>Distribution in Kind</u>. The liquidating trustee shall have the power to sell the LLC's assets for cash in order to provide for payment of liabilities and establish a reserve as aforesaid or otherwise. All saleable assets of the LLC may be sold in connection with any liquidation at public or private sale at such price and upon such terms as the liquidating trustee, in his sole discretion, may deem advisable. Any Member and any Person in which any Member is in any way interested may purchase assets at such sale. Distributions of LLC assets may be made in cash or in kind, in the sole and absolute discretion of the liquidating trustee.

## ARTICLE XII

## GENERAL

     12.1   <u>Notices</u>. Any notice or consent required or provided for by any provision of this Agreement shall be in writing and shall be deemed to have been duly and properly given or served for any purpose only if delivered personally with receipt acknowledged or sent by registered or certified mail, return receipt requested, or if sent by an internationally recognized courier service, postage and charges prepaid and addressed to such address of the Members set forth in <u>Exhibit A</u> to this Agreement.

     A Member may change his or her address for the purpose of this Section 12.1 by notice to the LLC at its principal office in the manner herein provided for. Any such notice, consent or other communication shall be deemed to have been given the day it was (i) received by the LLC or (ii) personally delivered with receipt acknowledged.

     12.2   <u>Further Assurances</u>. Each of the parties hereto agrees to execute, acknowledge, deliver, file, record and publish such further certificates, instruments, agreements and other documents, and to take all such further action as may be required by law or deemed by the Members to be necessary or useful in furtherance of the LLC's purposes and the objectives and intentions underlying this Agreement and not inconsistent with the terms hereof.

12.3    Prohibition Against Partition.  Each Member hereby permanently waives and relinquishes any and all rights he or she may have to cause all or any part of the property of the LLC to be partitioned, it being the intention of the Members to prohibit any Member from bringing a suit for partition against the other Members, or any of them.

12.4    Waiver. No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member in the performance by any other Member of his or her obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other Member of the same or any other obligation of such member hereunder. Failure on the part of a Member to complain of any act or failure to act of any other Member or to declare such other Member in default, irrespective of how long such failure continues, shall not constitute a wavier by such Member of his or her rights hereunder.

12.5    Severability. If any provision of this Agreement or the application thereof to any person or circumstances shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

12.6    Additional Remedies.  The rights and remedies of any Member hereunder shall not be mutually exclusive.   The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any party aggrieved as against the other for breach or threatened breach of any provision hereof, it being the intention of this Section 12.6 to make clear the agreement of the parties hereto that their respective rights and obligations hereunder shall be enforceable in equity as well as at law or otherwise.

12.7    Governing Law.  This Agreement and all matters relating to the LLC shall be governed and construed in accordance with the law of the State of New Jersey.

12.8    Entire Agreement.   This instrument incorporates the entire agreement among the parties hereto, regardless of anything to the contrary contained in the Certificate or other instrument, memorandum or notice purporting to summarize the terms hereof, whether or not the same shall be recorded or published.

12.9    Amendments.  This Agreement may not be modified or amended except as otherwise provided herein and with the consent of all of the Members.

12.10   Gender and Number.  Unless the context otherwise requires, when used herein, the singular includes the plural and vice versa, and the masculine includes the feminine and neuter and vice versa.

12.11  <u>Benefit</u>.  Subject to transfer restrictions set forth in Article X, this Agreement is binding upon and inures to the benefit of the parties hereunder, their heirs, legal representative, successors and permitted assigns.

12.12  <u>Captions</u>.  Captions are inserted for convenience only and shall not be given any legal effect.

12.13  <u>Execution</u>.  This Agreement may be executed in any number of counterparts, and each such counterpart will, for all purposes, be deemed an original instrument, but all such counterparts together will constitute but one and the same Agreement.

*[Remainder of Pager is Intentionally Left Blank]*

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement of PGB International LLC on the day and year first above written.

Members:

_____
Arthur Kupperman

_____
Paulette Krelman

_____
E. Ross Browne

## EXHIBIT A

### Members

| Name and Address | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Arthur Kupperman<br>43 Hampshire Drive<br>Mendham, NJ 07945 | $21,250 | 42.5% |
| Paulette Krelman<br>43 Hampshire Drive<br>Mendham, NJ 07945 | $21,250 | 42.5% |
| E. Ross Browne<br>123 Madison Avenue<br>Madison, New Jersey 07940 | $7,500 | 15% |

## EXHIBIT B

### <u>Officers</u>

President -   Arthur Kupperman

Vice-President -   E. Ross Browne

Secretary and Treasurer -   Paulette Krelman

CERTIFICATE OF FORMATION

OF

PGB INTERNATIONAL LLC

**FILED** LLC

APR 30 2003

~~State Treasurer~~

The undersigned, desirous of forming a limited liability company in accordance with the laws of the State of New Jersey, hereby states the following:

(1)  The name of the limited liability company is PGB International LLC (the "Company").

(2)  The address of the registered office of the Company is PITTRA GB International, Inc., 123 Madison Avenue, Madison, NJ  07940.  The Company's registered agent at that address is Arthur Kupperman.

(3) The Company shall have perpetual existence.

The undersigned represents that this filing complies with requirements detailed in N.J.S.A. 42:2B-1, et seq.  The undersigned hereby attests that he is authorized to sign this Certificate on behalf of the Company.

Robert A. Loewenstein

Dated: April 28, 2003
446761 w

S1245474
J2389794

0600168517

ℛ 30 2003 15:40

# EXHIBIT  D

## GUARANTY

New York , New York

_Ociose   13_ , 200_4_

WHEREAS, _____PCB INTERNATIONAL LLC_____

(hereinafter called the "Borrower"), desires to transact business with and to obtain credit or a continuation of credit or other financial accommodations from JPMORGAN CHASE BANK, a New York banking corporation (hereinafter called the "Bank"); and

WHEREAS, the Bank is unwilling to extend or continue credit to or other financial accommodations to the Borrower, unless it receives the following guaranty of the undersigned;

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration and in order to induce the Bank from time to time, in its discretion, to extend or continue credit or other financial accommodations to the Borrower, the undersigned hereby guarantees, absolutely and unconditionally, to the Bank the payment of all liabilities of the Borrower to the Bank of whatever nature, whether now existing or hereafter incurred, whether created directly or acquired by the Bank by assignment or otherwise, whether matured or unmatured, joint, several or joint and several, secured or unsecured and whether absolute or contingent, including, without limitation, all interest or other claims which may accrue or arise after the commencement of bankruptcy, insolvency, reorganization, liquidation or other similar proceedings (all of which are hereinafter collectively referred to as the "Liabilities of the Borrower").

In order to further secure the payment of the Liabilities of the Borrower, the undersigned does hereby give the Bank a continuing lien and right of set-off for the amount of the Liabilities of the Borrower upon any and all monies, securities and any and all other property of the undersigned and the proceeds thereof, now or hereafter actually or constructively held or received by or in transit in any manner to or from the Bank, J.P. Morgan Securities Inc., or any other affiliate of the Bank from or for the undersigned, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into the possession of the Bank, J.P. Morgan Securities Inc., or any other affiliate of the Bank in any way, or placed in any safe deposit box leased by the Bank, J.P. Morgan Securities Inc., or any other affiliate of the Bank to the undersigned. The Bank is also given a continuing lien and right of set-off for the amount of said Liabilities of the Borrower upon any and all deposits (general and special) and credits of, or for the benefit of the undersigned with, and any and all claims of the undersigned against, the Bank, J.P. Morgan Securities Inc., or any other affiliate of the Bank at any time existing. The Bank is hereby authorized at any time or times, without prior notice, to apply such deposits or credits, or any part thereof, to such Liabilities of the Borrower and, although said Liabilities of the Borrower may be contingent or unmatured, and whether the collateral security therefor is deemed adequate or not. The undersigned authorizes the Bank to deliver a copy of this guaranty to others as written notification of the undersigned's transfer of a security interest in the collateral described herein to the Bank.

The undersigned agrees that, with or without notice or demand, the undersigned shall reimburse the Bank for all the Bank's expenses (including reasonable fees of counsel for the Bank who may be employees thereof) incurred in connection with any of the Liabilities of the Borrower or the collection thereof.

This guaranty is a continuing guaranty and shall remain in full force and effect irrespective of any interruptions in the business relations of the Borrower with the Bank; provided, however, that the undersigned may, by notice in writing, delivered personally or received by certified mail, return receipt requested, addressed to the Bank's office at 1111 Fannin Street, Houston, Texas 77002, Commercial Loan Documentation Division, Attention: Manager, terminate this guaranty, but any such termination shall have no effect with respect to the Liabilities of the Borrower (including contingent liabilities) existing on the date on which such notice is so delivered or received or which on such date the Bank is obligated (including on a conditional basis) to provide or acquire thereafter, or with respect to any interest, fees, indemnities, charges, expenses or costs payable thereon or attributable thereto even if arising or incurred after such date, and this guaranty and the obligations of the undersigned hereunder with respect to the foregoing Liabilities of the Borrower shall continue notwithstanding any such termination until all such amounts are fully and finally paid.

All monies available to the Bank for application in payment or reduction of the Liabilities of the Borrower may be applied by the Bank in such manner and in such amounts and at such time or times as it may see fit to the payment or reduction of such of the Liabilities of the Borrower as the Bank may elect.

JPMorgan Chase Bank

The undersigned hereby waives: (a) notice of acceptance of this guaranty and of extensions of credit or other financial accommodations by the Bank to the Borrower; (b) presentment and demand for payment of any of the Liabilities of the Borrower; (c) protest and notice of dishonor or default to the undersigned or to any other party with respect to any of the Liabilities of the Borrower; (d) all other notices to which the undersigned may otherwise be entitled; and (e) any demand for payment hereunder.

All liabilities of the undersigned to the Bank hereunder or otherwise, whether or not then due or absolute or contingent, shall without notice or demand become due and payable immediately upon the occurrence of any default or event of default with respect to any Liabilities of the Borrower (or the occurrence of any other event which results in acceleration of the maturity of any thereof) or the occurrence of any default hereunder. This is a guaranty of payment and not of collection and the undersigned further waives unconditionally and irrevocably any right to require that any action be brought against the Borrower or any other person or to require that resort be had to any security or any other property or asset or to any balance of any deposit account or credit on the books of the Bank in favor of the Borrower or any other person prior to any payment under this guaranty being made or enforced.

The undersigned hereby consents that from time to time, before or after any default by the Borrower or any notice of termination hereof, with or without further notice to or assent from the undersigned, any security at any time held by or available to the Bank for any obligation of the Borrower, or any security at any time held by or available to the Bank for any obligation of any other person secondarily or otherwise liable for any of the Liabilities of the Borrower, may be exchanged, surrendered or released and any obligation of the Borrower, or of any such other person, may be changed, altered, renewed, extended, continued, surrendered, compromised, waived, discharged or released in whole or in part (including without limitation any such event resulting from any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or its assets) or any default with respect thereto waived, and the Bank may fail to set off and may release, in whole or in part, any balance of any deposit account or credit on the Bank's books in favor of the Borrower, or of any such other person, and may extend further credit in any manner whatsoever to the Borrower, and generally deal or take action or no action with regard to the Borrower or any such security or other person as the Bank may see fit; and the undersigned shall remain bound under this guaranty notwithstanding any such exchange, surrender, release, change, alteration, renewal, extension, continuance, compromise, waiver, discharge, inaction, extension of further credit or other dealing.

The obligations of the undersigned are absolute and unconditional and are valid irrespective of any amendment, modification, waiver, consent or other change, discharge or release (including by operation of law, regulation or legal proceedings) with respect to, or any lack of validity or enforceability of, any Liabilities of the Borrower, or with respect to any other guaranty thereof or other credit support thereto or any collateral securing any of the foregoing, or any other agreement or circumstance which might otherwise constitute a defense to the obligations hereunder to any of the Liabilities of the Borrower or to the obligations of others related hereto or thereto and the undersigned irrevocably waives the right to assert defenses, set-offs and counterclaims in any litigation relating to this guaranty and the Liabilities of the Borrower. This guaranty sets forth the entire understanding of the parties, and the undersigned acknowledges that no oral or other agreements, conditions, promises, understandings, representations or warranties exist in regard to the obligations hereunder, except those specifically set forth herein.

The undersigned irrevocably waives and shall not seek to enforce or collect upon any rights which it now has or may acquire against the Borrower, either by way of subrogation, indemnity, reimbursement or contribution, or any other similar right, for any amount paid under this guaranty or by way of any other obligations whatsoever of the Borrower to the undersigned. In the event either a petition is filed under the Bankruptcy Code in regard to the Borrower or an action or proceeding is commenced for the benefit of the creditors of the Borrower, this agreement shall at all times thereafter remain effective in regard to any payments or other transfers of assets to the Bank received from or on behalf of the Borrower prior to notice of termination of this guaranty and which are or may be held voidable or otherwise subject to recission or return on the grounds of preference, fraudulent conveyance or otherwise, whether or not the Liabilities of the Borrower have been paid in full.

Each reference herein to the Bank shall be deemed to include its successors and assigns, in whose favor the provisions of this guaranty shall also inure. Each reference herein to the undersigned shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of the undersigned, all of whom shall be bound by the provisions of this guaranty.

CBM – Revised (03 1060) 07/02/04

2

JPMorgan Chase Bank

The term "undersigned" as used herein shall, if this instrument is signed by more than one party, mean the "undersigned and each of them" and each undertaking herein contained shall be their joint and several undertaking, provided, however, that in the next succeeding paragraph hereof the term "undersigned" shall mean the "undersigned or any of them". If any party hereto shall be a partnership, the agreements and obligations on the part of the undersigned herein contained shall remain in force and applicable against the partnership and all of its partners (notwithstanding any changes in the individuals composing the partnership or any release of one or more partners) and the term "undersigned" shall include any altered or successive partnership but, the predecessor partnerships and their partners shall not thereby be released from any obligation or liability.

No delay on the part of the Bank in exercising any rights hereunder or failure to exercise the same shall operate as a waiver of such rights; no notice to or demand on the undersigned shall be deemed to be a waiver of the obligation of the undersigned or of the right of the Bank to take further action without notice or demand as provided herein; nor in any event shall any modification or waiver of the provisions of this guaranty be effective unless in writing signed by an authorized officer of the Bank; nor shall any such waiver be applicable except in the specific instance for which given.

**This guaranty** is, and shall be deemed to be, a contract entered into under and pursuant to the laws of the State of New York and **shall be in all respects governed, construed, applied and enforced in accordance with the laws of the State of New York**; and no defense given or allowed by the laws of any other State or Country shall be interposed in any action hereon unless such defense is also given or allowed by the laws of the State of New York.

The undersigned hereby unconditionally **WAIVES ANY RIGHT TO JURY TRIAL** in connection with actions by or against the Bank arising out of or in connection with the Liabilities of the Borrower and this guaranty.

(If partnership, Individual or Partnership name of partnership and signature of general partner(s) must appear.)

Paulette Krelman

*Name of Guarantor (Type or Print)*

_____

_____

43 Hampshire Drive

*Address*

Mendham, NJ 07945

Corporation

*Name of Guarantor (Type or Print)*

By:_____

_____

*Title*

**(AFFIX CORPORATE SEAL HERE)**

**Individual Acknowledgment**

STATE OF _NJ_ )

COUNTY OF _MORRIS_ ) SS:

On the _8TH_ day of _OCTOBER 2004_, before me personally came _Paulette Kaichas_ _____, to me known to be the individual described in and who executed the foregoing instrument and he/she acknowledged to me that he/she executed the same.

_____
Notary Public

My commission expires:

**Corporate Acknowledgment**

STATE OF _NJ_ )

COUNTY OF _Morris_ ) SS:

On the _8TH_ day of _OCTOBER, 2004_, before me personally came _EDWARD R. BROWNE_ _____, to me known, who, being by me duly sworn, did depose and say that he/she is the _____ of _____, the corporation described in and which executed the above instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the board of directors of said corporation, and that he/she signed his name thereto by like order.

_____
Notary Public

My commission expires:

RELU MUSAT
Notary Public
New Jersey
My Commission Expires June 18, 2009

**Partnership Acknowledgment**

STATE OF _NJ_ )

COUNTY OF _Morris_ ) SS:

On the _8TH_ day of _OCTOBER 2004_, before me personally came _ARTHUR R. KUPPERMAN_ _____, to me known to be the individual described in and who executed the foregoing instrument and he/she acknowledged to me that he/she executed the same as a General Partner of _____, a Partnership, as his/her act and deed.

_____
Notary Public

My commission expires:

RELU MUSAT
Notary Public
New Jersey
My Commission Expires June 18, 2009

RELU MUSAT
Notary Public
New Jersey
My Commission Expires June 18, 2009

## GUARANTY

New York , New York
ОТ ГВ В , 2004

WHEREAS,_____PGB INTERNATIONAL, LLC_____
(hereinafter called the "Borrower"), desires to transact business with and to obtain credit or a continuation of credit or other financial accommodations from JPMORGAN CHASE BANK, a New York banking corporation (hereinafter called the "Bank"); and

WHEREAS, the Bank is unwilling to extend or continue credit to or other financial accommodations to the Borrower, unless it receives the following guaranty of the undersigned;

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration and in order to induce the Bank from time to time, in its discretion, to extend or continue credit or other financial accommodations to the Borrower, the undersigned hereby guarantees, absolutely and unconditionally, to the Bank the payment of all liabilities of the Borrower to the Bank of whatever nature, whether now existing or hereafter incurred, whether created directly or acquired by the Bank by assignment or otherwise, whether matured or unmatured, joint, several or joint and several, secured or unsecured and whether absolute or contingent, including, without limitation, all interest or other claims which may accrue or arise after the commencement of bankruptcy, insolvency, reorganization, liquidation or other similar proceedings (all of which are hereinafter collectively referred to as the "Liabilities of the Borrower").

In order to further secure the payment of the Liabilities of the Borrower, the undersigned does hereby give the Bank a continuing lien and right of set-off for the amount of the Liabilities of the Borrower upon any and all monies, securities and any and all other property of the undersigned and the proceeds thereof, now or hereafter actually or constructively held or received by or in transit in any manner to or from the Bank, J.P. Morgan Securities Inc., or any other affiliate of the Bank from or for the undersigned, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into the possession of the Bank, J.P. Morgan Securities Inc., or any other affiliate of the Bank in any way, or placed in any safe deposit box leased by the Bank, J.P. Morgan Securities Inc., or any other affiliate of the Bank to the undersigned. The Bank is also given a continuing lien and right of set-off for the amount of said Liabilities of the Borrower upon any and all deposits (general and special) and credits of, or for the benefit of the undersigned with, and any and all claims of the undersigned against, the Bank, J.P. Morgan Securities Inc., or any other affiliate of the Bank at any time existing. The Bank is hereby authorized at any time or times, without prior notice, to apply such deposits or credits, or any part thereof, to such Liabilities of the Borrower and, although said Liabilities of the Borrower may be contingent or unmatured, and whether the collateral security therefor is deemed adequate or not. The undersigned authorizes the Bank to deliver a copy of this guaranty to others as written notification of the undersigned's transfer of a security interest in the collateral described herein to the Bank.

The undersigned agrees that, with or without notice or demand, the undersigned shall reimburse the Bank for all the Bank's expenses (including reasonable fees of counsel for the Bank who may be employees thereof) incurred in connection with any of the Liabilities of the Borrower or the collection thereof.

This guaranty is a continuing guaranty and shall remain in full force and effect irrespective of any interruptions in the business relations of the Borrower with the Bank; provided, however, that the undersigned may, by notice in writing, delivered personally or received by certified mail, return receipt requested, addressed to the Bank's office at 1111 Fannin Street, Houston, Texas 77002, Commercial Loan Documentation Division, Attention: Manager, terminate this guaranty, but any such termination shall have no effect with respect to the Liabilities of the Borrower (including contingent liabilities) existing on the date on which such notice is so delivered or received or which on such date the Bank is obligated (including on a conditional basis) to provide or acquire thereafter, or with respect to any interest, fees, indemnities, charges, expenses or costs payable thereon or attributable thereto even if arising or incurred after such date, and this guaranty and the obligations of the undersigned hereunder with respect to the foregoing Liabilities of the Borrower shall continue notwithstanding any such termination until all such amounts are fully and finally paid.

All monies available to the Bank for application in payment or reduction of the Liabilities of the Borrower may be applied by the Bank in such manner and in such amounts and at such time or times as it may see fit to the payment or reduction of such of the Liabilities of the Borrower as the Bank may elect.

JPMorgan Chase Bank

The undersigned hereby waives: (a) notice of acceptance of this guaranty and of extensions of credit or other financial accommodations by the Bank to the Borrower; (b) presentment and demand for payment of any of the Liabilities of the Borrower; (c) protest and notice of dishonor or default to the undersigned or to any other party with respect to any of the Liabilities of the Borrower; (d) all other notices to which the undersigned may otherwise be entitled; and (e) any demand for payment hereunder.

All liabilities of the undersigned to the Bank hereunder or otherwise, whether or not then due or absolute or contingent, shall without notice or demand become due and payable immediately upon the occurrence of any default or event of default with respect to any Liabilities of the Borrower (or the occurrence of any other event which results in acceleration of the maturity of any thereof) or the occurrence of any default hereunder.  This is a guaranty of payment and not of collection and the undersigned further waives unconditionally and irrevocably any right to require that any action be brought against the Borrower or any other person or to require that resort be had to any security or any other property or asset or to any balance of any deposit account or credit on the books of the Bank in favor of the Borrower or any other person prior to any payment under this guaranty being made or enforced.

The undersigned hereby consents that from time to time, before or after any default by the Borrower or any notice of termination hereof, with or without further notice to or assent from the undersigned, any security at any time held by or available to the Bank for any obligation of the Borrower, or any security at any time held by or available to the Bank for any obligation of any other person secondarily or otherwise liable for any of the Liabilities of the Borrower, may be exchanged, surrendered or released and any obligation of the Borrower, or of any such other person, may be changed, altered, renewed, extended, continued, surrendered, compromised, waived, discharged or released in whole or in part (including without limitation any such event resulting from any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or its assets) or any default with respect thereto waived, and the Bank may fail to set off and may release, in whole or in part, any balance of any deposit account or credit on the Bank's books in favor of the Borrower, or of any such other person, and may extend further credit in any manner whatsoever to the Borrower, and generally deal or take action or no action with regard to the Borrower or any such security or other person as the Bank may see fit; and the undersigned shall remain bound under this guaranty notwithstanding any such exchange, surrender, release, change, alteration, renewal, extension, continuance, compromise, waiver, discharge, inaction, extension of further credit or other dealing.

The obligations of the undersigned are absolute and unconditional and are valid irrespective of any amendment, modification, waiver, consent or other change, discharge or release (including by operation of law, regulation or legal proceedings) with respect to, or any lack of validity or enforceability of, any Liabilities of the Borrower, or with respect to any other guaranty thereof or other credit support thereto or any collateral securing any of the foregoing, or any other agreement or circumstance which might otherwise constitute a defense to the obligations hereunder to any of the Liabilities of the Borrower or to the obligations of others related hereto or thereto and the undersigned irrevocably waives the right to assert defenses, set-offs and counterclaims in any litigation relating to this guaranty and the Liabilities of the Borrower.  This guaranty sets forth the entire understanding of the parties, and the undersigned acknowledges that no oral or other agreements, conditions, promises, understandings, representations or warranties exist in regard to the obligations hereunder, except those specifically set forth herein.

The undersigned irrevocably waives and shall not seek to enforce or collect upon any rights which it now has or may acquire against the Borrower, either by way of subrogation, indemnity, reimbursement or contribution, or any other similar right, for any amount paid under this guaranty or by way of any other obligations whatsoever of the Borrower to the undersigned. In the event either a petition is filed under the Bankruptcy Code in regard to the Borrower or an action or proceeding is commenced for the benefit of the creditors of the Borrower, this agreement shall at all times thereafter remain effective in regard to any payments or other transfers of assets to the Bank received from or on behalf of the Borrower prior to notice of termination of this guaranty and which are or may be held voidable or otherwise subject to rescission or return on the grounds of preference, fraudulent conveyance or otherwise, whether or not the Liabilities of the Borrower have been paid in full.

Each reference herein to the Bank shall be deemed to include its successors and assigns, in whose favor the provisions of this guaranty shall also inure.  Each reference herein to the undersigned shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of the undersigned, all of whom shall be bound by the provisions of this guaranty.

The term "undersigned" as used herein shall, if this instrument is signed by more than one party, mean the "undersigned and each of them" and each undertaking herein contained shall be their joint and several undertaking, provided, however, that in the next succeeding paragraph hereof the term "undersigned" shall mean the "undersigned or any of them". If any party hereto shall be a partnership, the agreements and obligations on the part of the undersigned herein contained shall remain in force and applicable against the partnership and all of its partners (notwithstanding any changes in the individuals composing the partnership or any release of one or more partners) and the term "undersigned" shall include any altered or successive partnership but, the predecessor partnerships and their partners shall not thereby be released from any obligation or liability.

No delay on the part of the Bank in exercising any rights hereunder or failure to exercise the same shall operate as a waiver of such rights; no notice to or demand on the undersigned shall be deemed to be a waiver of the obligation of the undersigned or of the right of the Bank to take further action without notice or demand as provided herein; nor in any event shall any modification or waiver of the provisions of this guaranty be effective unless in writing signed by an authorized officer of the Bank; nor shall any such waiver be applicable except in the specific instance for which given.

**This guaranty** is, and shall be deemed to be, a contract entered into under and pursuant to the laws of the State of New York and **shall be in all respects governed, construed, applied and enforced in accordance with the laws of the State of New York**; and no defense given or allowed by the laws of any other State or Country shall be interposed in any action hereon unless such defense is also given or allowed by the laws of the State of New York.

The undersigned hereby unconditionally **WAIVES ANY RIGHT TO JURY TRIAL** in connection with actions by or against the Bank arising out of or in connection with the Liabilities of the Borrower and this guaranty.

| (If partnership, | **Individual or Partnership** | **Corporation** |
|---|---|---|
| name of partnership and signature of general partner(s) must appear.) | E. Ross Brown | |
| | _Name of Guarantor (Type or Print)_ | _Name of Guarantor (Type or Print)_ |
| | _signature_ | |
| | | By: _____ |
| | 27 Waterford Drive | |
| | _Address_ | |
| | Montville, NJ 07045 | _Title_ |

(AFFIX CORPORATE SEAL HERE)

**Individual Acknowledgment**

STATE OF ___N.J___ )
                                  ) SS:
COUNTY OF ___MORRIS___ )

On the ___8TH___ day of ___OCTOBER 2004___ before me personally came ___E. Ross Brown___ _____, to me known to be the individual described in and who executed the foregoing instrument and he/she acknowledged to me that he/she executed the same.

```
RELU MUSAT
Notary Public
New Jersey
My Commission Expires June 18, 2009
```

_____
Notary Public

My commission expires: _____

**Corporate Acknowledgment**

STATE OF _____ )
                                  ) SS:
COUNTY OF _____ )

On the _____ day of _____, _____, before me personally came _____ _____, to me known, who, being by me duly sworn, did depose and say that he/she is the _____ of _____, the corporation described in and which executed the above instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the board of directors of said corporation, and that he/she signed his name thereto by like order.

_____
Notary Public

My commission expires: _____

**Partnership Acknowledgment**

STATE OF _____ )
                                  ) SS:
COUNTY OF _____ )

On the _____ day of _____, _____, before me personally came _____ _____, to me known to be the individual described in and who executed the foregoing instrument and he/she acknowledged to me that he/she executed the same as a General Partner of _____, a Partnership, as his/her act and deed.

_____
Notary Public

My commission expires: _____

# EXHIBIT E

**PGB**
Loan Draws (including loan roll overs/renewals)

| Date | Amount |
|------|--------|
| 10/12/2004 | 1,600,000 |
| 10/25/2004 | 100,000 |
| 11/16/2004 | 1,000,000 |
| 11/17/2004 | 125,000 |
| 12/1/2004 | 300,000 |
| 12/8/2004 | 150,000 |
| 12/21/2004 | 200,000 |
| 1/4/2005 | 115,000 |
| 1/11/2005 | 85,000 |
| 3/1/2005 | 50,000 |
| 3/28/2005 | 150,000 |
| 3/31/2005 | 1,000,000 |
| 3/31/2005 | 650,000 |
| 4/6/2005 | 100,000 |
| 4/11/2005 | 50,000 |
| 4/28/2005 | 75,000 |
| 5/26/2005 | 150,000 |
| 6/3/2005 | 75,000 |
| 6/30/2005 | 150,000 |
| 7/8/2005 | 50,000 |
| 7/25/2005 | 300,000 |
| 7/29/2005 | 75,000 |
| 8/11/2005 | 25,000 |
| 9/6/2005 | 32,500 |
| 9/8/2005 | 17,500 |
| 11/4/2005 | 350,000 |
| 11/15/2005 | 75,000 |
| 11/17/2005 | 75,000 |
| 2/15/2006 | 500,000 |
| 3/8/2006 | 50,000 |
| 3/13/2006 | 50,000 |
| 3/31/2006 | 1,000,000 |
| 4/11/2006 | 1,500,000 |
| 4/20/2006 | 300,000 |
| 4/27/2006 | 30,000 |
| 6/6/2006 | 25,000 |
| 6/8/2006 | 15,000 |

# EXHIBIT  F



**JPMorgan Chase Bank, N.A.**
270 Park Avenue, 20th Floor
New York, NY 10017
Tel 212-270-7297
Fax 212-270-0454
E-Mail Wayne.E.Olson@Chase.com

**Wayne E. Olson**
Vice President
Special Credits Group

October 16, 2006

<u>Certified Mail Return Receipt and Regular US Mail</u>
PGB International LLC                    E. Ross Browne
6 South Street                          27 Waterford Drive
Morristown, NJ 07960                    Montville, NJ 07045

Paulette Krelman
43 Hampshire Drive
Mendham, NJ 07945

    **RE:   NOTICE OF DEFAULT, ACCELERATION OF INDEBTEDNESS AND DEMAND FOR PAYMENT**

Ladies and Gentlemen:

    PGB International LLC., a New Jersey limited liability company (the "Company") is indebted to JPMorgan Chase Bank, N.A. (the "Bank"), under a $3,000,000 Advised Line of Credit Note dated March 16, 2006 (the "Note"). The current principal balance $3,000,000.00. Accrued and unpaid interest as of October 16, 2006 equals $34,293.49

    The foregoing indebtedness, together with all other obligations and liabilities to the Bank now or hereafter existing or arising under the Note or otherwise (collectively, the "Obligations"), are secured by the collateral (the "Collateral") described in the Security Agreement dated March 8, 2004 from the Company (the "Security Agreement"). The Obligations have been guaranteed by E. Ross Browne and by Paulette Krelman (the "Guarantors"; and, together with the Company, the "Obligors") under their Guaranties dated October 8, 2004 (the "Guaranties).

    The Note, the Security Agreement, the Guaranties, and any other instruments, agreements or documents executed by any Obligor evidencing, governing or securing any Obligations or otherwise relating to any of the foregoing are hereinafter sometimes referred to collectively as the "Applicable Documentation".

    The Company is in default under the Security Agreement and the Note due to, inter alia, (i) the attachment of the collateral by Order of the United District Court District of New Jersey, (ii) material adverse change in the business, assets, affairs, prospects or financial condition of the Borrower (iii) the Bank with reasonable cause believes that its interest in the Collateral is in jeopardy. Accordingly, and pursuant to the terms of the Note and the Security Agreement the Bank hereby elects to accelerate the maturity of the Note. The Bank hereby makes immediate demand for payment. Interest will continue to accrue at the default rate provided in

58469

2

PGB International LLC
October 16, 2006

the Note, which is the Bank's prime rate plus 3% per annum.   Borrower is liable for reasonable costs and expenses of every kind incurred, including without limitation reasonable attorneys' fees and court costs incurred by the Bank.

Neither the delivery of this letter, nor the prior or future collection of any interest or principal by the Bank with respect to the Loan, whether or not at the said interest rate, shall be construed to (i) limit the undersigned's rights to receive any and all other sums which may be or become due or payable under your agreement or any document or instrument delivered in connection with the Loan, or otherwise including without limitation, costs of collection, costs of enforcement and late payment charges or (ii) waive, limit, prejudice or otherwise adversely affect any of the Bank's rights, remedies or powers under your agreement or any document or instrument delivered in connection with the Loan, by statute, at law or in equity, all of which rights, remedies and powers are expressly reserved.

You are further advised that no oral communication from on behalf of the Bank by any party shall constitute any agreement, commitment or evidence of any assurance or intention of the Bank with respect to any aspect of your agreement to the Loan.   Any agreement, commitment, assurance or intention of the Bank with respect to any aspect of your agreement of the Loan shall be effective only if in writing and duly executed on behalf of the Bank.  If you would like to discuss any of the foregoing, please contact the undersigned at (212) 270-7297.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By:_____
        Wayne E. Olson
        Vice President

58469