UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.,

Plaintiff,

-against-

ARTHUR KUPPERMAN; E. ROSS BROWNE; PAULETTE KRELMAN; PGB INTERNATIONAL, LLC; and J.P. MORGAN CHASE BANK, NATIONAL ASSOCIATION,

Defendants.

Case No. 06-Civ-4802 (DMC)

**DECLARATION OF AARON VAGELATOS**

I, **AARON VAGELATOS,** declare pursuant to 28 U.S.C. § 1746 under penalty of perjury that the following is true and correct:

1. The facts stated herein are based upon my personal knowledge.

2. I am a Vice President and Credit Relationship Officer at Merrill Lynch Business Financial Services, Inc. ("MLBFS").

3. I started working at MLBFS as a Senior Credit Manager in September 2003. Shortly thereafter, I assumed the relationship responsibility for the Working Capital Management Account ("WCMA") line of credit that MLBFS had extended to PITTRA G.B. International, Inc ("PITTRA").

4. All of my communications with PITTRA were through Arthur Kupperman ("Kupperman").

- 1 -

#0220605.02

## THE JANUARY 2004 AGREEMENT

5.  In or about December 2003, Kupperman submitted to MLBFS a request for a renewal and increase of PITTRA's WCMA line of credit from $2,750,000.00 to $3,250,000.00 (the "January 2004 Agreement").

### The 2003 Audit Letter

6.  On or around December 30, 2003, I stated in response to an internal inquiry regarding the January 2004 Agreement that any MLBFS increase of PITTRA's line of available credit should be conditioned upon PITTRA's submission of an audited report of its financial statements. Attached as Exhibit A hereto is a copy of that correspondence.

7.  In or about January 2004, Kupperman provided documents that he represented were internal financial statements audited by the accounting firm of Amper Politziner and Mattia ("APM"). Copies of those documents are attached hereto as Exhibit B.

8.  Relying upon the accuracy and veracity of the information contained in the financial statements, as well as the representation that the statements had been audited by APM, which purportedly had found that the financial statements were fair representations of PITTRA's financial position, MLBFS executed the January 2004 Agreement.

### The First Becker Meisel Letter

9.  On or around January 7, 2004, as part of its review of the PITTRA line of credit, MLBFS learned that PITTRA was involved in a number of pending lawsuits. Upon inquiry, Kupperman provided me with an explanation of these matters. In response, on or around January 13, 2004, I informed Kupperman by e-mail that MLBFS conditioned approval of the January 2004 Agreement upon its receipt and review of an attorney's letter from PITTRA

#0220605.02

counsel with an explanation of the lawsuits in which PITTRA was involved. On or around January 15, 2004, Kupperman informed me that he had obtained the required letter. Attached hereto as Exhibit C is a copy of that correspondence.

10. On or around January 20, 2004, Kupperman transmitted to me by facsimile a letter dated January 16, 2004 purporting to be from the law firm of Becker Meisel, LLC ("Becker Meisel"), bearing the signature of Ben H. Becker, and offering the summary of legal proceedings which MLBFS had requested. That letter, with the facsimile cover sheet, is attached hereto as Exhibit D.

11. MLBFS relied upon the representations in the letter dated January 16, 2004 purporting to be from Becker Meisel to conclude that PITTRA was an ongoing business concern with no significant legal issues facing it.

### The Krelman Documents

12. MLBFS also conditioned its execution of the January 2004 Agreement upon its receipt and review of certain additional documents, including personal financial statements from each of the PITTRA guarantors, as well as a letter from MLBFS dated January 15, 2004 regarding "WCMA Line of Credit Increase and Extension," countersigned by the PITTRA officers.

13. In response, on or around January 16, 2004, Kupperman provided a document that he represented was the Personal Financial Statement of Paulette Krelman ("Krelman") dated January 7, 2004. That document is attached hereto as Exhibit E.

#0220605.02

14. On that same date, Kupperman provided the letter regarding "WCMA Line of Credit Increase and Extension" purporting to bear Krelman's countersignature. That document is attached hereto as Exhibit F.

15. I relied upon the documents purporting be the Personal Financial Statement of Paulette Krelman reflecting Krelman's financial status to conclude that Krelman was able to meet her responsibilities as an individual guarantor of the WCMA line of credit, and consequently to recommend that MLBFS enter into the January 2004 Agreement.

16. I also relied upon Krelman's purported countersignature of the letter regarding "WCMA Line of Credit Increase and Extension" to recommend that MLBFS enter into the January 2004 Agreement.

## THE MAY 2004 AGREEMENT

17. In or about the beginning of March 2004, Kupperman proposed converting PITTRA from a corporation to a limited liability company named PGB International, LLC ("PGB"). He also proposed yet another renewal and increase of the PITTRA line of credit, this time from $3,250,000.00 to a total of $4,250,000.00 (the "May 2004 Agreement").

18. At that time, MLBFS was willing to accommodate the proposed conversion of the PITTRA business entity from a corporation to a limited liability company, with certain conditions. Specifically, we conditioned approval of the transition upon a review of the asset purchase agreement between PITTRA and PGB. By letter dated March 8, 2004 and attached hereto as Exhibit G, Kupperman enclosed a draft of the asset purchase agreement and stated that

the documents "were drafted for the Mitsui[1] deal and [would] now be used for our conversion from PITTRA to PGB. We did all of the paperwork, but never actually transferred anything from one company to another."

19. As an additional condition of its approval of the transition from PITTRA to PGB, MLBFS required proof that a loan from Peapack Gladstone Bank to PGB had been paid off in full. Attached as Exhibit H is a chain of e-mails on April 14 and 15, 2004 regarding these deficiencies.

20. In or about May 2004, Kupperman advised me that he had abandoned the proposed restructuring plan, but that he wanted to keep and increase the amount of the PITTRA financing, with PGB operating as a separate entity solely for the purpose of conducting business with a Russian customer.

21. On May 13, 2004, I expressed concerns about the possible impact that PGB's deal with the Russian customer may have upon PITTRA's business operations. In an e-mail attached hereto as Exhibit I, Kupperman represented that PGB would operate "separate and apart from our regular business" with "no impact whatsoever on PITTRA G.B."

22. On or around May 20, 2004, Kupperman sent another e-mail to me, attached hereto as Exhibit J, in which he stated, "There will be no commingling [of funds] between PITTRA and PGB. There are truly no intercompany transactions… This is intentional to keep both an arm's length perspective and a basis of fairness."

---

[1] Upon assumption of my responsibilities for the PITTRA account in September 2003, I learned that PITTRA had contemplated a transaction with Mistui and Co., Ltd. ("Mitsui"), a Japanese import/ export business, but that the transaction had not been consummated.

#0220605.02

23. Approximately three hours later, he sent another e-mail to me, attached hereto as Exhibit K, in which he further stated, "By the way, as an aside, the [PGB] deal with the Russian company really adds to our strength as PITTRA... I am having a hard time trying to think of the negatives or the intercompany transactions that could hurt PITTRA. It can only be favorable for PITTRA or a non-event for PITTRA. I cannot think of a negative under any circumstances, but perhaps there is something I am just not seeing."

24. Based upon the representations in these e-mails, I concluded that PITTRA and PGB were two separate and distinct business entities, and that PITTRA's ongoing business operations would not be impaired by PGB. Accordingly, MLBFS entered into the May 2004 Agreement.

### The Second Becker Meisel Letter

25. As we had with the January 2004 Agreement, and in response to its ongoing concerns about the relationship between PITTRA and PGB, I conditioned MLBFS's execution of the May 2004 Agreement upon its receipt and review of a letter from PITTRA legal counsel summarizing the basis for and status of lawsuits pending against PITTRA.

26. On or around May 28, 2004, Kupperman delivered to MLBFS a letter, attached hereto as Exhibit L, dated May 28, 2004 purporting to be from Becker Meisel, bearing the signature of Ben H. Becker, and offering the summary of legal proceedings which MLBFS had requested.

27. Based upon the representations in the letter dated May 28, 2004 purporting to be from Becker Meisel, I concluded that PITTRA was an ongoing business concern with no

#0220605.02

significant legal issues facing it, and accordingly recommended that MLBFS enter into the May 2004 Agreement.

### The May 2004 Krelman Documents

28. In or about April 2004, I conditioned MLBFS's execution of the May 2004 Agreement upon its receipt and review of Personal Financial Statements by PITTRA's individual guarantors, a Secretary's Certificate executed by the PITTRA Secretary, Unconditional Guaranties by the individual guarantors and the PITTRA officers' countersignature of the letter from MLBFS dated May 28, 2004 addressed to PITTRA regarding "WCMA Line of Credit Increase and Extension."

29. In or about May 2004, Kupperman provided to me the Secretary's Certificate dated May 20, 2004 purporting to bear Krelman's signature, attached hereto as Exhibit M. MLBFS relied upon Krelman's purported signature of the Secretary's Certificate to conclude that PITTRA remained a functioning business entity, and that it was appropriate for MLBFS to enter into the May 2004 Agreement.

30. In or about May 2004, Kupperman provided to me his Unconditional Guaranty dated May 28, 2004, attached hereto as Exhibit N. MLBFS relied upon the document purporting be Kupperman's personal Unconditional Guaranty to conclude that Kupperman was able to meet his responsibilities as an individual guarantor of the WCMA line of credit, and consequently that it was appropriate for MLBFS to enter into the May 2004 Agreement.

31. In or about May 2004, Kupperman provided to me the Unconditional Guaranty of Krelman dated May 28, 2004, attached hereto as Exhibit O. MLBFS relied upon the document purporting be Krelman's personal Unconditional Guaranty to conclude that Krelman was able to

#0220605.02

meet her responsibilities as an individual guarantor of the WCMA line of credit, and consequently that it was appropriate for MLBFS to enter into the May 2004 Agreement.

32. In or about May 2004, Kupperman provided to me the letter from MLBFS dated May 28, 2004 addressed to PITTRA regarding "WCMA Line of Credit Increase and Extension" that he represented bore Krelman's signature. That letter is attached hereto as Exhibit P. MLBFS relied upon Krelman's countersignature to conclude that PITTRA's officers had agreed to the terms of the May 2004 Agreement.

33. Upon its receipt and review of these documents, and in reliance upon the representations contained therein, in or about May 2004, MLBFS agreed to a renewal and increase of PITTRA's WCMA line of credit from $3,250,000.00 to $3,750,000.00, and an extension of an additional $500,000.00 to PITTRA in the form of a separate term loan.

34. On or around July 15, 2004, I received an internal MLBFS inquiry expressing concern about the Pittra account. Referencing the financial statements that Kupperman had submitted to me on a regular basis, as well as the documents and information that Kupperman had provided pursuant to the May 2004 Agreement, I informed my colleague that the account did not warrant being placed on "watch" status. Attached hereto as Exhibit Q is a copy of that correspondence.

35. Again on or around September 15, 2004, I received another internal MLBFS inquiry expressing concern about the Pittra account. I informed my colleague, based upon the financial records that Kupperman had provided, that Pittra was profitable. However, I stated that I was "against giving them any more money at the current time." Attached hereto as Exhibit R is a copy of that correspondence.

#0220605.02

## 2005 CONTINUATION OF THE WCMA LINE OF CREDIT

### The 2004 Audit Letter

36. On or around February 1, 2005, I sent an e-mail to Kupperman requesting that he deliver PITTRA's audited financial statements to me. In response, Kupperman sent to me documents that he represented were internal financial statements for the fiscal years ending September 30, 2004 and 2003, which purportedly had been audited by APM. Attached hereto as Exhibit S are those documents, with the corresponding e-mail message to which they were attached.

37. Relying upon the accuracy and veracity of the information contained in the financial statements, as well as the representation that the statements had been audited by APM, which purportedly had found that the financial statements were fair representations of PITTRA's financial position, MLBFS continued the WCMA line of credit in February 2005.

Pursuant to 28 U.S.C. 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

_____
Aaron Vagelatos

Executed on September 29, 2009