**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------

MERRILL LYNCH BUSINESS FINANCIAL
SERVICES INC.,

      Plaintiff,

   -against-

ARTHUR KUPPERMAN; E. ROSS BROWNE;
PAULETTE KRELMAN; PGB
INTERNATIONAL, LLC; and J.P. MORGAN
CHASE BANK, NATIONAL ASSOCIATION,

      Defendants.

---------------------------------------------------

Case No. 06-Civ-4802 (DMC)

## STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Merrill Lynch Business Financial Services Inc. ("MLBFS"), by its attorneys,

Vedder Price P.C., submits this Statement of Uncontested Material Facts, pursuant to Rule 56.1

of the Local Civil Rules of the United States District Court for District of New Jersey, in support

of its motion for summary judgment on the issue of defendant Arthur Kupperman's fraud in the

above-captioned action.

This Statement of Uncontested Material Facts contains citations to the record in which

support for such facts is found.

### THE PARTIES

1.  Plaintiff Merrill Lynch Business Financial Services Inc. ("MLBFS") is a

Delaware corporation with its principal place of business in Chicago, Illinois.  MLBFS is in the

business, *inter alia*, of providing commercial loans to small and middle market companies. (Verified Complaint ("Ver. Cplt."), ¶3[1]; Declaration of Catherine L. Briick ("Briick Dec.") ¶ 3[2])

2.      Defendant Arthur Kupperman ("Kupperman") is a citizen of New Jersey residing at 43 Hampshire Drive, Mendham, New Jersey 07945.  (September 26, 2006 deposition of Arthur Kupperman ("9/26/06 Kupperman Dep.") 4:15-25, attached to the Declaration of Michael J. Goettig ("Goettig Dec.") as Exhibit B)

3.      On October 12, 2001, Kupperman incorporated PITTRA G.B. International, Inc. ("PITTRA"), a New Jersey corporation, with a listed agent address of 43 Hampshire Drive, Mendham, NJ 07945. (PITTRA Business Entity Status Report, Goettig Dec. Ex. D)  Kupperman was PITTRA's President and, as of November 1, 2004, its sole shareholder (Goettig Dec. ¶¶ 9-10, Exs. G-H).  PITTRA conducted business out of 6 South Street, Suite 301, Morristown, New Jersey 07960.  (PITTRA Voluntary Petition of Bankruptcy 1, 3, Goettig Dec. Ex. M)

4.      On April 30, 2003, Kupperman formed defendant PGB International, LLC ("PGB"), a New Jersey limited liability company, with a listed business address of 6 South Street, Suite 301, Morristown, New Jersey 07960.  Kupperman is PGB's managing member. (PGB Business Entity Status Report, Goettig Dec. Ex. E)

5.      Kupperman composed all of the e-mails sent from his account.   (6/22/05 Kupperman Dep. 23:17-24:4)

---

[1] Kupperman has refused to answer each and every allegation in the Verified Complaint of MLBFS under the Fifth Amendment of the U.S. Constitution on the grounds that providing responses to the allegations therein may tend to incriminate him.

[2] Copies of the declarations referred to herein are attached to the Notice of Motion.

6.    Paulette Krelman ("Krelman"), a citizen of the State of New Jersey residing at 43 Hampshire Drive, Mendham, NJ, was PITTRA's Secretary and Treasurer as well as a director and shareholder of the company.   (September 29, 2009 declaration of Paulette Krelman ("Krelman Dec.") ¶ 1)   On or about November 1, 2004, Krelman sold all of her shares in PITTRA to Kupperman. (Goettig Dec. Ex. G)

7.    E. Ross Browne ("Browne"), a citizen of the State of New Jersey residing at 27 Waterford Drive, Montville, NJ, was PITTRA's Vice President as well as a director and shareholder of the company.   (Ver. Cplt. ¶ 8)   On or about November 1, 2004, Browne sold all of his shares in PITTRA to Kupperman.   (Goettig Dec. Ex. H)

8.    Ross Browne III was employed by PITTRA and PGB from February 2001 to September 2006. (Declaration of Ross Browne III ("R. Browne III Dec.") ¶ 1)

9.    Alison Browne was employed by PITTRA and PGB from February 2001 to October 2006. (Declaration of Alison Browne ("A. Browne Dec.") ¶ 1)

10.    Colin Browne was employed by PITTRA and PGB from February 2002 to October 2002. (Declaration of Alison Browne ("C. Browne Dec.") ¶ 1)

11.    Cathy Brennan was employed by PITTRA from its inception until approximately March of 2004.  (Declaration of Cathy Brennan ("Brennan Dec.") ¶ 1)

### 2002 EXTENSION OF MLBFS'S LINE OF CREDIT TO PITTRA

12.    On or around November 19, 2002, MLBFS extended financial accommodations in the amount of $2,250,000.00 to PITTRA in the form of a Working Capital Management Account

("WCMA"), the terms of which were memorialized in the Loan and Security Agreement (the "WCMA Agreement"). (Briick Dec. ¶ 4, Ex. A)

13.    At no time did MLBFS waive its lien on PITTRA's customer list or any other tangible or intangible property held by PITTRA.  (Briick Dec. ¶ 7)

## 2003 LINE OF CREDIT RENEWAL

14.    In or around December 2002, Kupperman applied to MLBFS for a renewal and increase of PITTRA's WCMA line of credit from $2,250,000.00 to $2,750,000.00.  In or about January 2003, relying upon the documents submitted by Kupperman purporting to reflect the ongoing financial health of PITTRA, MLBFS agreed to the this renewal and increase (the "2003 Agreement").  (Briick Dec. ¶¶ 8, 11)

15.    In or about December 2002, MLBFS conditioned its execution of the 2003 Agreement upon its receipt and review of PITTRA's audited financial statements revealing a financial condition of PITTRA satisfactory to MLBFS.  (Briick Dec. ¶ 9)

16.    On or around January 2, 2003, Kupperman provided by facsimile transmission to MLBFS documents that he represented were internal financial statements for the fiscal year ending September 30, 2002, which purportedly had been audited by the accounting firm of Amper, Politzner & Mattia, P.A. ("APM") as reflected in the "Independent Auditor's Report" dated December 12, 2002.  (Briick Dec. ¶ 10, Ex. C)

17.    MBLFS relied upon the accuracy and veracity of the information contained in the financial statements, as well as the representation that the statements had been audited by APM,

which purportedly had found that the financial statements were fair representations of PITTRA's financial position, to reach its decision to execute the 2003 Agreement. (Briick Dec. ¶ 11)

18.    The "Independent Auditor's Report" submitted by Kupperman had not been prepared by APM or by anyone at the direction of APM.   APM has no record of the "Independent Auditor's Report" in its files.  PITTRA has never been an audit client of APM. (Declaration of Wayne Tessler ("Tessler Dec.") ¶ 3)

19.    Neither Krelman nor Browne was involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.  Prior to the commencement of this action, neither had any knowledge whatsoever of the document's existence. (Krelman Dec. ¶ 4; Browne Dec. ¶ 3)

20.    Ross Browne III was not involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.   Prior to the commencement of this action, he had no knowledge whatsoever of the document's existence.  (R. Browne III Dec. ¶ 3)

21.    Alison Browne was not involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.   Prior to the commencement of this action, she had no knowledge whatsoever of the document's existence.  (A. Browne Dec. ¶ 3)

22.    Colin Browne was not involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.   Prior to the commencement of this action, he had no knowledge whatsoever of the document's existence.  (C. Browne Dec. ¶ 3)

23.     Cathy Brennan was not involved in the creation of the "Independent Auditor's Reports" or its delivery to MLBFS.   Prior to the commencement of this action, she had no knowledge whatsoever of the document" existence. (Brennan Dec. ¶ 3)[3]

## TRANSFER OF PITTRA ASSETS TO PGB

24.     On June 5, 2003, Kupperman facilitated the transfer of all of PITTRA's assets to PGB in exchange for a promissory note which went unpaid.   The asset purchase agreement memorializing the transfer purported to sell PITTRA's assets to PGB free of the liens of MLBFS as a secured lender.   (Asset Purchase Agreement, Goettig Dec. Ex. F)

25.     Kupperman did not inform MLBFS of the sale of PITTRA's assets to PGB.   (June 22, 2005 deposition of Arthur Kupperman ("6/22/05 Kupperman Dep.") 66:20-67:2, Goettig Dec. Ex. C)

26.     PITTRA ceased doing business in or about August or September 2003.   (6/22/05 Kupperman Dep. 77:15-23; April 15, 2005 e-mail from Kupperman to Patrick J. Collins, Goettig Dec. Ex. I)

27.     On a regular basis after PITTRA ceased doing business, Kupperman continued to submit financial statements, as required by the terms of the WCMA Agreement and 2003 Agreement, purporting to reflect PITTRA's ongoing business activities. (Briick Dec. ¶ 5)

28.     MLBFS relied upon these statements to determine that PITTRA was an ongoing and viable business.   (Briick Dec. ¶ 6)

---

[3] Ross Browne II, Alison Browne, Colin Browne and Cathy Brennan are referred to collectively hereinafter as the "PITTRA Employees."

### JANUARY 2004 LINE OF CREDIT RENEWAL AND INCREASE

29.    In or about December 2003, despite the fact that PITTRA had ceased operating and that its assets had been transferred to PGB, Kupperman applied for a renewal and increase of PITTRA's WCMA line of credit from $2,750,000.00 to $3,250,000.00 (the "January 2004 Agreement"). (Vagelatos Dec. ¶ 5)

### The First Becker Meisel Forgery

30.    On or around January 7, 2004, as part of its review of the PITTRA line of credit, MLBFS learned that PITTRA was involved in a number of pending lawsuits.  (Vagelatos Dec. ¶ 9)

31.    Upon inquiry, Kupperman provided an explanation of these matters.  In response to this explanation, on or around January 13, 2004, Vagelatos wrote to Kupperman, "As a Condition of Approval [of the January 2004 Agreement] I need a letter from your attorney(s) addressed to MLBFS with a short explanation of the lawsuits (filed by you and against you) and the terms of which you are resolving these issues.  In essence, I basically need the same conversation you and I had yesterday confirmed by your attorney(s)." (Vagelatos Dec. ¶ 9, Ex. C)

32.    On or around January 15, 2004, Kupperman wrote to MLBFS, "I received the letter from the lawyer this morning, but they have to make some minor corrections.  In order to make sure it meets with your approval, a draft copy will be sent by later this afternoon.  If it meets with your approval, they will forward a signed letterhead copy." (Vagelatos Dec. ¶ 9, Ex. C)

33.     On or around January 20, 2004, Kupperman transmitted to MLBFS by facsimile a letter dated January 16, 2004 purporting to be from the law firm of Becker Meisel, LLC ("Becker Meisel") and purporting to bear the signature of Ben H. Becker.  (Vagelatos Dec. ¶ 10, Ex. D)

34.     MLBFS relied upon the representations in the letter dated January 16, 2004 purporting to be from Becker Meisel to conclude that PITTRA was an ongoing business concern with no significant legal issues facing it.  (Vagelatos Dec. ¶ 11)

35.     The letter dated January 16, 2004 was not created or issued by Becker Meisel. Ben H. Becker, the purported signatory of the letters, did not sign either document.  The initials at the bottoms of the letters are not in a format typical of Becker Meisel, and the secretary's initials in the letters are not those of Ben H. Becker's secretary.  (Sept. 29, 2006 Certification of Ben H. Becker ¶¶ 3-5)

36.     Neither Krelman nor Browne was involved in the creation of the letter purporting to be from Becker Meisel or its delivery to MLBFS.  Prior to the commencement of this action, they had no knowledge whatsoever of the document's existence. (Krelman Dec. ¶ 8; Browne Dec. ¶ 7)

37.     None of the PITTRA Employees were involved in the creation of the letter purporting to be from Becker Meisel or its delivery to MLBFS.  Prior to the commencement of this action, they had no knowledge whatsoever of the document's existence.  (R. Browne III Dec. ¶ 7; A. Browne Dec. ¶ 7; C. Browne Dec. ¶ 7; Brennan Dec. ¶ 7)

## The January 2004 Krelman Forgeries

38.    In or about January 2004, MLBFS conditioned its execution of the January 2004 Agreement upon its receipt and review of personal financial statements from each of the PITTRA guarantors, as well as countersignature by the PITTRA officers of the letter from MLBFS dated January 15, 2004 addressed to PITTRA regarding "WCMA Line of Credit Increase and Extension." (Vagelatos Dec. ¶ 12)

39.    On or around January 16, 2004, Kupperman provided to MLBFS a document that he represented was the Personal Financial Statement of Paulette Krelman dated January 7, 2004. (Vagelatos Dec. ¶ 13)

40.    Krelman had no involvement in the creation of this document or its delivery to MLBFS, and prior to the commencement of this action, had no knowledge whatsoever of this document's existence.   The document bears Kupperman's handwriting.   Krelman did not authorize Kupperman to prepare or execute the document on her behalf. (Krelman Dec. ¶ 11)

41.    On or around January 16, 2004, Kupperman provided to MLBFS the letter from MLBFS dated January 15, 2004 addressed to PITTRA regarding "WCMA Line of Credit Increase and Extension" that he represented bore Krelman's signature. (Vagelatos Dec. ¶ 14)

42.    Krelman had no involvement in the execution of this document or its delivery to MLBFS, and prior to the commencement of this action, had no knowledge whatsoever of the document's existence.   Krelman did not authorize Kupperman to countersign the document on her behalf. (Krelman Dec. ¶ 12)

#0202716.04

43.     MBFS relied upon the documents purporting be the Personal Financial Statement of Paulette Krelman reflecting Krelman's financial status to conclude that Krelman was able to meet her responsibilities as an individual guarantor of the WCMA line of credit, and consequently to enter into the January 2004 Agreement.  (Vagelatos Dec. ¶ 15)

44.     MLBFS relied upon Krelman's purported countersignature of the letter regarding "WCMA Line of Credit Increase and Extension" to enter into the January 2004 Agreement. (Vagelatos Dec. ¶ 16)

**The Forged 2003 Report**

45.     On or around December 30, 2003, Vice President and Senior Credit Underwriter Aaron Vagelatos ("Vagelatos") stated in response to an internal inquiry regarding the January 2004 Agreement that any MLBFS increase of PITTRA's line of available credit should be conditioned upon PITTRA's submission of an audited report of its financial statements. (Vagelatos Dec. ¶ 6, Ex. A)

46.     In or about January 2004, MLBFS conditioned its execution of the January 2004 Agreement upon its receipt and review of PITTRA's audited financial statements revealing a financial condition of PITTRA satisfactory to MLBFS.   (WCMA Agreement § 3.2(a)(i); Vagelatos Dec. ¶ 6; Briick Dec. ¶ 9)

47.     In or about January 2004, Kupperman provided to MLBFS documents that he represented were internal financial statements for the fiscal years ending September 30, 2003 and 2002, which purportedly had been audited by APM as reflected in the "Independent Auditor's Report" dated December 17, 2003. (Vagelatos Dec. ¶ 7, Ex. B)

#0202716.04

48.     The "Independent Auditor's Report" submitted by Kupperman had not been prepared by APM or by anyone at the direction of APM.   APM has no record of the Independent Auditor's Report in its files.   PITTRA has never been an audit client of APM.  (Tessler Dec. ¶ 3)

49.     Neither Krelman nor Browne was involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.   Prior to the commencement of this action, neither had any knowledge whatsoever of the document's existence.  (Krelman Dec. ¶ 5; Browne Dec. ¶ 4)

50.     None of the PITTRA Employees were involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.   Prior to the commencement of this action, they had no knowledge whatsoever of the document's existence.  (R. Browne III Dec. ¶ 4; A. Browne Dec. ¶ 4; C. Browne Dec. ¶ 4; Brennan Dec. ¶ 4)

51.     Relying upon the accuracy and veracity of the information contained in the financial statements, as well as the representation that the statements had been audited by APM, which purportedly had found that the financial statements were fair representations of PITTRA's financial position, MLBFS executed the January 2004 Agreement.  (Vagelatos Dec. ¶ 8)

## MAY 2004 LINE OF CREDIT RENEWAL AND INCREASE

52.     In or about the beginning of March 2004, Kupperman proposed converting PITTRA from a corporation to a limited liability company named PGB.  (Vagelatos Dec. ¶ 17)

53.     Kupperman also proposed yet another renewal and increase of the PITTRA line of credit, this time from $3,250,000.00 to a total of $4,250,000.00.  (Vagelatos Dec. ¶ 17)

54.     In May 2004, in reliance upon the representations recounted below, MLBFS agreed to a renewal and increase of PITTRA's WCMA line of credit from $3,250,000.00 to $3,750,000.00, and an extension to PITTRA of an additional $500,000.00 in the form of a term loan documented by a Collateral Installment Note and a Term Loan Security Agreement. (Briick Dec. ¶ 12)

### Kupperman's Misrepresentations of PITTRA as a Going Concern

55.     In March 2004, MLBFS was willing to accommodate the proposed conversion of the PITTRA business entity from a corporation to a limited liability company, with certain conditions. Specifically, MLBFS conditioned approval of the transition upon a review of the asset purchase agreement between PITTRA and PGB. (Vagelatos Dec. ¶ 18)

56.     Pursuant to that plan, on or around March 8, 2004, Kupperman sent a letter to Vagelatos in which he stated that the closing documents memorializing the transition from PITTRA to PGB "were drafted for the Mitsui[4] deal and [would] now be used for our conversion from PITTRA to PGB. We did all of the paperwork, but never actually transferred anything from one company to another." (Vagelatos Dec. ¶ 18, Ex. G)

57.     In or about May 2004, Kupperman advised MLBFS that he had abandoned the proposed restructuring plan but wanted to increase the amount of MLBFS financing to PITTRA, with PGB operating as a separate entity solely for the purpose of conducting business with a Russian customer. (Vagelatos Dec. ¶ 20)

---

[4] "The Mitsui deal" was an unrelated transaction which was contemplated but abandoned by a then-potential business partner of PITTRA in the summer and fall of 2003.

58.     On or around May 13, 2004, in response to MLBFS concerns about the potential impact that PGB's deal with the Russian customer may have upon PITTRA's business operations, Kupperman represented that PGB would operate "separate and apart from our regular business" with "no impact whatsoever on PITTRA G.B." (Vagelatos Dec. ¶ 21, Ex. I)

59.     On or around May 20, 2004, Kupperman again represented that PITTRA was an ongoing, active and viable business, stating, "There will be no commingling [of funds] between PITTRA and PGB.  There are truly no intercompany transactions… This is intentional to keep both an arm's length perspective and a basis of fairness." (Vagelatos Dec. ¶ 22, Ex. J)

60.     Kupperman further stated, "By the way, as an aside, the [PGB] deal with the Russian company really adds to our strength as PITTRA… I am having a hard time trying to think of the negatives or the intercompany transactions that could hurt PITTRA.  It can only be favorable for PITTRA or a non-event for PITTRA.  I cannot think of a negative under any circumstances, but perhaps there is something I am just not seeing." (Vagelatos Dec. ¶ 23, Ex. K)

61.     Kupperman continuously led MLBFS to believe by these e-mails that PITTRA and PGB were two separate and distinct business entities, and that PITTRA's ongoing business operations would not be impaired by PGB.  At no time did Kupperman advise MLBFS that PITTRA had previously transferred all of its assets to PGB in July 2003 and had ceased operating in September 2003.  Rather, Kupperman continued to assure MLBFS that PITTRA continued to exist and was a viable entity.  Accordingly, MLBFS entered into the May 2004 Agreement. (Vagelatos Dec. ¶ 24)

### The Second Becker Meisel Forgery

62.     In or about May 2004, MLBFS conditioned its execution of the May 2004 Agreement upon its receipt and review of a letter from PITTRA legal counsel summarizing the basis for and status of lawsuits pending against PITTRA. (Vagelatos Dec. ¶ 25)

63.     On or around May 28, 2004, Kupperman delivered to MLBFS a letter dated May 28, 2004, again purporting to be from Becker Meisel and purporting to bear the signature of Ben H. Becker. (Vagelatos Dec. ¶ 26, Ex. L)

64.     MBFS relied upon the representations in the letter dated May 28, 2004 purporting to be from Becker Meisel to conclude that PITTRA was an ongoing business concern with no significant legal issues facing it. (Vagelatos Dec. ¶ 27)

65.     The letter dated May 28, 2004 was not created or issued by Becker Meisel. Ben H. Becker, the purported signatory of the letters, did not sign either document. The initials at the bottoms of the letters are not in a format typical of Becker Meisel, and the secretary's initials in the letters are not those of Ben H. Becker's secretary. (Sept. 29, 2006 Certification of Ben H. Becker ¶¶ 3-5)

66.     Neither Krelman nor Browne was involved in the creation of the letter purporting to be from Becker Meisel or its delivery to MLBFS. Prior to the commencement of this action, they had no knowledge whatsoever of the document's existence. (Krelman Dec. ¶ 9; Browne Dec. ¶ 8)

67.     None of the PITTRA Employees were involved in the creation of the letter purporting to be from Becker Meisel or its delivery to MLBFS. Prior to the commencement of

this action, they had no knowledge whatsoever of the document's existence.  (R. Browne III Dec.

¶ 8; A. Browne Dec. ¶ 8; C. Browne Dec. ¶ 8; Brennan Dec. ¶ 8)

### The May 2004 Krelman Forgeries

68.     In or about April 2004, MLBFS conditioned its execution of the May 2004

Agreement upon its receipt and review of Personal Financial Statements by the individual

guarantors, a Secretary's Certificate executed by the PITTRA Secretary, Unconditional

Guaranties by the individual guarantors and the PITTRA officers' countersignature of the letter

from MLBFS dated May 28, 2004 addressed to PITTRA regarding "WCMA Line of Credit

Increase and Extension." (Vagelatos Dec. ¶ 28)

69.     In or about May 2004, Kupperman provided to MLBFS the Secretary's Certificate

dated May 20, 2004 purporting to bear Krelman's signature. (Vagelatos Dec. ¶ 29)

70.     Krelman had no involvement in the execution of the document or its delivery to

MLBFS, and prior to the commencement of this action, had no knowledge of the document's

existence.    The document bears Kupperman's handwriting.    Krelman did not authorize

Kupperman to prepare or execute the document on her behalf. (Krelman Dec. ¶ 13)

71.     MLBFS relied upon Krelman's purported signature of the Secretary's Certificate

to enter into the May 2004 Agreement. (Vagelatos Dec. ¶ 33)

72.     In or about May 2004, Kupperman provided to MLBFS his Unconditional

Guaranty dated May 28, 2004. (Vagelatos Dec. ¶ 30)

#0202716.04

73.     Krelman had no involvement in the execution of this document or its delivery to MLBFS, and prior to the commencement of this action, had no knowledge whatsoever of this document's existence. The document bears Kupperman's handwriting. (Krelman Dec. ¶ 14)

74.     MLBFS relied upon the document purporting be Kupperman's personal Unconditional Guaranty to conclude that Kupperman was able to meet his responsibilities as an individual guarantor of the WCMA line of credit, and consequently to enter into the May 2004 Agreement. (Vagelatos Dec. ¶ 30, 33)

75.     In or about May 2004, Kupperman provided to MLBFS the Unconditional Guaranty of Krelman dated May 28, 2004. (Vagelatos Dec. ¶ 31)

76.     Krelman had no involvement in the execution or delivery to MLBFS of this document.   The document bears Kupperman's handwriting.   Krelman did not authorize Kupperman to prepare or execute the document on her behalf. (Krelman Dec. ¶ 15)

77.     MLBFS relied upon the document purporting be Krelman's personal Unconditional Guaranty to conclude that Krelman was able to meet her responsibilities as an individual guarantor of the WCMA line of credit, and consequently to enter into the May 2004 Agreement. (Vagelatos Dec. ¶ 31, 33)

78.     In or about May 2004, Kupperman provided to MLBFS the letter from MLBFS dated May 28, 2004 addressed to PITTRA regarding "WCMA Line of Credit Increase and Extension" that he represented bore Krelman's signature. (Vagelatos Dec. ¶ 32)

79.     Krelman had no involvement in the execution of this document or its delivery to MLBFS, and prior to the commencement of this action, had no knowledge of the document's

existence.  With the exception of the signature above the typed name of E. Ross Browne (upon which Krelman offers no testimony), the document bears Kupperman's handwriting.  Krelman did not authorize Kupperman to prepare or execute the document on her behalf.   (Krelman Dec. ¶ 16)

80.    MLBFS relied upon the document purporting have been countersigned by Krelman to conclude that PITTRA's officers had agreed to the terms of the May 2004 Agreement. (Vagelatos Dec. ¶ 32, 33)

### 2005 LINE OF CREDIT RENEWAL

81.    On or around February 1, 2005, MLBFS sent an e-mail to Kupperman requesting that he deliver PITTRA's audited financial statements. (Vagelatos Dec. ¶ 34)

82.    MLBFS conditioned its continuation of the WCMA line of credit upon its receipt and review of PITTRA's audited financial statements revealing a financial condition of PITTRA satisfactory to MLBFS (the "2005 Agreement").  ((Declaration of Kimberly Fedorski ("Fedorski Dec.") ¶ 6)

### The Forged 2004 Report

83.    On or around February 1, 2005, Kupperman sent an e-mail message to MLBFS to which he attached documents that he represented were internal financial statements for the fiscal years ending September 30, 2004 and 2003, which purportedly had been audited by APM as reflected in the "Independent Auditor's Report" dated December 22, 2004.  (Vagelatos Dec. ¶ 34, Ex. Q)

84.     Relying upon the accuracy and veracity of the information contained in the financial statements, as well as the representation that the statements had been audited by APM, which purportedly had found that the financial statements were fair representations of PITTRA's financial position, MLBFS executed the 2005 Agreement.   (Fedorski Dec. ¶ 8)

85.     The "Independent Auditor's Report" submitted by Kupperman had not been prepared by APM or by anyone at the direction of APM.   APM has no record of the Independent Auditor's Report in its files.   PITTRA has never been an audit client of APM.   (Tessler Dec. ¶ 3)

86.     Neither Krelman nor Browne was involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.   Prior to the commencement of this action, neither had any knowledge whatsoever of the document's existence. (Krelman Dec. ¶ 6; Browne Dec. ¶ 5)

87.     None of the PITTRA Employees were involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.   Prior to the commencement of this action, they had no knowledge whatsoever of the document's existence.   (R. Browne III Dec. ¶ 5; A. Browne Dec. ¶ 5; C. Browne Dec. ¶ 5; Brennan Dec. ¶ 5)

**The 2005 Krelman Forgeries**

88.     In or about May 2005, MLBFS conditioned execution of the 2005 Agreement upon its receipt and review of Personal Financial Statements by PITTRA's individual guarantors and the PITTRA officers' countersignature of the letter from MLBFS dated July 7, 2005 addressed to PITTRA regarding "Amendment to Loan Documents." (Fedorski Dec. ¶ 9)

#0202716.04

89.     On or around May 31, 2005, pursuant to the 2005 Agreement, Kupperman provided by e-mail to MLBFS a document that he represented was the Personal Financial Statement of Paulette Krelman dated May 26, 2005.  (Fedorski Dec. ¶ 10, Ex. B)

90.     MBFS relied upon the documents purporting be the Personal Financial Statement of Paulette Krelman reflecting Krelman's financial status to conclude that Krelman was able to meet her responsibilities as an individual guarantor of the WCMA line of credit, and consequently to enter into the 2005 Agreement.  (Fedorski Dec. ¶ 12)

91.     Krelman had no involvement in the creation of this document or its delivery to MLBFS, and prior to the commencement of this action, had no knowledge whatsoever of this document's existence.   The document bears Kupperman's handwriting.   Krelman did not authorize Kupperman to prepare or execute the document on her behalf.  (Krelman Dec. ¶ 18)

92.     In or about July 2005, Kupperman delivered to MLBFS a countersigned copy of the letter from MLBFS dated July 7, 2005 addressed to PITTRA regarding "Amendment to Loan Documents," purporting to bear Krelman's signature.  (Fedorski Dec. ¶ 11, Ex. C)

93.     Krelman had no involvement in the execution of this document or its delivery to MLBFS, and prior to the commencement of this action, had no knowledge whatsoever of this document's existence.  With the exception of the signatures above the typed names of Kimberly D. Fedorsky and E. Ross Browne (upon which Krelman offers no testimony), the document bears Kupperman's handwriting.   Krelman did not authorize Kupperman to execute the document on her behalf.  (Krelman Dec. ¶ 17)

-19-

94.   MLBFS relied upon the document purporting have been countersigned by Krelman to conclude that she had agreed to the terms of the May 2004 Agreement. (Fedorski Dec. ¶ 12)

95.   In or about July 2005, in reliance upon the documents provided by Kupperman, MLBFS renewed the WCMA line of credit. (Fedorski Dec. ¶ 8)

## 2006 BANKRUPTCY

96.   On or around January 31, 2006, Kupperman directed his attorneys to file a bankruptcy petition on behalf of PITTRA. (e-mail dated January 31, 2006 between Kupperman and his attorneys, Goettig Dec. Ex. K)

97.   On February 7, 2006, Kupperman informed his attorneys that "there is nothing due [from PITTRA] to either Paulette Krelman or Ross Browne, or any other creditor. There is a debt to me in the amount of $542,168[.]" (e-mail dated February 7, 2006 between Kupperman and his attorneys, Goettig Dec. Ex. L)

98.   On February 9, 2006, PITTRA declared bankruptcy pursuant to Chapter Seven of the United States Bankruptcy Code as memorialized in *In re PITTRA G.B. International, Inc.*, Index No. 06-10889 (MS). The creditor matrix filed with the petition did not list MLBFS as a creditor. (Goettig Dec. Ex. M)

99.   On February 24, 2006, Kupperman stated under penalty of fine or imprisonment that MLBFS had been paid in full on January 10, 2006. (Pittra Declaration Concerning Debtors Schedules, Goettig Dec. Ex. N)

100.   On March 3, 2006, Kupperman testified under oath before the trustee of the PITTRA bankruptcy at a meeting of PITTRA creditors held pursuant to 11 U.S.C. 341 that the reason why MLBFS was not listed on the creditor matrix was that MLBFS had been paid in full. Kupperman further testified that MLBFS had waived its security interest in PITTRA's property. (Goettig Dec. ¶ 19, Ex. O)

101.   Merrill has not been paid in full. As of the date of PITTRA's bankruptcy petition, PITTRA owed MLBFS a total of $4,187,250.43, consisting of $3,942,299.68 on the WCMA and $244,950.75 on the term loan.  (Briick Dec. ¶ 13)

102.   At no time did MLBFS waive any of its interests in PITTRA's property pursuant to the WCMA.  (Briick ¶ 7)

103.   In or about March 2006, Kupperman provided to MLBFS documents that he represented were internal financial statements for the fiscal years ending September 30, 2005 and 2004, which purportedly had been audited by APM as reflected in the "Independent Auditor's Report" dated December 16, 2005.  (Briick Dec. ¶ 15, Ex. D)

104.   MLBFS relied upon the statements in the "Independent Auditor's Report" to determine that PITTRA was an ongoing and viable business until September 2006, when it learned of PITTRA's bankruptcy filing.  (Briick ¶ 16)

105.   The "Independent Auditor's Report" submitted by Kupperman had not been prepared by APM or by anyone at the direction of APM.  APM has no record of the Independent Auditor's Report in its files.  PITTRA has never been an audit client of APM.  (Tessler Dec. ¶ 3)

#0202716.04

106.   Neither Krelman nor Browne was involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.  Prior to the commencement of this action, neither had any knowledge whatsoever of the document's existence.  (Krelman Dec. ¶ 7; Browne Dec. ¶ 6)

107.   None of the PITTRA Employees were involved in the creation of the "Independent Auditor's Report" or its delivery to MLBFS.  Prior to the commencement of this action, they had no knowledge whatsoever of the document's existence.  (R. Browne III Dec. ¶ 6; A. Browne Dec. ¶ 6; C. Browne Dec. ¶ 6; Brennan Dec. ¶ 6)

## 2006 ATTEMPTED RENEWAL OF THE LINE OF CREDIT

108.   In or about July 2006, despite the fact that PITTRA had ceased operating and that its assets had been transferred to PGB, Kupperman applied for a renewal and increase of the WCMA line of credit (the "2006 Attempt").  (Declaration of Daniel Spencer ("Spencer Dec.") ¶ 4)

109.   In connection with its review of the July 2006 renewal and increase request, MLBFS learned of PITTRA's February 9, 2006 bankruptcy filing.  (Spencer Dec. ¶ 5)

110.   Upon learning of PITTRA's bankruptcy filing in July 2006, MLBFS confronted Kupperman.   At that time and throughout the month of August, Kupperman repeatedly represented to MLBFS that PITTRA was still operating and that the bankruptcy filing had been a mistake which was being corrected.  (Briick Dec. ¶ 18; Spencer Dec. ¶ 6)

111.   On or around August 14, 2006, Kupperman represented to MLBFS that it would be "paid off in full" within the month.  (Briick Dec. ¶ 19, Ex. E; Spencer Dec. ¶ 6, Ex. A)

112.    On or around September 8, 2006, Kupperman provided to MLBFS by e-mail a letter and payoff statement purporting to be from a company named Escrow and Closing Services Ltd. with an attached schedule of proceeds indicating that $10,000.000.00 was being held at Wachovia Bank and that disbursements would be made on September 11, 2006. (Briick Dec. ¶ 19, Ex. F; Spencer Dec. ¶ 7, Ex. B)

113.    A nationwide search of the relevant LexisNexis database finds no records reflecting the existence of a business by the name of Escrow and Closing Services Ltd. (Goettig Dec. ¶ 12, Ex. J)

114.    MLBFS received no disbursements on September 11, 2006 or at any time thereafter. (Briick Dec. ¶ 21; Spencer Dec. ¶ 8)

115.    Neither Krelman nor Browne was involved in the creation of the letter from Escrow and Closing Services Ltd. or its delivery to MLBFS. Prior to the commencement of this action, neither had any knowledge whatsoever of the document's existence. (Krelman Dec. ¶ 10; Browne Dec. ¶ 9)

116.    None of the PITTRA Employees were involved in the creation of the letter from Escrow and Closing Services Ltd. or its delivery to MLBFS. Prior to the commencement of this action, they had no knowledge whatsoever of the document's existence. (R. Browne III Dec. ¶ 9; A. Browne Dec. ¶ 9; C. Browne Dec. ¶ 9; Brennan Dec. ¶ 9)

## KUPPERMAN'S REFUSAL TO OFFER TESTIMONY

117.    Kupperman has refused to offer testimony of any kind in this matter and has instead asserted his privilege against self incrimination under the Fifth Amendment of the United

-23-

States Constitution.  (9/26/06 Kupperman Dep. 5:12-12:11; Declaration of Arthur Kupperman;

October 23, 2006 Kupperman Deposition transcript 6:13-19, 10:5-13:18, 16:15-16, 17:5-18:2,

Goettig Dec. Ex. R)


Dated: New York, New York

September 30, 2009

VEDDER PRICE P.C.


By:  s/ Michael J. Goettig
    Randall M. Lending
    Michael M. Eidelman
    Michael J. Goettig (MG 2771)
    1633 Broadway, 47th Floor
    New York, New York  10019
    tel: (212) 407-7700
    fax: (212) 407-7799

    222 North LaSalle Street, Suite 2600
    Chicago, IL 60601
    (312) 609-7500
    (312) 609-5005

    *Attorneys for Plaintiff*
    *Merrill Lynch Business Financial Services,*
    *Inc.*

#0202716.04