UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

MERRILL LYNCH BUSINESS FINANCIAL
SERVICES INC.,

               Plaintiff,

-against-

ARTHUR KUPPERMAN; E. ROSS BROWNE;
PAULETTE KRELMAN; PGB
INTERNATIONAL, LLC; and J.P. MORGAN
CHASE BANK, NATIONAL ASSOCIATION,

               Defendants.

---

Case No. 06-Civ-4802 (DMC)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION
BY PLAINTIFF MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.
FOR SUMMARY JUDGMENT AS TO JPMORGANCHASE BANK, N.A.**

               Michael M. Eidelman
               Randall M. Lending
               Michael J. Goettig (MG-3771)
               VEDDER PRICE P.C.
               1633 Broadway, 47th Floor
               New York, New York 10019

               222 North LaSalle Street
               Chicago, Illinois 60601
               *Attorneys for Plaintiff*
               *Merrill Lynch Business Financial*
               *Services Inc.*

**Returnable December 7, 2009**

## TABLE OF CONTENTS

Page

ARGUMENT .................................................................................................................1

A.   MLBFS HAS NOT WAIVED ITS CLAIM AS TO PGB OR CHASE ............................1

B.   MLBFS HAS STANDING TO ASSERT ITS FRAUDULENT TRANSFER CLAIM ....2

C.   THE TRANSFER OF ASSETS FROM PITTRA TO PGB WAS FRAUDULENT .........5

D.   MLBFS IS ENTITLED TO ALL PITTRA COLLATERAL AND PROCEEDS .............7

E.   CHASE HAD NOTICE OF THE CLAIMS OF MLBFS IN OCTOBER 2006 ................8

CONCLUSION ............................................................................................................10

# TABLE OF AUTHORITIES

Page

**Cases**

*AC-Delco Corp. v. Serrins Automotive Warehouse, Inc.*
(*In re Serrins Automotive Warehouse, Inc.*, 18 B.R. 718 (Bankr. W.D. Pa. 1980) .................... 8

*Agriliance, LLC v. Farmpro Servs.*,
328 F.Supp. 2d 958 (S.D. Iowa 2003) .................................................................................. 10

*Fields v. Bleiman*,
267 Fed. Appx. 144 (3d Cir. 2008) ........................................................................................ 4

*Gilchinsky v. Nat'l Wettminster Bank N.J.*,
159 N.J. 463 (1999) ................................................................................................................ 5

*In re Air Vermont, Inc.*,
48 B.R. 588 (Bankr. D. Vt. 1985) ......................................................................................... 4

*In re West Coast Food Sales, Inc.*, 637 F.2d 707 (9th Cir. 1981) ............................................. 8

*Moister v. Nat'l Bank of Georgia (In re Guaranteed Muffler Supply Co., Inc.)*
1 B.R. 324 (Bankr. N.D. Ga. 1979) ...................................................................................... 7

*Unisys Corp. v. Dataware Products, Inc.*,
848 F.2d 311 (1st Cir. 1988) ................................................................................................. 4

*Wawel Savings Bank v. Jersey Tractor Trailer Training Inc.*,
580 F.3d 147 (3d Cir. 2009) ................................................................................................ 10

**Rules**

Fed. R. Civ. P. 56(b) ............................................................................................................... 10

**Statutes**

11 U.S.C. § 554(a) .................................................................................................................... 4

N.J.S.A. § 12A:9-331 .............................................................................................................. 10

N.J.S.A. § 25:2-29(a)(3)(C) ..................................................................................................... 8

**Other Authorities**

Collier on Bankruptcy, § 554.02[3] (L. King, ed. 2008) ......................................................... 5

Plaintiff Merrill Lynch Business Financial Services Inc. ("Plaintiff" or "MLBFS"), through its attorneys, submits this reply memorandum of law in further support of its motion (the "Motion") for partial summary judgment and for entry of an Order that Plaintiff has a first priority right to the assets of PGB International LLC ("PGB") as a consequence of 1) those assets being fraudulently transferred from PITTRA G.B. International, Inc. ("PITTRA"); and 2) the lien of MLBFS being superior to that of defendant and counterclaim plaintiff JPMorganChase Bank, N.A. ("Chase").

## ARGUMENT

### A.   MLBFS Has Not Waived Its Claim As To PGB or Chase

Chase incorrectly argues in Part II of its brief that, by executing the Stipulation of Settlement and Mutual Release attached as Exhibit C to the August Declaration (the "Settlement Agreement"), MLBFS waived its right to assert that it has priority over Chase with regard to the PITTRA assets fraudulently transferred to PGB. Chase, however, overlooks two salient facts: first, all claims MLBFS had against PGB were expressly excluded from the scope of the release, and second, none of the releases in the Settlement Agreement flowed from MLBFS to either Chase or PGB.

The plain language of the Settlement Agreement indicates that the release therein was, in relevant part, between the PITTRA Trustee Mr. Benjamin A. Stanziale, Jr. ("Mr. Stanziale" or the "PITTRA Trustee"), Chase and MLBFS (collectively, the "Creditor Releasors") on one side and E. Ross Browne and his wife Ardith Browne (collectively, the "Brownes") on the other in exchange for the settlement funds paid by the Brownes. While the PITTRA Trustee also entered into mutual releases with MLBFS and Chase, their terms have nothing to do with the resolution of any claims the PITTRA Trustee had against PGB, or with resolution of any priority controversy between Chase and MLBFS. To make this point explicit, the Settlement Agreement provides in relevant part:

> [The Creditor Releasors which includes the PITTRA Trustee] shall hereby release, acquit and forever discharge [the Brownes,] ... **but in**

> all events excluding ... PGB[,] ... from all manner of actions ....
> **For the avoidance of doubt, nothing in this paragraph is intended or shall be deemed to apply to any actions ... of the Creditor Releasors with respect to or against ... PGB...**

Settlement Agreement ¶ 9 (emphasis added.)

In the declaration submitted by Chase in opposition to the Motion, Mr. James A. Scarpone, counsel for the PITTRA Trustee, expressed his understanding that, under the Settlement Agreement, the PITTRA Trustee had settled "everything including any claims to the assets that were fraudulently transferred from PITTRA to PGB and including the competing and conflicting lien claims of MLBFS and Chase." (Scarpone Dec. ¶ 8 at Docket #330.) The Settlement Agreement proves the contrary. It settled neither the claims the PITTRA Trustee had against PGB nor the priority disputes between Chase and MLBFS relating to PGB. Accordingly, the Court should reject Chase's baseless argument that MLBFS somehow waived its right to assert a claim relating to the fraudulent transfer of PITTRA assets to PGB.

### B. <u>MLBFS Has Standing To Assert Its Fraudulent Transfer Claim</u>

Chase argues in Point I of its brief that only the PITTRA Trustee – and not MLBFS – has standing to assert a claim arising out of PITTRA's fraudulent transfer of assets to PGB. However, Chase ignores the fact that the PITTRA Trustee abandoned this claim on behalf of the PITTRA estate. Consequently, as a matter of law, the estate was divested of – and MLBFS was "re-vested" with – the right to pursue a claim sounding in fraudulent transfer.

Chase correctly states that, as part of the adversary proceeding bearing Index Number 06-2702 related to PITTRA's filing for bankruptcy, the PITTRA Trustee alleged a fraudulent conveyance claim against PGB on September 20, 2006. Chase also correctly states that the Bankruptcy Court approved a settlement of some of the PITTRA Trustee's claims on February 2, 2009, and that the Adversary Proceeding was closed on February 11, 2009 with all claims therein dismissed with prejudice.

2

However, Chase is incorrect as to several facts critical to its argument that MLBFS lacks standing. First and paramount among them is the fact that there was no settlement of the fraudulent transfer claim between the PITTRA Trustee and PGB. Indeed, neither the January 9, 2009 notice of the PITTRA Trustee's motion for approval of the settlement nor the February 11, 2009 order approving the settlement of the PITTRA Trustee's claims makes any mention of PGB at all. (11/30/09 Goettig Dec. Ex. A; Scarpone Dec. Ex. C.) In fact, as recounted in Part A, *supra*, the Settlement Agreement specifically carved out of the scope of the release the PITTRA Trustee's right to pursue claims against PGB, and no subsequent release between the PITTRA Trustee and PGB was ever executed. Indeed, Chase counsel recognized the fact that the Settlement Agreement did not address PGB in its December 23, 2008 letter to this Court. (11/30/09 Goettig Dec. Ex. B, in which Chase's counsel represented to the Court that "PGB . . . [is] not affected by Proposed Order" [relating to the Settlement Agreement].)

Despite the fact that the PITTRA Trustee did not settle any claims the estate had against PGB by virtue of the Settlement Agreement, and in fact expressly retained the right to pursue all claims against PGB, Mr. Stanziale nonetheless urged the Bankruptcy Court to dismiss the Adversary Proceeding. He advised the Bankruptcy Court, "Merrill and Chase both appear to have valid enforceable liens on whatever assets the Debtor or its successor [PGB] had. Recovery in the litigation [against PGB] fairly appears to be no more than a recovery of Merrill and Chase's collateral or the proceeds of their collateral." (Certification of Benjamin A. Stanziale, Jr., Chapter 7 Trustee (11/30/09 Goettig Dec. Ex. C) (the "Trustee Declaration" or "Trustee Dec.") ¶ 10(b).) Thus, in seeking and permitting the dismissal of the Adversary Proceeding against PGB with prejudice, the PITTRA Trustee apparently concluded that PITTRA's fraudulent conveyance of assets to PGB was not worth pursuing on behalf of the estate. Accordingly, on February 11, 2009,

3

the Bankruptcy Court dismissed the PITTRA Trustee's Adversary Proceeding in its entirety with prejudice. *See* PITTRA Adv. Pro. Docket # 32, attached as Ex. D to August Dec.

Section 554 of the Bankruptcy Code provides, in pertinent part: "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). The PITTRA Trustee has done just that. He retained the right to pursue claims against PGB in the Settlement Agreement, but nevertheless provided notice to PITTRA creditors that he was seeking dismissal of the Adversary Proceeding wherein he asserted claims for PITTRA's fraudulent conveyance of assets to PGB. *See* 11/30/09 Goettig Dec. Exs. A, C. After a hearing on the PITTRA Trustee's motion, on February 11, 2009, the Bankruptcy Court dismissed with prejudice the Adversary Proceeding, including the PITTRA Trustee's fraudulent conveyance claim against PGB. (August Dec. Ex. D.) Consequently, the PITTRA Trustee has abandoned the estate's claim that PITTRA assets had been fraudulently conveyed to PGB. *In re Air Vermont, Inc.*, 48 B.R. 588, 590 (Bankr. D. Vt. 1985) (knowing and voluntary relinquishment with no intent to retain rights in the property constitutes abandonment).

With the PITTRA Trustee's abandonment of the claim, the right to pursue encumbered assets of the estate in the possession of PGB reverted to MLBFS. *See, e.g., Unisys Corp. v. Dataware Products, Inc.*, 848 F.2d 311, 314 (1st Cir. 1988) (quoting Section 554.02[3] of Collier on Bankruptcy (L. King, ed. 2008) for the proposition that, "[a]lthough section 554 does not specify to whom property is abandoned, property may be abandoned by the trustee to any party with a possessory interest in it" and holding that the secured creditor was entitled to pursue action against abandoned property); *Fields v. Bleiman (In re Fields)*, 267 Fed. Appx. 144, 145 (3d Cir. 2008) (secured creditor was free to initiate proceedings against property that bankruptcy trustee had

4

abandoned). Accordingly, MLBFS has standing to pursue its claim to recover PITTRA assets that were fraudulently transferred to PGB.

### C.  The Transfer Of Assets From PITTRA To PGB Was Fraudulent

In Part III of its brief, Chase argues that material issues of fact preclude a finding that the transfer of assets from PITTRA to PGB was fraudulent. The Court must reject this argument.

First, Chase asks this Court to apply the UFTA in a manner that has been rejected by the Supreme Court of New Jersey. In doing so, Chase attempts (unsuccessfully) to undermine three of the seven badges of fraud identified by MLBFS, and thereby argues that "MLBFS has not established the existence of any fraudulent transfer to support its claims." (Chase Mem. 8.) This analysis focuses on the alleged lack of certain badges of fraud instead of on the probative value of the badges that are present. In *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463 (1999), the New Jersey Supreme Court reversed the lower court's holding which applied the UFTA in this manner, holding:

> the Appellate Division made a critical error by giving controlling weight to the absence of two factors in a list of eleven. The proper inquiry is whether the badges of fraud are present, not whether some factors are absent. Although the presence of a single factor, *i.e.* badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.

*Id.* at 489-90. The appropriate analysis when assessing the UFTA's "badges of fraud" does not call for the statute to be used as a checklist, with the absence of one factor compelling a conclusion that fraud was not present. Instead, the UFTA calls for the Court to weigh the badges of fraud that are present to reach a determination as to whether the transfer was fraudulent. In this case, MLBFS has demonstrated that the transfer of assets from PITTRA to PGB was fraudulent. Chase does not attempt to dispute most of these badges of fraud, including that the transaction was between

5

insiders, that the principal maintained control of the transferred assets and that substantially all of PITTRA's assets were transferred to PGB.

Furthermore, contrary to Chase's argument, it is unnecessary for the Court to determine whether $310,000.00 was a reasonably equivalent value for the assets transferred from PITTRA to PGB because PGB gave nothing in exchange for the assets it received. Under the terms of the PITTRA/PGB Asset Purchase Agreement (the "APA"), PGB was to "pay to [PITTRA] at Closing the aggregate amount of ten thousand dollars ($10,000.00) … payable by certified check or bank check." APA ¶ 2(a) (9/30/09 Goettig Dec. Ex. F.) PITTRA's bank record indicates that there was no deposit even approximating that amount at any time near the date on which the APA was executed. (10/7/2009 Goettig Dec. Ex. B.) Chase argues that the various intermittent deposits that were made into PITTRA's bank account, ranging in value from $840.00 to $45,910.06, "may have been" installment payments from PGB in satisfaction of its $310,000.00 debt to PITTRA. (Chase Response 8.) This conclusion is belied by the clear fraud that marked this transaction, as well as Arthur Kupperman's invocation of the Fifth Amendment and refusal to offer testimony on the details of the transaction. There is simply no evidence in the record that PGB tendered any money to PITTRA in exchange for PGB's assets.

Chase also argues that MLBFS knew of the existence of PGB in March of 2004, and that consequently the transaction in the summer of 2003 could not have been concealed. This argument overlooks the nine-month campaign of concealment that preceded Kupperman's proposal in March 2004 to convert PITTRA into PGB, as well as Kupperman's numerous false and fraudulent representations that the Asset Purchase Agreement had not yet been executed in the spring of 2004, and that it was not subsequently executed at any point thereafter. The record demonstrates that, while MLBFS learned in March 2004 that PGB existed, Kupperman concealed the fact that PITTRA's assets had been transferred to PGB some nine months earlier. Accordingly, the Court

6

must reject Chase's contention that MLBFS's mere knowledge of PGB's existence somehow brought with it knowledge of the transfer of PITTRA's assets.

### D. MLBFS is Entitled to All PITTRA Collateral and Proceeds

In reply to Chase's argument, articulated in Part IV of its Opposition Brief, that MLBFS has not identified with specificity the collateral and proceeds encumbered by its lien, MLBFS incorporates by reference pages 3-10 of its November 12, 2009 Memorandum of Law in Opposition to Chase's Motion for Summary Judgment. (Docket # 319.) As set forth more fully therein, the lien of MLBFS extends to all of the assets, including proceeds, that were transferred by PITTRA to PGB. Furthermore, contrary to the representations of Chase, the terms of the WCMA Loan and Security Agreement ("WCMA," attached as Exhibit A to the Verified Complaint) specify that the security interest of MLBFS extends to the after-acquired collateral and proceeds of PGB as PITTRA's successor as well.

The case upon which Chase relies in its Opposition Brief, *Moister v. Nat'l Bank of Georgia (In re Guaranteed Muffler Supply Co., Inc.)*, is inapposite. There, the court found it significant that "there is no language in the partnership security agreement that indicates an intent that the successors of the partnership were to assume the lien-creating obligations of the agreement." 1 B.R. 324, 326 (Bankr. N.D. Ga. 1979). In contrast, the WCMA specifically stated that the terms therein "shall be binding upon, and shall inure to the benefit of MLBFS, Customer [PITTRA] and their respective successors and assigns." (Ver. Cplt. Ex. A, § 3.7(g).) Moreover, the WCMA also stated that the security interest of MLBFS extended to PITTRA's inventory, general intangibles and deposit accounts, "howsoever arising, whether now owned or existing or hereafter acquired or arising, and wherever located[.]" (Ver. Cplt. Ex. A, § 1.1 ("Collateral").) Accordingly, the lien of MLBFS extends to the assets transferred to PGB, as well as to the assets that were acquired by PGB after the transfer of PITTRA assets, because:

7

> It is uniformly held that security interests perfected against inventory and accounts receivable, replacements thereof, future acquisitions and the proceeds of their sale continue in effect against acquisitions and purchases of a successor entity or transferee as well as the original debtor on the principle that a debtor cannot destroy the perfected security interest of a secured party by transferring title to the collateral or changing its name or corporate structure and the validity of the lien against subsequently acquired assets as well as those presently owned is effective thereagainst as of its original date[.]

*AC-Delco Corp. v. Serrins Automotive Warehouse, Inc. (In re Serrins Automotive Warehouse, Inc.)*, 18 B.R. 718, 719 (Bankr. W.D. Pa. 1980); *see also In re West Coast Food Sales, Inc.*, 637 F.2d 707, 709 (9th Cir. 1981) (holding that a creditor's security interest extended to after-acquired collateral of a successor business because a "debtor cannot destroy the perfected security interest of a secured party by merely changing its name or corporate structure").[1] In contrast to the cases cited in Chase's brief, the WCMA expressly states that its terms apply to PITTRA's successors and assigns, and that MLBFS's security interest extends to after-acquired property.[2]

### E.  Chase Had Notice Of The Claims Of MLBFS In October 2006

The Court must reject Chase's arguments, articulated in Parts V and VI of its Opposition Brief, that a) it is a holder in due course of PGB's accounts receivable, pursuant to which it collected $489,321.86 from PGB account debtors; and b) MLBFS raised issues in its Motion that were not alleged in its Complaint. Because an identifiable portion of those accounts were subject to the prior perfected security interest of MLBFS, and because Chase was on notice of MLBFS's interest in those accounts at the time that it collected funds from PGB debtors, Chase does not qualify as either a holder in due course or a purchaser of instruments under the UCC.

---

[1] *In re Serrins* and *In re West Coast Food Sales* were decided prior to New Jersey's adoption of the revised UCC Article 9. However, as Chase noted in its brief, New Jersey courts look to other courts' interpretations of the UCC where case law within their jurisdiction is lacking. Chase Brief 10 n.2.

[2] Chase's argument on this point does not address the relief available to MLBFS under the UFTA, under which the Court may grant "any . . . relief the circumstances may require," subject to the applicable principles of equity and rules of civil procedure. N.J. Stat. § 25:2-29(a)(3)(C).

8

Chase is incorrect in its assertion that it "was not aware of any other liens against PGB's assets" or that it "did not have any notice of ... any ... claim to the checks." (Chase Mem. 14.) In fact, Chase was clearly put on notice of the competing security interest of MLBFS to the assets of PGB upon its receipt of the Verified Complaint of MLBFS and the amendments thereto. Count Seven of the October 5, 2006 Verified Complaint seeks "Foreclosure of Security Interest Against PGB" and the Prayer for Relief (¶ F) seeks an Order that all of the assets transferred from PITTRA to PGB and proceeds thereof be turned over to MLBFS. The Prayer for Relief in ¶ F was amended on October 20, 2006 to provide that "MLBFS [be] deemed to have a first priority right to such assets ahead of all other creditors of PGB, including Chase." (October 20, 2006 Amendment to Verified Complaint, Docket #31, ¶ F.) Moreover, Paragraph 83 of the Amendment to Verified Complaint asserts, "MLBFS has the right to enforce its security interest against the assets transferred [from PITTRA to PGB] and the proceeds thereof, ahead of, and with priority over any and all other creditors of PGB, including Chase." (Id., ¶ 83.) Thus, it is clear that: a) Chase had notice of the competing security interest of MLBFS over PGB assets by the time it became involved in this case in October 2006, which was before it collected money from PGB debtors; and b) the issues addressed by MLBFS in the instant Motion were first raised in MLBFS's Verified Complaint.[3]

Because Chase had received notice of MLBFS's competing security interest in PGB assets, its collections on PGB's accounts receivable were subject to that interest. Chase may not take refuge in the fact that a prior lien search conducted in 2004 failed to identify MLBFS's Financing

---

[3] Moreover, Chase's own Counterclaim raises the issue of the competing priority of Chase's and MLBFS's Financing Statements, alleging in relevant part that, "[p]ursuant to its filed Uniform Commercial Code Financing Statement, Chase has a first priority security interest in all of PGB's assets." (Docket #67, ¶ 36.) Under Rule 56(b) of the Federal Rules of Civil Procedure, MLBFS is entitled to move for summary judgment on the allegations against it in Chase's counterclaim as well as on its allegations as to Chase in its Complaint. For this reason as well, the Court must reject the argument in Part VI of Chase's Opposition Brief.

Statement because "the proper time for determining whether the recipient of an instrument has notice of a claim or defense is the time of negotiation of the instrument to the holder." *Agriliance, LLC v. Farmpro Servs.*, 328 F.Supp. 2d 958, 972 (S.D. Iowa 2003), *citation omitted*. Here, Chase negotiated delivery of the instruments from PGB debtors after it had notice of MLBFS's competing claim. Even assuming that the search that Chase conducted in 2004 was commercially reasonable, it was *not* commercially reasonable for Chase to disregard the notice that it received in October 2006 of MLBFS's competing interest in PGB assets. As a consequence, Chase is not a good faith holder in due course or purchaser of instruments. *See Agriliance, supra*, 328 F.Supp. 2d at 973-74.

Because Chase indisputably had actual knowledge of facts from which it could reasonably infer that MLBFS had a probable claim over PGB assets, Chase is neither a holder in due course of those assets nor a good-faith purchaser of instruments. *See Wawel Savings Bank v. Jersey Tractor Trailer Training Inc. (In re Jersey Tractor Trailer Training Inc.)*, 580 F.3d 147, 159 n.21 (3d Cir. 2009) (quoting N.J. Stat. § 12A:9-330 cmt. 7 for the proposition that "notice of a conflicting security interest precludes a purchaser from becoming a holder in due course"); N.J.S.A. § 12A:9-331, cmt. 5 ("the senior secured party [here, MLBFS] is likely to be prejudiced if the debtor [PGB] is going out of business and the junior secured party [Chase] collects the accounts by notifying the account debtors to make payments directly to the junior. Those collections may not be consistent with 'reasonable commercial standards of fair dealing'").

## CONCLUSION

For the foregoing reasons, the Motion should be granted.

10

Dated: New York, New York
      November 30, 2009

VEDDER PRICE P.C.



By: _____

Michael M. Eidelman
Randall M. Lending
Michael J. Goettig (MG-3771)
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019

222 North LaSalle Street
Chicago, Illinois 60601

*Attorneys for Plaintiff*
*Merrill Lynch Business Financial Services Inc.*

11