NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|  |  |
|---|---|
| : | |
| : | |
| : | |
| MERRILL LYNCH BUSINESS : | |
| FINANCIAL SERVICES, INC. : | |
| : | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, : | |
| : | **OPINION** |
| v. : | |
| : | Civil Action No. 06-4802  (DMC) (MCA) |
| : | |
| ARTHUR KUPPERMAN, PGB : | |
| INTERNATIONAL, LLC, and : | |
| JPMORGAN CHASE BANK, N.A. : | |
| : | |
| Defendants. : | |
| : | |
| _____ : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motions for summary judgment by Merrill Lynch

Business Financial Services Inc. ("Merrill") and JPMorgan Chase Bank, N.A. ("Chase").  Merrill

moves for summary judgment on its claims against Arthur Kupperman ("Kupperman"), and Chase

moves for summary judgment on its crossclaims against Kupperman.  Both Merrill and Chase move

for summary judgment on their claims against each other, asking this Court to determine who has

a first priority right to the assets of PGB International, LLC ("PGB").

No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.

For the reasons discussed below, Merrill's motion for summary judgment on its claims against

Kupperman is **granted**;  Chase's motion for summary judgment on its crossclaims against

Kupperman is **granted**; Merrill's motion for summary judgment as to its claim of priority over the assets of PGB is **granted**; and, Chase's motion for summary judgment as to its claim of priority over the assets of PGB is **denied**.

## **BACKGROUND**[1]

This case involves loans that PGB obtained from Chase, and that PGB's predecessor-in-interest, PITTRA G.B. International, Inc. ("PITTRA"), obtained from Merrill. See Chase Brief in Support of its Motion for Summary Judgment on its Crossclaims against Arthur Kupperman ("Doc. 289-1"), at 1. Plaintiffs allege that PGB's principal and managing member, Kupperman, used PGB and PITTRA to submit financial statements and other documents that intentionally overstated PGB's and PITTRA's assets in order to obtain loans and defraud Chase and Merrill out of millions of dollars. Id.

On October 5, 2006, Merrill, upon learning of the alleged fraud, filed a Verified Complaint (the "Complaint") and Order to Show Cause seeking writs of attachment. Id. On October 6, 2006, this Court entered the Order to Show Cause providing for writs of attachment. Id. at 1-2. On November 8, 2006, at the show cause hearing, this Court extended the writs of attachment pending a trial in this action. Id. at 2. On August 6, 2007, this Court granted Merrill's motion for summary judgment on its fourth count alleging breach of contract as to Kupperman, Krelman and Browne. See Merrill's Brief in Support of its Motion for Summary Judgment on its Claims against Arthur Kupperman ("Doc. 308"), at 3. Merrill has settled all claims against Krelman and Brown. Id.

Upon receiving notice of this proceeding, Chase appeared through counsel at a hearing on

---

[1] The Court has relied extensively on the submissions of the parties in providing the facts and procedural history this Opinion.

October 13, 2006 in support of the writs of attachment.  Id.  Merrill subsequently amended its Complaint to add Chase as a defendant.  Id.  On November 8, 2006, Chase filed its answer, counterclaim and crossclaim.  See Doc. No. 67.  Chase subsequently filed an amended crossclaim (the "Amended Crossclaim"), see Doc. No. 229, which included, counts against Kupperman for fraud, and for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. and the New Jersey Racketeering Act ("N.J. RICO"), N.J.S.A. § 2C:41-1, et seq.

In response to the Amended Crossclaim, Kupperman filed an answer at docket no. 241, in which he invoked his Fifth Amendment privilege against self-incrimination and refused to answer any of the allegations.  Id.  Kupperman also invoked the Fifth Amendment at his deposition and refused to answer any questions.  Id.

In its Counterclaim against Merrill, Chase sought a declaration that it holds a first priority security interest with respect to all of PGB's assets, such that Chase's interest has priority over any interest that Merrill holds on such assets.  See Chase Brief in Support of its Motion for Summary Judgment on its Counterclaim against Merrill ("Doc. 290-1"), at 2.

On September 30, 2009, Chase moved for summary judgment on its crossclaim against Kupperman, and on its counterclaim against Merrill.[2]  On the same date, Merrill moved for summary judgment on its claims against Kupperman and its claims against Chase.

_____

[2] Chase asserts that Merrill's motion for summary judgment was not timely filed, as its entire submission in support of its motion was not filed on September 30, 2009.  The Court will treat Merrill's motion as timely, as it appears that there was a misunderstanding as to which motmions were subject to the September 30th deadline.  See Doc. No. 316.  In any case, the motion's accompanying documents were filed soon thereafter, and no party is prejudiced by the slight delay.

The Court will consider each of the four pending summary judgment motions. Additional facts relevant to each motion are recited below, where appropriate.

## **STANDARD OF REVIEW**

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). The moving party bears the burden of showing either (1) there is no genuine issue of fact and it must prevail as a matter of law; or (2) the non-moving party has not shown facts relating to an essential element of the issue for which he bears the burden. Celotex, 477 U.S. at 331. If either showing is made then the burden shifts to the non-moving party, who must demonstrate facts that support each element for which he or she bears the burden and must establish the existence of genuine issues of material fact. Id. The Court will consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Penn. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

A party opposing a motion for summary judgment "may not rely merely on allegations or denials in its own pleading," and must "furnish, with its opposition, papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement and disagreement . . ." See L. Civ. R. 56.1(a). A failure to do so results in a court treating all undisputed material facts as uncontroverted for the purposes of the summary judgment motion. See, e.g., Bainbridge v. Mid-State Filigree Sys., LLC, 2009 U.S. Dist. LEXIS 106517, at *4 ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion[; as]

-4-

plaintiff has failed to respond, the Court is entitled to treat defendant's Rule 56.1(a) statement as uncontroverted."); Hooten v. Schaaff, 2008 U.S. Dist. LEXIS 34193 (D.N.J. Apr. 24, 2008) (same). A defendant's unsworn brief in opposition to a motion is not affirmative evidence, much less evidence sufficient to defeat an amply supported motion for summary judgment by creating a genuine issue of material fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986).

The Court notes that a party's reliance on the Fifth Amendment in a civil case permits a fact finder to draw "an adverse inference against the party claiming its benefits."  See S.E.C. v. Graystone Nash, Inc., 25 F.3d 187, 191 (3d Cir. 1994); CUTTR Holdings, LLC v. Patinkin, 2006 U.S. Dist. LEXIS 76985, at *5 (D.N.J. Oct. 24, 2006) ("In a civil case, the finder of fact is not prohibited from making an adverse inference from a party's assertion of the fifth amendment privilege."); Digital Equip. Corp. v. Currie Enterprises, 142 F.R.D. 8, 13 (D. Mass. 1991).[3]  While a Court may "draw an adverse inference in a civil matter where the party refuses to testify in response to probative evidence offered against it," a plaintiff still "may not rest a judgment on defendant's constitutionally protected silence alone."  Chase Manhattan Bank, N.A. v. Frenville, 67 B.R. 858, 862 (Bankr. D.N.J. 1986) (citing Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) and National Acceptance Co. of America v. Bathalter, 705 F.2d 924, 932 (7th Cir., 1983)).  That is, although invocation of the Fifth Amendment clearly "is a relevant factor to be considered in light of the proffered evidence," LaSalle BankLake View v. Seguban, 54 F.3d 387, 390, 391 (7th Cir. 1995), an analysis of all proffered evidence is still required.

---

[3] Such "adverse inferences may be drawn at the summary judgment stage as well as at trial."  See In re Bartlett, 154 B.R. 827, 829-30 (Bankr. D.N.H. 1993); see also Young Sik Woo v. Glantz, 99 F.R.D. 651, 653 (D.R.I. 1983); Matter of Metzgar, 127 Bankr. 708 (Bankr. M.D.Fla. 1991).

## DISCUSSION

The Court will consider the four pending summary judgment motions in turn:  **(I)** Merrill's motion on its claim against Kupperman;  **(II)** Chase's motion on its claims against Kupperman; **(III)** Merrill's motion on its priority claim against Chase;  **(IV)** Chase's motion on its priority claim against Merrill.

### I.      MERRILL'S MOTION FOR SUMMARY JUDGMENT ON ITS FRAUD CLAIM AGAINST ARTHUR KUPPERMAN

Merrill moves for summary judgment on its claim for fraud against Kupperman (Count II).

### A. FACTS

Kupperman incorporated PITTRA on October 12, 2001, and he was president and majority (eventually sole) shareholder of the company.  See Doc. 308, at 3.  On November 19, 2002, Merrill extended a line of credit to PITTRA, in the form of a $2,250,000.00 Working Capital Management Account ("WCMA").  Id.  Kupperman executed the WCMA Loan and Security Agreement in his capacity as president of PITTRA.

In December 2002, Kupperman applied to Merrill for a renewal and increase of PITTRA's line of credit from $2,250,000.00 to $2,750,000.00.  Id. at 4.  Merrill approved this extension and increase contingent upon its receipt and satisfactory review of PITTRA's audited financial statements.  Id.  On or around January 2, 2003, Kupperman provided Merrill documents that he represented to be PITTRA's internal financial statements for the fiscal year ending September 30, 2002, which had been audited by the firm of Amper, Politzner & Mattia, P.A. ("APM"), as reflected in an Independent Auditor's Report dated December 12, 2002.  Id.  In light of the representations

-6-

made therein, Merrill granted Kupperman's application for a loan renewal and increase.  Id.
Contrary to Kupperman's representations, however, PITTRA was never audited by APM.  Id.

On April 30, 2003, Kupperman formed PGB International, LLC, a New Jersey limited liability company.  Id. at 5.  PGB was registered as operating from the same address as PITTRA, and also designated Kupperman as its managing member.  Id.  After PGB was established, Kupperman transferred many of PITTRA's assets to PGB, in exchange for a promissory note.  Id.  This transaction occurred in direct contravention of Section 3.3(g) of the WCMA Agreement, which required that PITTRA obtain the written consent of Merrill before transferring, selling or leasing any substantial assets.  Id.  The asset purchase agreement (transferring assets from PITTRA to PGB) purported to transfer the assets free of any liens that Merrill had as a secured lender under the terms of the WCMA.  Id.

PITTRA ceased doing business in the Fall of 2003.  Id.  Kupperman nonetheless continued to submit financial statements purporting to reflect PITTRA's ongoing business activities to Merrill to continue to receive financing.  Id.

In December 2003, Kupperman again applied for a renewal and increase of PITTRA's WCMA line of credit from $2,750,000.00 to $3,250,000.00.  Id. at 6.  In early January, in reviewing documents related to PITTRA's line of credit, Merrill learned that the company was involved in several pending lawsuits.  Id.  Merrill requested a status summary for these lawsuits from PITTRA's attorney.  Id.  On January 20, 2004, Kupperman transmitted a letter to Merrill purporting to be from the law firm of Becker Meisel, LLC.  Id.  Understanding the letter to indicate that PITTRA was an ongoing business facing no significant legal issues, Merrill permitted the WCMA line of credit to continue.  Id.  Despite Kupperman's representations, however, no one at Becker Meisel drafted the

letter.  Id. at 7.

Also in relation to Merrill's January 2004 review of PITTRA's credit, Merrill requested personal financial statements of PITTRA guarantors, as well as countersignatures from PITTRA's officers on a Merrill letter.  Id. at 7.  This included, then, the personal financial statements of Krelamn, as well as her countersignature on the Merrill letter.  Kupperman provided the documentation to Merrill, however, Krelman had no knowledge that such documents were prepared. Id.  In fact, it is Kupperman's handwriting that appears on the documents.  Id.  Relying on the financial statements that were purportedly Krelman's, Merrill determined that she was able to serve as a guarantor of the WCMA line of credit.   Id. at 8.

Further, before authorizing the January 2004 extension/renewal, Merrill requested one more set of documents from PITTRA—an updated copy of the company's audited financial statements. Id.  On or around January 16, 2004, Kupperman provided Merrill documents that he represented to be PITTRA's internal financial statements for the fiscal year ending September 30, 2003 and 2002, which had been audited by the firm of APM, as reflected in an Independent Auditor's Report dated December 17, 2003.  Id.  Once again, Merrill relied on these audited financial statements in extending credit to PITTRA, and once again, APM had nothing to do with preparation of the audit report.  Id. at 9.

Two months later, in March 2004, Kupperman approached Merrill with a proposal for another renewal and increase of the PITTRA line of credit from $3,250,000.00 to $4,250,000.00 ("the May 2004 Agreement").  Id.  He also proposed converting PITTRA from a corporation to a LLC bearing the name PGB (a transaction which, in essence, already occurred via the asset transfer). Id.  Kupperman provided the paperwork from the asset transfer to Merrill, and asserted that although

the paperwork was done, the transfer was never actually consummated.  Id.  Kupperman made this representation despite the fact that a PITTRA-PGB asset transfer did in fact take place nearly a year prior.

In May 2004, Kupperman advised Merrill that the asset transfer plan was abandoned, and that he determined that PITTRA should continue to operate independently from PGB.  Id. at 10. Kupperman sent a number of emails to Merrill in May 2004 indicating that PITTRA was an ongoing, viable business.  Id.  He asserted that the existence of PGB did not interfere with the operations of PITTRA, and did not, at any time, indicate to Merrill that PITTRA stopped operating and transferred all of its assets to PGB.  Id. at 11.  Accordingly, Kupperman indicated that he still wanted to proceed with the May 2004 Agreement with respect to the renewal and extension of credit to PITTRA.

Again, prior to entering into the new agreement with PITTRA, Merrill conditioned its execution of the May 2004 Agreement on documentation from PITTRA's law firm and guarantees from PITTRA officers.  Id.  Kupperman, like before, provided the requested documentation.  Neither the law firm (Becker Meisel) or the other guarantor (Krelman) had any knowledge of these documents being created or executed.  Id. at 11-12.  Id.  Further, Merrill's letter regarding the credit increase was again purportedly countersigned by Krelman, although she had no knowledge of this. In light of the documentation provided, Merrill agreed to renew and increase PITTRA's WCMA line of credit from $3,250,000.00 to $3,750,000.00, and agreed to extend an additional $500,000.00 to PITTRA in the form of a separate term loan.  Id. at 13.

On November 1, 2004, Krelman and Browne sold their shares in PITTRA to Kupperman, making him sole shareholder.  Id.

In May 2005, upon another review of PITTRA's credit line, Merrill was provided with the

same documentation as previously requested (i.e., purported guarantees from officers, audited financial statements and countersigned Merrill correspondences).  Id. at 13-15.

On January 31, 2006, Kupperman requested that his attorneys file for bankruptcy on behalf of PITTRA.  He informed his attorneys that "there is nothing due [from PITTRA] to either Paulette Krelman or Ross Browne, or any other creditor.  There is a debt to me in the amount of $542,168[.]"  Id. at 15.  Kupperman never told his counsel about the lines of credit totaling over $4 million dollars with Merrill.  Id.  Merrill was not listed on the schedule of creditors filed pursuant to the PITTRA bankruptcy.  Id.  On February 9, 2006, Kupperman declared bankruptcy on behalf of PITTRA pursuant to Chapter Seven of the United States Bankruptcy Code. Id. at 16.  In so doing, he stated that Merrill had been paid in full on January 10, 2006.  Id.  On March 3, 2006, Kupperman further stated that because he paid Merrill in full, they were not listed on the creditor schedule.  Id.  He further testified that Merrill waived its security interest in PITTRA's property.  Id.  In fact, Merrill was not paid in full, and never waived its security interest in PITTRA's property.  Id.

In July 2006, a month after PITTRA filed for bankruptcy, Kupperman provided another set of financial statements purportedly prepared by APM.  Id. at 17.  Merrill, however, learned of the bankruptcy proceedings and confronted Kupperman.  Id.  Through August 2006, Kupperman continued to represent to Merrill that the bankruptcy was a mistake, and that Merrill would be "paid off in full" within the month.  Id.

On September 8, 2006 Kupperman provided to Merrill a letter and payoff statement purporting to be from a company named Escrow and Closing Services Ltd.  Id.  The statement indicated that $10,000,000.00 was being held at Wachovia Bank, and that disbursements of such funds would be made on September 11, 2006.  Id.  No disbursements were made, and it appears that

-10-

no business named "Escrow and Closing Services Ltd" exists.  Id.

On October 5, 2006, Merrill brought this action against Kupperman.  On September 30, 2009, Merrill moved for summary judgment on its fraud claim against Kupperman.  In response to the subject action, Kupperman invoked the Fifth Amendment and refused to offer testimony.

### B.  APPLICABLE LAW

In order to recover on a claim for fraud, a plaintiff must demonstrate (i) a material misrepresentation of fact; (ii) made with knowledge of its falsity; (iii) with the intention that it would be relied upon by the other party; (iv) reliance thereon by the other party to its detriment; and (v) damages.  See Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997) (citing Jewish Center of Sussex County v. Whale, 86 N.J. 619, 624-25 (1981)).

To sustain its burden on a motion for summary judgment for fraud, then, a plaintiff must show that no reasonable jury could fail to find that defendant made a misrepresentation of fact,  with the knowledge that it was false and with the intent that it be relied upon and that plaintiff did rely on the misrepresentation to its harm.  See Kuibyshevnefteorgsynthez v. Model, 1995 U.S. Dist. LEXIS 1896, at *51-52 (D.N.J. Feb. 6, 1995), aff'd 168 F.3d 479 (3d Cir. N.J. 1998); Bilotti v. Accurate Forming Corp.,188 A.2d 24, 36 (1963); Louis Schlesinger Co. v. Wilson, 127 A.2d 13, 18 (1956).

### C.  ANALYSIS

Merrill moves for summary judgment on its fraud claim against Kupperman.  Kupperman has not made any attempt to dispute the evidence relied upon by Merrill, as he has invoked the Fifth Amendment.  Despite the lack of opposition from Kupperman, this Court has nonetheless fully considered whether Merrill has met its burden in demonstrating that there is no material question of

fact with respect to each element of its fraud claim.

Merrill has demonstrated that Kupperman made multiple material misrepresentations of fact, with knowledge of their falsity, with the intention that such representations would be relied upon by Merrill to its detriment.  See Gennari, 148 N.J. at 610 (1997) (citing Jewish Center, 86 N.J. at 624-25).  Accordingly, Merrill's motion for summary judgment against Kupperman is granted.

First, Merrill has demonstrated that Kupperman knowingly made misrepresentations and/or omissions of material fact.  As discussed extensively in the facts section above, soon after the WCMA line of credit was established, Kupperman began delivering fraudulent documents to Merrill to induce it to continue and increase the flow of money from it to PITTRA.  See Section I.A, supra.  These included documents purporting to be prepared by an auditor (APM), a law firm (Becker Meisel), an escrow service and personal documents from PITTRA officers.  In fact, however, none of the documents were prepared or executed by these firms and individuals.  This finding is supported by numerous affidavits to that effect, in addition to the inference that may be drawn as a result of Kupperman's refusal to dispute such facts.

As the above-mentioned documents were not prepared by the individuals and firms that were supposedly responsible for their production, the facts indicate that Kupperman produced them.  As the PITTRA president and majority shareholder, as well as the liaison with Merrill, no other individual had the means to continuously prepare and present such documentation to the Merrill personnel overseeing the WCMA loan.

Even if Kupperman did not himself produce the documents proffered to Merrill, an omission of material fact and knowledge of its materiality satisfies the misrepresentation and falsity elements of legal fraud.  See Mall at IV Group Props., LLC v. Roberts, 2005 U.S. Dist. LEXIS 31860, at *23

(D.N.J. Dec. 8, 2005); <u>Varacallo v. Massachusetts Mut. Life Ins. Co.</u>, 752 A.2d 807 (N.J. Super. Ct. App. Div. 2000). Here, the documents provided to Merrill from Kupperman were consistently and substantially incorrect with respect to the actual financial position of PITTRA. As such, even if the Court were hesitant to find that Kupperman prepared the documents, there is ample evidence demonstrating that he knowingly sent false documents to Merrill without disclosing their inaccuracies. This Court finds that Kupperman knowingly made numerous material representations of fact, and no reasonable trier of fact could conclude otherwise.

Second, it is clear that Kupperman's representations were made with the intent that Merrill rely on them. In fact, one of the primary reasons that Kupperman continued to provide documents to Merrill was to convince Merrill to maintain funding for PITTRA and to further extend the company's line of credit. For example, Kupperman provided the false documents supposedly prepared by Becker Meisel in response to Merrill's correspondence indicating that "As a Condition of Approval [of the January 2004 Agreement] I need a letter from your attorney(s)." Doc. 308, at 3. Similar reviews took place again in May of 2004 and 2005. Such documentation (purportedly from attorneys, independent auditors, etc.) was often submitted directly in response to Merrill's requests as part of its review of the WCMA loan's status and viability—that is, Merrill directly relied on the information provided by Kupperman in determining how to proceed in the loan arrangement(s). Kupperman made these material misrepresentations knowing that Merrill would rely on them.

Third, based upon many of the same facts discussed above, the Court finds that Merrill relied on Kupperman's representations to its detriment. For example, it explicitly conditioned its renewal and increase of PITTRA's credit on the fact that it received the (false) documentation. In deciding

-13-

to extend the credit, Merrill clearly and reasonably relied on the documents and made its decision accordingly.  See, e.g., New Jersey Auto. Ins. Plan v. Sciarra, 103 F. Supp. 2d 388, 400 (D.N.J. 1998).

In light of the competent evidence proffered by Merrill, as well as Kupperman's failure to respond thereto, see SEC v. Chester Holdings, Ltd., 41 F. Supp. 2d 505, 1999 U.S. Dist. LEXIS 3734 (D.N.J. 1999) (granting summary judgment in favor of Plaintiff on its securities fraud claims); see also SEC v. U.S. Funding Corp., 2006 U.S. Dist. LEXIS 24789 (D.N.J. Apr. 11, 2006) (same), this Court finds that Merrill is entitled to summary judgment on its fraud claims against Kupperman.

## II.   CHASE'S MOTION FOR SUMMARY JUDGMENT ON ITS CROSSCLAIMS AGAINST ARTHUR KUPPERMAN

Chase moves for summary judgment on its crossclaims against Kupperman.  These claims include a claim for fraud (Count III), RICO (Count X) and N.J. RICO claims (Count XI).

### A.   FACTS

Chase made a loan to PGB International, LLC with a principal availability of $3,000,000.00 (the "Chase Loan") pursuant to the terms and conditions contained in an Advised Line of Credit Note, dated March 16, 2006 (the "Note").  See Chase's Undisputed Statement of Material Fact in Support of its Motion for Summary Judgment against Arthur Kupperman ("Doc. 289-2"), at ¶ 2. The certificate of formation provides that PGB is a New Jersey limited liability company and the operating agreement provides that Kupperman, E. Ross Browne and Paulette Krelman are the members and officers of PGB.  Id. ¶ 9.  PGB's books and records establish that it imports goods from overseas into New Jersey and then distributes those goods to customers throughout the United States.  Id. ¶ 10.

-14-

The Chase Loan was made pursuant to the terms and conditions contained in an Advised Line of Credit Note, dated March 16, 2006 (the "Note"). See id. at ¶ 2. The Note renewed and extended prior loans to PGB going back to October 2004. Id. In the Note, PGB waived any defense that it may have to the payment or performance of the liabilities evidenced by the Note. Id. ¶ 3. The Note, together with all of PGB's other obligations to Chase, was secured by the collateral described in a certain Security Agreement dated October 8, 2004 (the "Security Agreement", and together with the Note and related documents, the "Loan Documents"). Id. ¶ 4. Arthur Kupperman executed the Note and Security Agreement as the Managing Member of PGB. Id. ¶ 5. The Security Agreement gave Chase a first priority security interest in all of the assets of PGB. Id. ¶ 6. On or about October 20, 2004, Chase duly filed a Uniform Commercial Code Financing Statement (#22632197) to perfect its security interest in PGB's assets. Id. ¶ 7. A UCC search completed on October 30, 2006 confirmed that there is no other financing statement filed against PGB's assets. Id. ¶ 8.

In connection with the Chase Loan and in accordance with the Loan Documents, PGB, through Kupperman as managing member, provided annual financial statements to Chase as follows: (i) an Independent Auditors' Report from APM, dated December 17, 2003 (the "APM 2003 Report"); (ii) an Accountants' Review Report from Sy Helderman & Company ("SHC"), dated January 6, 2005 (the "SHC Jan. 2005 Report"); and (iii) an Accountants' Review Report from SHC, dated December 21, 2005 (the SHC Dec. 2005 Report"). Id. ¶ 11. PGB, through Kupperman, also provided interim financial statements, including a balance sheet for PGB, dated June 30, 2006. Id. ¶ 12. This June 30, 2006 balance sheet showed total assets of $12,387,967.00, which included accounts receivable of $9,621,813.00. Id. ¶ 13.

PGB also provided monthly borrowing base certificates evidencing PGB's outstanding

accounts receivable. Id. ¶ 14. Kupperman signed these monthly borrowing base certificates in order to attest to their accuracy. Id. ¶ 15. For the year prior to the filing of this action, these borrowing base certificates showed an average amount of accounts receivable of between $8 million and $9 million. Id. ¶ 16. On or about September 15, 2006, Kupperman provided a borrowing base certificate[4] representing that as of August 31, 2006, PGB had accounts receivable of not less than $8,067,945.59, of which $4,681,975.53 were current and $3,207,331.24 were between 31 and 60 days past due. Id. ¶ 17.

Based upon the representations set forth in the documents provided to Chase, including the annual and interim financial statements and the borrowing base certificates, Chase made periodic advances on the Chase Loan. Id. ¶ 18. At or about the time that Merrill filed its Complaint and this Court issued an Order to Show Cause, Chase first learned of the existence of PITTRA G.B. International Inc. and the alleged fraud perpetrated by Kupperman against Merrill and other creditors of PITTRA. Id. ¶ 19. Immediately upon learning of the alleged fraud, Chase sent auditors (the "Auditors") to PGB's offices to verify the financial information that Kupperman, as managing member of PGB, had been providing to Chase. Id. ¶ 20.

A preliminary examination of PGB's books and records revealed that instead of having more than $8,000,000.00 of accounts receivable, as PBG and Kupperman had represented in the borrowing base certificate for the month ended August 31, 2006, PGB actually had less than $1,700,000.00 in current accounts receivable. Id. ¶ 21. Chase subsequently learned that the monthly borrowing base certificates and financial statements provided by PGB were materially inaccurate and fraudulent.

---

[4] A borrowing base certificate is a document through which a borrower provides its lender with regular (e.g., monthly) information as to the collateral underlying and asset-backed loan.

Id. ¶ 22.  Among other things, the Auditors advised that PGB's actual accounts receivable were substantially less than $1,700,000.00, and likely no greater than $1,649,863.26.  The enormous discrepancy appears to have been caused, at least in part, because PGB substantially overstated receivables by reporting the full sale amount on commission transactions, rather than reporting only PGB's commissions.  Id.  The Auditors also advised of various other irregularities and discrepancies regarding PGB's financial condition and the representations that had been made to Chase regarding such financial condition.  Id. ¶ 23.

The annual financial statements provided to Chase were also materially inaccurate and fraudulent.  Id. ¶ 24.  The Affidavit of Wayne P. Tessler, an officer and shareholder of APM, demonstrates that the APM 2003 Report is a forgery.  Id.  Similarly, the Affidavit of Sy Helderman, the owner of SHC, demonstrates that the SHC Jan. 2005 Report and the SHC Dec. 2005 Report, are forgeries.  Id.  The Affidavit also establishes that the information in the forged SHC reports was materially inaccurate.  Id. ¶ 25.  The documents attached to that affidavit demonstrates that there is a stark difference between the numbers on the financial statements that PGB, acting through Kupperman, provided to Chase and the numbers on the financial statements provided to SHC.  Id.

PGB and Kupperman interfered with Chase's investigation of PGB.  Id. ¶ 26.  The Auditors advised that, among other things: (i) despite their requests, they were provided only with payable vendor names, and not with contact information (i.e., address, phone, etc.); (ii) they were provided with few, if any, original invoices, bills of lading, or purchase orders which they had requested to verify receivables; and (iii) PGB provided documents for only approximately one-quarter of the transactions for which vendor invoices and backup information had been requested and most of the sample invoices provided were copies, rather than originals.  Id.  In addition, the Auditors advised

-17-

that their task was substantially impeded as they were not given unfettered access to PGB's books and records.  Id. ¶ 26.  Instead, they were provided only those documents which PGB and Kupperman chose to selectively produce.  Id. ¶ 27.

PGB defaulted on its obligations to Chase under the Note and Security Agreement.  Id. ¶ 28. By letter dated October 16, 2006 (the "Default Notice"), Chase notified PGB, Browne and Krelman that: (i) PGB had defaulted on its obligations to Chase under the Loan Documents; and (ii) the Loan is accelerated.  Id. ¶ 29.  As of September 30, 2009 (the date this Motion was filed), the amount due and owing on the Chase Loan totaled $2,893,558.65, plus attorneys fees, costs and expenses of collection.  Id. ¶ 30.  This amount takes into account any and all sums received to date by Chase from any account debtors of PGB, as well as any settlement proceeds received from other persons in connection with this matter.  Id.  Collections from account debtors total $489,321.86.  Id.  In addition, Chase has received certain settlement proceeds with respect to claims asserted against Paulette Krelman and E. Ross Browne, respectively, totaling an additional $393,002.29.  Id.  Thus, total funds received to date and which have been offset against the amounts that remain due and owing on the Chase Loan equal $882,324.13.  Id.

On October 23, 2006, Kupperman, as representative of PGB and individually, appeared at the offices of Merrill's counsel for a deposition pursuant to a Notice to Take Depositions issued pursuant to this Court's Order to Show Cause.  Id. ¶ 31.  At his depositions, Kupperman, as representative of PGB and individually, invoked the Fifth Amendment privilege against self incrimination and refused to answer any questions.  Id. ¶ 32.  Kupperman signed a declaration confirming that he would invoke his Fifth Amendment privilege and refuse to answer all possible questions.  Id. ¶ 33.

### B. Applicable Law

#### 1. Count III - Fraud

The Court fully set forth the law underlying a claim for fraud under New Jersey law above, in Section I.B, supra.   In short, a plaintiff must demonstrate that the defendant has made a material misrepresentation of fact, with knowledge of its falsity, with the intention that such representations would be relied upon by plaintiff to its detriment. See Gennari, 148 N.J. at 610 (1997) (citing Jewish Center of Sussex County, 86 N.J. at 624-25).

#### 2. Count X - RICO

Pursuant to the federal RICO statute, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).[5]

To prevail on a cause of action for civil RICO, a plaintiff must demonstate the seven constituent elements of a substantive RICO violation:  "[i] that the defendant [ii] through the commission of two or more acts constituting a 'pattern' [iii] of 'racketeering activity' [iv] directly or indirectly invests in, or maintains an interest in, or participates in [v] an 'enterprise' [vi] the activities of which affect interstate or foreign commerce." Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983).

With respect to the third element "racketeering activity," is defined as "any act which is indictable" under specified provisions of Title 18, including mail fraud, wire fraud, extortion, and

_____

[5] Section 1962(d) makes it "unlawful for any person to conspire to violate . . . the provisions of subsection . . . (c)."  18 U.S.C. § 1962(d).

**bank/financial institution fraud**.  See 18 U.S.C. § 1961(1)(B).

### 3. Count XI - N.J. RICO

"The New Jersey RICO provisions parrot those of the federal statute," Curley v. Cumberland

Farms Dairy, Inc., 728 F. Supp. 1123, 1138 (D.N.J. 1989), and are in construed in accordance with

the Federal RICO statute.  See State v. Ball, 268 N.J. Super. 72, 98 (App. Div. 1993), aff'd, 141 N.J.

142 (1995); Cetel v. Kirwan Fin. Group, 460 F.3d 494, 510 (3d Cir. 2006) ("[T]he New Jersey

Supreme Court believe[s] [that] the New Jersey RICO statute was and should be consistent with the

federal RICO statute.").

### C. ANALYSIS

The Court will consider the three Counts on which Chase moves for summary judgment in

turn.

### 1. Count III - Fraud

Chase moves for summary judgment on its fraud claim against Kupperman.  This motion is

unopposed.  Kupperman has not made any attempt to dispute the evidence relied upon by Chase, as

he has invoked the Fifth Amendment.  Upon considering the evidence proffered by Chase, in

addition to Kupperman's failure to respond to the submissions, the Court finds that Chase has shown

that Kupperman made multiple misrepresentations of material facts, with knowledge of their falsity,

with the intention that such representations would be relied upon by Chase to its detriment.  See

Gennari, 148 N.J. at 610 (1997) (citing Jewish Center of Sussex County, 86 N.J. at 624-25).

Accordingly, Chase is entitled to summary judgment on its fraud claim.[6]

---

[6] Kupperman's scheme of fraud against Chase is substantially similar to the scheme he
carried out against Merrill.  Accordingly, for many of the same reasons discussed above, Chase's
motion for summary judgment is granted.

First, Chase has demonstrated that Kupperman knowingly made misrepresentations and/or omissions of material fact.  As part of his fraudulent scheme, Kupperman provided Chase with fraudulent documents, such as the ARM 2003 Report, the SHC January 2005 Report, and the SHC December 2005 Report.  These documents, however, were not prepared or executed by the auditors or accountants, as represented by Kupperman.  See Section II.A, supra.  This finding is supported by **numerous uncontested** affidavits to that effect, in addition to the inference that may be drawn as a result of Kupperman's failure to dispute such facts.  Moreover, he provided grossly inaccurate borrowing base certificates to maintain his line of credit with Chase.  He signed such certificates attesting to their accuracy.

The above-mentioned financial reports were not prepared by the individuals/firms that were supposedly responsible for their production, and the facts suggest that Kupperman produced them.  As a managing member of PGB, who was involved in the company's day-to-day affairs, Kupperman was aware of PGB's finances (including its accounts receivable, which were materially misrepresented in the documents submitted to Chase to obtain funding).  Regardless of whether Kupperman prepared the financial documents, it is clear that Kupperman—at the very least—was aware that the documents were erroneous when he submitted them to Chase.  These actions are sufficient to demonstrate that he knowingly omitted material facts in his dealings with Chase; such conduct satisfies the misrepresentation and falsity elements of legal fraud.  See Mall at IV Group, 2005 U.S. Dist. LEXIS 31860, at *23;  Varacallo, 752 A.2d at 807.  Here, the documents provided to Chase from Kupperman were consistently incorrect with respect to the financial position of PGB.  There is ample evidence to show that Kupperman sent false documents to Chase without disclosing their inaccuracies.  This Court finds that Kupperman knowingly omitted material facts on numerous

occasions in the documents he provided to Chase.  No reasonable trier of fact could conclude otherwise.  Accordingly, Chase has satisfied the first element of its fraud claim.

Second, it is clear that such representations/omissions were made with the intent that Chase rely on the documents—Kupperman's motivation in continuing to provide the false documents was to convince Chase to advance funds to PGB.  Chase directly relied on the information provided by Kupperman in determining to proceed in the loan arrangement.  Kupperman made these material misrepresentations knowing that Chase would rely on them.

Third, the Court also finds that Chase relied on Kupperman's representations to its detriment. Chase continued to disburse funds to PGB with the understanding that PGB was adequately collateralized.  In deciding to extend the credit, Chase clearly relied on the documents and made its decision accordingly.  See, e.g., New Jersey Auto. Ins. Plan v. Sciarra, 103 F. Supp. 2d 388, 400 (D.N.J. 1998).  The purpose of the documentation was to demonstrate that the debtor would be in a position to repay the loan.  PGB, now insolvent, cannot repay its loan to Chase, which is owed  a total of $2,893,558.65, plus interest, legal fees, costs and expenses of collection.

In light of the competent evidence proffered by Chase, as well as Kupperman's failure to respond thereto, see SEC v. Chester Holdings, Ltd., 41 F. Supp. 2d 505, 1999 U.S. Dist. LEXIS 3734 (D.N.J. 1999) (granting summary judgment in favor of Plaintiff on its securities fraud claims); see also SEC v. U.S. Funding Corp., 2006 U.S. Dist. LEXIS 24789 (D.N.J. Apr. 11, 2006) (same), this Court finds that Chase is entitled to summary judgment on its fraud claims against Kupperman.

## 2. Count X - RICO

Chase asserts that the uncontroverted evidence entitles it to summary judgment on its federal RICO claim.[7]

Chase asserts that all six elements of its RICO claim have been satisfied. See Section II.B.2, supra (listing the requisite elements of a federal RICO claim). First, PGB was operated by Kupperman, who served as managing member and officer of the company (Elements 1 and 5). Second, the company was an enterprise within the meaning of the RICO statute, as enterprise is defined to include legal entities such as limited liability companies. (Element 2). See 18 U.S.C. § 1961(4). Next, Kupperman committed two or more acts constituting a "pattern" of "racketeering activity"—specifically, multiple acts of financial institution/bank fraud under 18 U.S.C. § 1344 (Elements 3 and 4). Finally, the enterprise, PGB, was engaged in activities affecting foreign and interstate commerce as it imported goods from overseas and distributed those goods to customers throughout the United States (Element 6). These acts constitute a RICO violation that caused significant harm to both plaintiffs here (Chase and Merrill). Chase asserts that as of September 30, 2009, Kupperman/PGB owed Chase a total of $2,893,558.65, plus interest, legal fees, costs and expenses of collection of the unpaid loan obligations.

Kupperman responds that summary judgment on Chase's RICO claim is inappropriate for two reasons. First, as an initial matter, he argues that his assertion of the Fifth Amendment does not

---

[7] This Court previously denied a motion for summary judgment by Chase on its RICO claims against Kupperman. Merrill Lynch Bus. Fin. Servs., Inc. v. Kupperman, 2007 U.S. Dist. LEXIS 57640, at *21-22 (D.N.J. Aug. 6, 2007). At that time, the only evidence provided by Chase in support of its motion was an equivocal declaration of an auditor who investigated PGB's current accounts receivable, books and other records at PGB's location. In their current motion, Chase has submitted additional evidence that the Court has considered in determining whether summary judgment is appropriate.

alone permit the Court to draw a negative inference of liability sufficient to enter summary judgment against him.  <u>See</u> Brief of Arthur Kupperman in Opposition to Chase's Motion for Summary Judgment ("Doc. 334"), at 2.  That is, only if his assertion of the Fifth Amendment, considered in conjunction with additional admissible evidence, indicates that "the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]," is summary judgment appropriate.  <u>Id.</u> (internal citations omitted).  In light of this standard, then, Kupperman asserts that Chase has not come forward with enough evidence to demonstrate that he has engaged in "racketeering activity." <u>Id.</u> at 3.  Kupperman's first argument, in essence, is that there is a lack of evidence as to the third element of Chase's RICO claim.  <u>Id.</u>[8]  Next, Kupperman argues that a RICO claim is inappropriate here because the alleged harm is isolated to a single private actor, and not against the community at large.

In light of the parties' arguments, the Court must determine whether (a) there is sufficient evidence, in conjunction with Kupperman's invocation of the Fifth Amendment, to find that Kupperman committed a racketeering activity; and (b) whether the type of claim asserted by Chase is cognizable under the federal RICO statute.

---

[8] Kupperman also asserts that " in light of the affidavits of both Ross Browne and Paulette Krelman . . . there can no longer be any allegation that a conspiracy existed as these individuals claim that they had no role in the commission of a fraud."  <u>Id.</u> at 4.  This argument is inapposite here, as a conspiracy is only a requirement for a claim under 18 U.S.C. § 1962(d), which is not asserted by Chase.

To the extent that Kupperman asserts that he/PGB cannot be an "enterprise" under the RICO statute, he is incorrect.  A RICO enterprise under Section 1961(4) includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

*(a) Evidence of Racketeering Activity*

There is ample evidence demonstrating that Kupperman committed multiple acts of bank fraud under 18 U.S.C. § 1344, which constitutes racketeering activity. See 18 U.S.C. § 1961(1)(B); see, e.g., Centrix HR, LLC v. On-Site Staff Mgmt., Inc., 2008 U.S. Dist. LEXIS 23280, at *53-54 (E.D. Pa. Mar. 25, 2008). Accordingly, the Court finds that Chase has satisfied the third element of its RICO claim.

Bank fraud under 18 U.S.C. § 1344 occurs when a individual knowingly executes a scheme or artifice[9] to defraud a financial institution, or obtain any of the monies, funds, credits, assets, securities, or other property from a financial institution by means of false or fraudulent pretenses, representations, or promises. United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987). In determining whether Kupperman committed bank fraud this Court finds the case of LaSalle Bank Lake View v. Seguban, 937 F. Supp. 1309 (N.D. Ill. 1996) to be particularly persuasive. As the facts and law relating to that case are substantially similar to the case here, this Court will discuss it at length.

In LaSalle Bank, a district court in the Seventh Circuit entered summary judgment on a plaintiff's RICO claims against Defendant, Ellen Seguban. Id. at 1312. As here, the alleged racketeering activity was multiple violations of the bank fraud statute, 18 U.S.C. § 1344. Id. at 1314. Also, like the case here, Seguban invoked her Fifth Amendment privilege. See id. Seguban, a bank teller, embezzled funds from her employer, LaSalle bank. Id. at 1313-14. To do so, she disguised fraudulent transactions by executing false teller tickets approximately every three days over a

---

[9] A "scheme or artifice to defraud means any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another of something of value." See United States v. Sturm, 671 F.2d 749, 751 (3d Cir. 1982), cert. denied, 459 U.S. 842 (1982).

twelve-year period. Id. at 1314. By submitting these tickets, the Bank's internal controls mechanism (to detect discrepancies in cash flow in and out of its vault) was never triggered. Id. at 1313-14. Ultimately, she diverted a total of $ 940,000. Id.

There, in support of its summary judgment motion, LaSalle submitted:  the affidavit of the Vice-President of the Bank; two affidavits of the Bank's Assistant Vice President - Security; the affidavit of the Teller Manager for the Bank; three affidavits of the Bank's Assistant Vice President - Assistant Controller.  Based upon this evidence, in conjunction with Seguban's failure to respond to LaSalle's statement of facts (as a result of invoking the Fifth Amendment), summary judgment was entered against her.

Kupperman argues that, here, the evidence that has been submitted is insufficient to warrant a similar result.  Kupperman asserts that Chase merely "relies upon the Olson Declaration which does nothing more than recite hearsay or vague information supposedly obtained from Chase's auditors." Kupperman Op. at 3.   Specifically, he argues that "[t]he Olson Declaration regurgitates information received from 'the Auditors' without even naming who provided the information." Id. at 3-4.  Kupperman argues that because the affidavit is vague and comprised of hearsay statements, the evidence is insufficient to form the basis for Chase's summary judgment motion.  Id.

While the Court agrees with Kupperman that competent and admissible evidence must be submitted (to support the Fifth Amendment inference drawn against him), see, e.g., LaSalle Bank, 937 F. Supp. 1319 (quoting Whitted v. General Motors Corp., 58 F.3d 1200, 1204 (7th Cir 1995)), the Court finds that Chase has provided adequate evidence here.

In conjunction with its summary judgment motion, Chase provided four affidavits of various individuals with firsthand knowledge of the accuracy of the documents that Kupperman provided

to the banks to obtain loans.  Chase submitted, in addition to the Declaration of Olsen Declaration: an affidavit of Wayne P. Tessler, an officer and shareholder of APM, that demonstrates that the APM 2003 Report is a forgery; an affidavit of Sy Helderman that establishes that the information in the forged SHC reports was materially inaccurate; and, a certification by Israel A. Rodriguez stating that PGB mistated the value of its assets in its borrowing base certification wherein it represented that its account receivables were $8,000,000 when in fact they were less than $1,700,000.  These affidavits, in addition to copies of the various documentation submitted by Kupperman to Chase to secure continued funding, are overwhelming evidence of bank fraud.  There are clear discrepancies between the figures listed in the documents provided to Chase and the accurate financial documents.  Such evidence, in addition to Kupperman's invocation of the Fifth Amendment in this proceeding, supports summary judgment here.  See Graystone Nash, 25 F.3d at 191.

*(b) Chase's Claim falls within the Scope of a RICO claim*

Kupperman next argues that the type of claim asserted by Chase is not properly brought as a RICO claim.  He argues that RICO is "not meant to provide a windfall to individual litigants such as Chase, but instead to protect the public at large."  Kupperman Op. at 4-5.  Without demonstrating a "public harm," Kupperman argues, Chase's RICO claim should fail.  This Court disagrees.

Kupperman's fraud was carried out against Merrill, and subsequently Chase.  The "public harm" requirement urged by Kupperman appears to have been rejected by the Third Circuit.  The Circuit has held that "there is no requirement in civil RICO that the predicate acts pose a societal threat."  Tabas v. Tabas, 47 F.3d 1280, 1297 n.22 (3d Cir. Pa. 1995).   In fact, the Supreme Court has instructed that "RICO is to be read broadly . . . and may be applicable to many garden-variety fraud cases."  Id. at 1296.  Kupperman's ongoing scheme of fraud continued against two financial

institutions over the course of nearly three years.  Moreover, there is no indication that such fraud would have ceased if Kupperman's scheme was not uncovered, and bankruptcy proceedings initiated.  See, e.g., id. at 1295.

### 3.  Count XI - New Jersey RICO

Chase also alleges a violation of the New Jersey RICO statute, N.J.S.A. 2C:41-4(c).  As Chase's claim is based on the same predicate acts and pattern of racketeering activity as its federal RICO claim, the Court need not separately consider Chase's state law claim.  See Cetel v. Commw. Life Ins. Co., 460 F.3d 494, 510 (3d Cir. 2006) (citing State v. Ball, 141 N.J. 142, 661 A.2d 251 (1995)) ("[T]he New Jersey Supreme Court believed the New Jersey RICO statute was and should be consistent with the federal RICO statute."); In re Schering-Plough Corp. Intron, 2009 U.S. Dist. LEXIS 58900, at *29 (D.N.J. July 10, 2009).  In all respects material to this case, Chase's federal and state law RICO claims are the same.  Chase is accordingly entitled to summary judgment on its state law claim.[10]

---

[10] To prove a violation of N.J.S.A. 2C:41-2(c), the New Jersey RICO statute, a plaintiff must demonstrate:

> (1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity.

State v. Ball, 141 N.J. 142, 181, 661 A.2d 251, 271(1995).  Additionally, a private plaintiff must claim injury as a result of the violation.  Maxim Sewerage Corp. v. Monmouth Ridings, 273 N.J. Super. 84, 94, 640 A.2d 1216, 1220 (Law Div. 1993).

### III.   MERRILL'S MOTION FOR SUMMARY JUDGMENT ON ITS CLAIMS AGAINST CHASE

Merrill moves for partial summary judgment on the tenth count of its Complaint, asking this Court to find that Merrill has a first priority right to the assets of PGB.

### A.   FACTS

PITTRA was incorporated on October 12, 2001, by Kupperman, the company's president, and did business as an importer and exporter of industrial food ingredients.  See Merrill's Motion for Summary Judgment on Claims against Chase ("Doc. 319"), at 2.  As discussed at length above, Merrill extended a line of credit to PITTRA in November 2002.  Id.  On or about December 3, 2002, Merrill duly recorded a UCC Financing Statement, putting creditors on notice that it had a priority interest in all PITTRA assets.  Id. at 3.  On April 30, 2003, Kupperman formed PGB, also an importer and exporter of industrial food ingredients.

On June 5, 2003, Kupperman facilitated the transfer of certain Pittra assets to PGB for $310,000.00.  Id. at 3.  As part of the purchase price, PGB gave PITTRA a promissory note for $300,000.00 payable within 30 days.  Id.

On or about February 9, 2006, PITTRA filed a petition for relief under Chapter 7 of the Title 11 of the U.S. Code, as amended ("Bankruptcy Code"), and a Chapter 7 Trustee (the "PITTRA Trustee") was appointed.  See Chase's Opposition to Merrill's Motion for Summary Judgment , at 4.  On or about September 20, 2006, the PITTRA Trustee filed an action entitled Benjamin A. Stanziale, Jr., Chapter 7 Trustee for PITTRA G.B. International, Inc. v. Arthur Kupperman, et al., Adversary Proceeding No. 06-2702 (MS) (the "Fraudulent Transfer Adversary Proceeding") in the Bankruptcy Court for the District of New Jersey against PGB, seeking to recover certain of PITTRA's assets that were allegedly improperly transferred.  Id.  In the Fraudulent Transfer

-29-

Adversary Proceeding, the PITTRA Trustee sought to avoid the June 5, 2003 transfer of assets from PITTRA to PGB as a fraudulent transfer and to recover PGB's assets for the benefit of PITTRA's creditors, including Merrill  Id.  Also, on or about February 8, 2008, the PITTRA Trustee filed a lawsuit against Merrill seeking to recover payments that Merrill received from PITTRA within 90 days of PITTRA's bankruptcy filing, entitled Benjamin A. Stanziale, Jr., Chapter 7 Trustee for PITTRA G.B. International, Inc. v. MLBFS, Adversary Proceeding No. 08-1131 (MS) (the "Merrill Adversary Proceeding").  Id.  On October 5, 2006, Merrill filed this action.  Id. at 5.

On February 2, 2009, Chase, Merrill and the PITTRA Trustee resolved the Fraudulent Transfer Adversary Proceeding and the Merrill Adversary Proceeding, and this action with respect to Defendants E. Ross Browne and Paulette Krelman.  Id.  In connection with the settlement, the PITTRA Trustee provided Chase and Merrill a full release.  Id.  The settlement contains a release by the PITTRA Trustee to Chase and Merrill.  Id.  Chase and Merrill also provided a full release to the PITTRA Trustee.  Id.  More specifically, Merrill waived all claims against the PITTRA estate and withdrew with prejudice the proof of claim it filed in the PITTRA Bankruptcy Case.  Id.  The Fraudulent Transfer Adversary Proceeding and the Merrill Adversary Proceeding were dismissed in connection with the settlement.  Id.

**B. ANALYSIS**

Merrill moves for partial summary judgment on its claims against Chase, and asks this Court to find that it has a first priority right to the assets of PGB.  Merrill asserts that it had a lien on the assets of PITTRA, many of which were fraudulently transferred to PGB through the asset sale described above.  See Doc. 319,, at 1; see also I.A, supra.  Merrill asserts, the lien (and Merrill's priority to PGB collateral) was not disrupted by the asset sale.

-30-

In response, Chase contends that summary judgment must be denied for five reasons:  (1) Merrill has no standing to assert that the transfer from PITTRA to PGB was fraudulent; (2) Merrill waived any claim to recover PGB's assets by entering into a settlement with the PITTRA Trustee; (3) the UCC financing statement filed with respect to PITTRA does not give Merrill a continuing lien on the assets of PGB under these circumstances; (4) Merrill has not established that a fraudulent transfer took place; (5) with reference to certain PGB accounts that Chase collected directly, Chase has priority as a holder in due course and as a purchaser of instruments; and (6) the Writs of Attachment entered by this Court require a *pro rata* split of the PGB/Kupperman assets, preventing Merrill from collecting on any judgment entered against PGB and Kupperman as a senior creditor. See Doc. 329, at 1-2.[11]    The arguments are addressed in turn.

    1.    Does Merrill have standing to assert that the transfer from PITTRA to PGB was fraudulent?

Chase first argues that Merrill has no standing to assert that the transfer from PITTRA to PGB was fraudulent, and thus its summary judgment must be denied.   That is, because the PITTRA Trustee was vested with the authority to challenge a fraudulent transfer, Merrill should not be permitted to bring such a claim in its own right here.   The Court does not agree.

---

[11] Chase also asserts that Merrill may not move for summary judgment on the grounds that it filed a valid UCC Financing Statement against PITTRA.  Chase argues that Merrill, initially, only argued that it "has priority over any eventual recovery from PGB by virtue of the Writs of Attachment issued in this matter—**not** because of the UCC [Financing Statement] that [Merrill] filed against PITTRA."  Doc. 329, at 16 (emphasis added.  Accordingly, Chase asserts that Merrill's motion for summary judgment based on its UCC Financing Statement is improper.

    Merrill responds that Chase's own counterclaim "raises the issue of the competing priority of Chase's and [Merrill's] Financing Statements" and, therefore, Merrill "is entitled to move for summary judgment on the allegations against its in Chase's counterclaim."  Doc. 342, at 9 n.3.  The Court agrees with Merrill, and will not consider Chase's sixth argument in opposition to Merrill's motion for summary judgment.

When a petition is filed under Chapter 7, a trustee is appointed as the representative of the estate, and is granted broad powers to avoid and recover fraudulent transfers pursuant to the Bankruptcy Code §§ 544(b), 548.  See The Official Committee Of Unsecured Creditors v. Chinery (In re Cybergenics Corp.), 330 F3d. 548, 568-69 (3rd Cir. 2003).  As the Third Circuit explained in In Re Cybergenics,

> [t]he policy concern evident in § 544(b) is the need to channel avoidance actions through the trustee, who acts as a gatekeeper and prevents independent avoidance actions by creditors that might prejudice the estate and rival creditors.  The Supreme Court stated as much in Hartford Underwriters when it expressed concern about parties "usurp[ing] the trustee's role as representative of the estate."  530 U.S. at 8-9.  This representative role explains why § 544(b) allows the trustee, but not a creditors' committee, to bring an avoidance action on its own authority, i.e., without court permission. . . . The end result of this equitable remedy—the estate's recovery of fraudulently transferred property . . .

Id. at 568.  As such, a trustee is typically the party first charged with bringing an avoidance action.

Section 554 of the Bankruptcy Code, however, permits a trustee to abandon estate property pursuant to § 554(a) or (b).  Section 554 is entitled "Abandonment of property of the estate" and provides:

> (a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
>
> (b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

11 U.S.C. § 554(a)-(b).  In accordance with the statute, "[s]cheduled property may be abandoned by the trustee after notice to all creditors and a hearing; or, scheduled property, which is not administered by the trustee, is abandoned by operation of law upon the formal closing of the bankruptcy case."  Dunlap v. Independence Bank, 2007 U.S. Dist. LEXIS 84598, at *5 (W.D. Ky.

-32-

Nov. 15, 2007) (citing In re Beaton, 1997 Bankr. LEXIS 1312, at *5-7 (Bankr. N.D. Ala. 1997)). Section 554's "notice and hearing requirements serve to protect the trustee, who often must make decisions based on incomplete or less than candid information supplied by debtors." Id.

Here, before the Bankruptcy Court, the Trustee advised that "Merrill and Chase both appear to have valid enforceable liens on whatever asserts the Debtor or its successor [PGB] had. Recovery in the litigation [against PGB] fairly appears to be no more than a recovery of Merrrill and Chase's collateral or the proceeds of their collateral." See Doc. 319, at 3. Because the proceeds of the claim against PGB were merely funds to be received by Merrill and Chase—not to be recovered on behalf of the Estate—it appears that the Trustee did not find it appropriate to pursue the claims. This action was in accordance with its role as trustee. See Congress Credit Corp. v. AJC Int'l, 186 B.R. 555, 559 (D.P.R. 1995), ("[A] trustee's primary duty is to the unsecured creditors rather than to the secured creditors; and [t]he secured creditors, for the most part, should be able to look to their collateral for satisfaction of their claims[, accordingly if] there is no equity in the collateral for the bankruptcy estate . . . the trustee generally abandons the property); Barber v. McCord Auto Supply (In re Pearson Indus.), 178 B.R. 753, 761 (Bankr. C.D. Ill. 1995) ("The court went on to state that where property is fully encumbered, abandonment is the order of the day. A Chapter 7 Trustee should not act as a mere conduit for the benefit of secured creditors only."); see also In re Feinstein Family Pshp., 247 B.R. 502, 508 (Bankr. M.D. Fla. 2000) ("Clearly, the Code never contemplated that a Chapter 7 trustee should act as a liquidating agent for secured creditors who should liquidate their own collateral."). For this reason, the Trustee decided not to pursue the claim against PGB. The Trustee, accordingly, stipulated to dismissal of the fraudulent conveyance claim against PGB.

Having determined that the Trustee declined to pursue an avoidance claim on behalf of the

creditors (i.e., Merrill and Chase), the Court finds that the Trustee abandoned such property.  A.T.
Massey Coal Co. v. Jenkins, 2009 U.S. Dist. LEXIS 43521, at *7-8 (W.D. Va. May 22, 2009)
(finding that property abandoned under § 554 ceases to be property of the estate and "reverts to the
debtor and stands as if no bankruptcy petition was filed."); In re Renaissance Stone Works, L.L.C.,
373 B.R. 817, 820-21 (Bankr. E.D. Mich. 2007); Cuda v. Nigro (In re Northview Motors), 202 B.R.
389, 394 (Bankr. W.D. Pa. 1996) (collecting cases).  Accordingly, the Court finds that Merrill now
has standing to pursue such a claim.

> 2.    Has Merrill waived its claim to recover PGB's assets by entering into a
>       settlement with the PITTRA Trustee?

Chase next asserts that even if Merrill has standing to pursue its fraudulent transfer claim,
it waived any claim to recover PGB's assets by entering into a settlement with the PITTRA Trustee.
Chase states that because Chase, Merrill and the PITTRA Trustee all issued mutual releases—and
because the Fraudulent Transfer Adversary Proceeding and the Merrill Adversary Proceedings were
dismissed—Merrill has waived all claims asserted therein (i.e., its claim challenging the transfer of
assets from PITTRA to PGB).  The Court disagrees, and finds that Merrill has not waived the claim
asserted in its summary judgment motion against Chase.

On February 2, 2009, Chase, Merrill and the PITTRA Trustee settled the District Court action
with Defendants E. Ross Browne and Paulette Krelman, as well as the Fraudulent Transfer
Adversary Proceeding and the Merrill Adversary Proceeding.  Id.  This Court approved the
Stipulation of Settlement and Mutual Release ("Settlement Agreement") on January 11, 2009.  See
Docket entry no. 280.  The Settlement Agreement reads:

> Upon Court Approval and upon written confirmation by the PITTRA Trustee that he
> has received the Settlement Amount in full, and except for the obligations created by

-34-

or preserved in the Stipulation, the PITTRA Trustee, in his role as Chapter 7 Trustee of PITTRA's bankruptcy estate . . . [Merrill and Chase] shall hereby release, acquit and forever discharge [Ross] Browne and Ardith Browne and their attorneys, administrators, heirs and executors, **but in all events excluding Arthur Kupperman, PGB, IFIG USA, Inc. ("IFIG"), Paulette Krelman, Arthur Krelman, PGB International, Inc., G.B. International, Inc., Biz Link, LLC, A.K. Capital and any other entity controlled directly or indirectly by Kupperman** . . . from all manner of actions. . . .  **For the avoidance of doubt, nothing in this paragraph is intended** or shall be deemed to apply to any actions, suits, proceedings, causes of action, claims, debts, assessments, dues, losses, damages, judgements, executions, defaults, covenants, contracts, controversies, agreements, promises, attorneys' fees, costs, expenses, accounts, bills, liabilities, obligations, or demands of the Creditor Releasors [i.e., Merrill and Chase] with respect to or against **Kupperman, PGB** . . . .

Settlement Agreement ¶ 9.  Thus, the Settlement Agreement states that the releases were between

Trustee/Chase/Merrill and the Brownes.  The PITTRA Trustee also entered into mutual releases with

Merrill and Chase.  With respect to these releases, however, the latter portion of the excerpt above

illustrates that claims against PGB were specifically exempted from the Settlement Agreement.[12]

The Court finds that Merrill did not waive its fraudulent transfer claim against PGB in the

settlement agreement, and as noted above, has standing to pursue such a claim.  See Section III.B.1.

The Court, accordingly, must next consider whether Merrill has a superior priority interest over the

assets of PGB.

> 3.    Does the UCC Financing Statement filed with respect to PITTRA give Merrill a continuing lien on the assets PGB?

Chase argues that Merrill's summary judgment motion must also be denied because it has

not specified the "uncontroverted" collateral and/or proceeds transferred from PITTRA to PGB as

---

[12] In opposition to Merrill's motion for summary judgment, Chase submits an affidavit of counsel for the PITTRA Trustee, who opined that under the Settlement Agreement Merrill and Chase's competing priority claims were dismissed.  This reading, however, cannot be reconciled with the plain language of the settlement agreement which expressly did not apply to Merrill and Chase's respective claims against PGB.

part of the June 2003 sale.  That is, Chase asserts that Merrill's continuing security interest (arising from its UCC Financing Statement filed against PITTRA) is not enforceable because Merrill cannot specifically identify the PGB assets it has a secured interest in, and, similarly, cannot identify the proceeds that flowed from those assets.

Merrill responds that it need not identify the specific collateral, and the proceeds arising therefrom, in order to demonstrate priority over PGB's assets.  Under the facts of this case, the Court must agree with Merrill.

To determine whether Merrill has a continuing (priority) interest in all of the assets of PGB, the Court must make three assessments:  first, (i) it must determine the scope of Merrill's security interest; second, (ii) it must determine whether that interest continues despite the transfer of assets from PITTRA to PGB; and, third, (iii) it must determine whether Merrill's interest has priority over that of Chase.[13]

(i)  *What is the scope of Merrill's security interest?*

With respect to the first assessment, Chase characterizes the "collateral" here as the assets that were transferred as part of the asset-sale between PITTRA and PGB.  It contends that because the asset sale was not a sale for all of PITTRA's assets, Merrill only has a secured interest in the specific assets transferred to PGB.  Chase goes on, then, to argue that Merrill is only entitled to recover on its lien to the extent that it can identify the specific assets transferred to PGB, and can trace the proceeds flowing from those assets.  See Doc. 329, at 10.

---

[13] The parties center their discussion around three provisions of Article 9 of the UCC and its New Jersey statutory equivalent:  9-315 (secured party's rights on disposition of collateral); 9-325 (priority of security interests in transferred collateral); 9-507 (effect of filing financing statement).

The Court finds that Chase's argument relies on a mischaraterization of the scope of Merrill's lien. UCC Section 9-315 provides that "(1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and (2) a security interest attaches to any identifiable proceeds of collateral." New Jersey Uniform Commercial Code, N.J.S.A. 12A:9-315(a). Merrill's security interest under the WCMA loan to PITTRA defines collateral as:

> [T]he WCMA Account, all Accounts, Chattel Paper, Contract Rights, Inventory, Equipment, Fixtures, General Intangibles, Deposit Accounts, Documents, Instruments, Investment Property and Financial Asserts of Customer, howsoever arising, **whether now owned or existing or hereafter acquired or arising**, and wherever located; together will all parts thereof (including spare parts), all accessories and accessions thereto, all books and records (including computer records) directly related thereto, all proceeds thereof (including, without limitation, proceeds in the form of Accounts and insurance proceeds), and the additional collateral described in Section 3.6(b) hereof.

See Security Agreement, ¶ 1.1 ("Collateral") (emphasis added). The Security Agreement explains that the terms of the loan agreement and accompanying documents "shall be binding upon, and shall inure to the benefit of [Merrill], Customer [i.e., PITTRA] **and their respective successors and assigns**." Id. ¶ 3.7(g) (emphasis added). The collateral is fully recited in the UCC Financing Statement filed by Merrill on December 3, 2002. Accordingly, Merrill's lien encumbers additional collateral (of the varieties listed in the Security Agreement), and the lien is effective as against PITTRA successors.

Merrill's designation of such collateral in the Security Agreement is permissible, and the Agreement is enforceable to its full scope. See Wollenberg v. Phoenix Leasing, 893 P.2d 4, 8-10 (Ariz. Ct. App. 1994) ("The UCC permits a security interest to extend to property acquired by the

debtor after the creation of the security agreement only if the agreement itself provides that covered

obligations are to be secured by after-acquired collateral.") (citations omitted); In re Koro Corp., 10

B.R. 767, 1981 Bankr. LEXIS 3846 (Bankr. D. Mass. 1981) ("Moreover, South Shore Bank having

a valid security interest with an after acquired clause in all the Debtor's receivable inventory and

proceeds, would have a superior right to the proceeds."); In re Serrins Automotive Warehouse, Inc.,

18 B.R. 718, 720 (Bankr. W.D. Pa. 1980) (same; collecting cases).   Accordingly, the Court must

reject Chase's contention that Merrill's lien on PGB's "collateral" is exclusively limited to the assets

transferred from PITTRA pursuant to the assets transfer agreement.   Because the scope of Merrill's

collateral is not simply the transferred assets, Merrill is not require to "trace" the transferred assets

and proceeds thereof to identify its security interest.[14]

--------

[14] Under certain circumstances, Chase's argument would be persuasive.  For example, if, in fact, the collateral for Merrill's loan only included "PITTRA's current assets," then this Court would agree that Merrill has the burden to identify the assets/proceeds in which it had a secured interest.  See Valmed v. Jess Med. Sys., L.L.C., 2007 N.J. Super. LEXIS 2689, at *19 (App.Div. Jan. 23, 2007) (unpublished) ("Proceeds that are commingled with other property are identifiable proceeds . . . to the extent that the secured party identifies the proceeds by a method of tracing . . . .") (citing N.J.S.A. 12A:9-315(b)(2)); In re Oriental Rug Warehouse Club, Inc., 205 B.R. 407, 411, 413 (Bankr. D. Minn. 1997).  Here, in contrast, the Security Agreement extends broadly to cover all "Accounts, Chattel Paper, Contract Rights, Inventory, Equipment, Fixtures, General Intangibles, Deposit Accounts, Documents, Instruments, Investment Property and Financial Asserts of Customer" whether in existence or after-acquired, and applies as against PITTRA's successors.  Having determined that the "collateral" is not limited to the specific assets subject to the PITTRA-PGB transfer, Merrill is not required to trace which assets were transferred to PGB (or the proceeds flowing from those assets) in order to possess a valid secured interest in the collateral.

The Court's analysis is bolstered by a case relied upon by Chase, wherein the Court specifically noted that "there is no language in the partnership security agreement that indicates an intent that the successors of the partnership were to assume the lien-creating obligations of the agreement."  See Moister v. Nat. Bank of Georgia (In re Guaranteed Muffler Supply Co., Inc.), 1 B.R. 324, 326 (Bankr. N.D. Ga. 1979).  Accordingly, there, the creditor had to "trace" collateral and proceeds for its security interest to be maintained post-transfer.  See id, 1 B.R. at 326.  In contrast, in this case the creditor (i.e., Merrill) does have a Security Agreement broadly securing

(ii)  *Does Merrill's interest remain intact notwithstanding the asset transfer from PITTRA to PGB?*

Having established the scope of Merrill's collateral, the next question for this Court is whether the transfer of assets to PGB destroys Merrill's security interest in said collateral.  As the In re Serrins Court explained

> [i]t is uniformly held that security interests perfected against inventory and accounts receivable, replacements thereof, future acquisitions and the proceeds of their sale continue in effect against acquisitions and purchases of a successor entity or transferee as well as the original debtor on the principle that **a debtor cannot destroy the perfected security interest of a secured party by transferring title to the collateral or changing its name or corporate structure** and the validity of the lien against subsequently acquired assets as well as those presently owned is effective thereagainst as of its original date.

18 B.R. 718, 720;  see also Inter Mountain Associates of Credit Men v. The Villager, Inc., 527 P.2d 664, 671 (Utah 1974).  The Court also finds In re West Coast Food Sales, Inc., 637 F.2d 707, 708-90 (9th Cir. Cal. 1981) ("West Coast") and Bank of the West v. Commercial Credit Financial Services, Inc., 852 F.2d 1162 (9th Cir. 1988), to be especially instructive on this point.

The West Coast Court addressed the issue of "whether the [parties'] security agreement extends to assets acquired by the debtor after it has changed its name or structure."  It observed that Courts "have allowed a security interest to be asserted against the assets of a successor entity acquired after that organization came into existence."  Id. (collecting cases).  There, the Court determined that a creditor's security interests remains intact despite modifications to the debtor, such as a name change, a structural change (i.e., change from a partnership to a corporation), or even "a corporate merger in which the original debtor was absorbed into a successor corporation."  Id. at 709.

---

collateral acquired by PITTRA and its successors.

Significantly, and especially relevant to this case here as well, the Court stressed that "[o]wnership [of the secured interest] at all times remained vested in Granahan and his immediate family."  Id.

Other Courts confronted with similar facts have been in accord.  In Bank of the West v. Commercial Credit Financial Services, Inc. the Court found that an "intercorporate" transfer of a business entity from one subsidiary to another by the parent company does not extinguish a creditor's security interest; holding that "[w]e will not validate an attempt by [a debtor] to switch assets among its affiliated, wholly-owned subsidiaries so that the debt to Bank of the West [a subsequent creditor] is satisfied at the cost of CCFS's perfected secured claim against the beverage business's assets." 852 F.2d 1162, 1170-71 (9th Cir. 1988); see Q.T., Inc. v. Thomas Russell & Co., 1989 U.S. Dist. LEXIS 18064, at *7-8 (E.D. Va. 1989) (noting that Courts that have considered "whether a security agreement containing an after-acquired property clause with an individual debtor who subsequently transfers the business to a corporation is effective against the succeeding corporation have generally held that the security agreement continues to bind the corporation.").[15]  This Court finds the reasoning in these cases to be persuasive, and finds that the security agreement entered into between PITTRA and Merrill must be enforceable against PGB.

Here, since 2001, Kupperman ran PITTRA as an importer and exporter of industrial food

_____

[15] Chase asserts that a different result is compelled, and cites to Northeastern Bank of Pa. v. Spirit of the West, Inc., (In re Spirit of the West, Inc.), 164 B.R. 34, 37 (Bankr. M.D. Pa. 1993) and In re Just for Kids, Inc., 150 B.R. 123, 124-25 (Bankr. M.D. Pa. 1992).  Chase argues that the cases indicate that  "a filed financing statement remains effective with respect to collateral that is transferred and in which a security interest continues," and "that the financing statement only remains effective for **specific** collateral that is transferred, not newly acquired assets of the transferee."  Doc. No. 329, at 10 (citing 164 B.R. at 37).  Those two cases, however, did not involve a scenario where the transferor was subject to a security agreement wherein the creditor was granted a lien over after-acquired assets of the company and its successors.  This fact, then, distinguished these cases from the case here.

ingredients out of the address of 6 South Street, Suite 301 in Morristown, N.J.  On April 30, 2003,

he formed PGB, which conducted the same type of business at the same exact location.

Approximately one month later, Kupperman transferred PITTRA's office furniture and equipment,

customer lists, supplier lists, telephone numbers, and general goodwill to PGB.  Kupperman was the

sole shareholder of PITTRA and the managing member of PGB.  Additionally, Kupperman and

Krelman, who had been in a committed longstanding relationship, were both principals of the

companies, PITTRA and PGB; Krelman executed the asset transfer agreement on behalf of PGB and

Kupperman executed it on behalf of PITTRA.  Based upon these facts, this Court finds that PGB is

a "successor[] or assign[ee]" to PITTRA under the Merrill-PITTRA Security Agreement.  PGB's

assets are, accordingly, subject to Merrill's security interest as established in the Security Agreement

and memorialized in Merrill's UCC Financing Statement.[16]

> (iii)  *Does Merrill's security interest in the PGB assets have priority over*
> *that of Chase?*

As the Court finds that Merrill has a security interest in PGB's assets—including those

acquired after the June 2003 asset transfer—the Court must next determine whether that interest

---

[16] Chase urges that PGB was a separate business entity that continued to operate after the sale, and thus PGB cannot be liable under the Security Agreement between PITTRA and Merrill. Chase attempts to distinguish the above-cited cases as being different from the case here because in those cases (and others) Courts are often applying successor liability where the corporate transaction is simply a name change and/or a merger.  Chase argues, essentially, that here the sale was a legitimate sale of assets to another business, not a mere superficial modification to the PITTRA business structure.  Merrill, in contrast, argues that PGB stopped operations a month after the asset transfer.  Regardless of the precise date PITTRA ceased operating, the Court finds that PGB, particularly in light of its overlapping ownership with PITTRA, is properly treated as a successor for the purposes of assessing the applicability of the Security Agreement.

Although Chase emphasized that a UCC Financing Statement was never filed against PGB's assets, see Doc Nos. 289-1, at 4, it does appears to acknowledge that PGB is functionally PITTRA's successor-in-interest.  See, e.g., id. at 1; 290-2, at 1.

takes priority over that of Chase.

Chase asserts that its interest in PGB's assets is senior to Merrill's by virtue of its Security Agreement dated October 8, 2004, and its UCC Financing Statement filed on October 20, 2004.  It asserts that Merrill's previously filed Financing Statement, filed against PITTRA, does not operate to give Merrill priority.

The Courts finds that Merrill's Financing Statement is effective as to PGB's assets, and therefore Merrill has priority as Chase acquired the PGB collateral subject to Merrill's preexisting security interest.

With respect to the continuing validity of a filed financing statement, UCC Section 9-507 provides that "[a] filed financing statement remains effective with respect to collateral that is sold, exchanged, leased, licensed, or otherwise disposed of and in which a security interest or agricultural lien continues, even if the secured party knows of or consents to the disposition."[17]  As Comment 3 to the Section explains,

> the collateral may be owned by a person other than the debtor against whom the financing statement was filed. Under subsection (a), the secured party remains perfected even if it does not correct the public record. For this reason, any person seeking to determine whether a debtor owns collateral free of security interests must inquire as to the debtor's source of title and, if circumstances seem to require it, search in the name of a former owner.

N.J Stat. § 12A:9-507.  Accordingly, the Financing Statement Merrill filed against PITTRA remains valid with respect to the collateral as described in the Security Agreement (i.e., PGB's assets).

As Merrill's filing statement remains valid against PITTRA and its successors, it may take

---

[17] Although the Section appears to be referring to collateral that is presently in existence—as it refers to said collateral undergoing a transfer or some form of disposition—the case law makes clear that using after-acquired property as collateral is permissible.  See Sections III.B.3(i)-(ii), supra.

priority to the assets over Chase.  As stated by UCC Section 9-322, "conflicting perfected security interests . . . rank according to priority in time of filing or perfection."  N.J. Stat. § 12A:9-322(a)(1). In accordance with this rule, Merrill's security interest has priority over Chase's.  This is even the case notwithstanding the transfer of the collateral (at least the already-acquired portion of collateral) under UCC Section 9-325.  The Section, which also addresses the priority of competing liens, provides that "a security interest created by a debtor is subordinate to a security interest in the same collateral created by another person if:  (1) the debtor acquired the collateral subject to the security interest created by the other person; (2) the security interest created by the other person was perfected when the debtor acquired the collateral; and (3) there is no period thereafter when the security interest is unperfected."  Id. § 9-9395.

The case of Ocean County National Bank v. Palmer, 457 A.d 1225 (App. Div. 1983), is instructive on this point.  There, a marina sold a boat to a debtor ("Debtor 1").  The debtor gave a security interest in the boat to a bank ("Bank"), which filed a Financing Statement. The debtor subsequently returned the boat to the marina, so that the marina could re-sell the boat, and use the proceeds of the sale to pay off the bank's lien.  The marina sold it to a new buyer ("Debtor 2"), who purchased the boat by assigning a security interest to another bank ("Bank 2").  Both banks, therefore, had duly perfect security interests in the collateral.  In determining which of the banks had priority, the court stated that "[t]he resale of the boat by the debtor was not authorized by the secured party [Bank 1] . . . [t]herefore, by reason of [9-315, Bank 1's] perfected security interest in the boat continued unless another provision  of [Article] 9 permitted [Debtor 2] to take free of that interest of gave [Bank 2] priority for its lien."   Id. at 1227.  Just as in Ocean County, here, Merrill is still entitled to priority despite the fact that Chase may have been unaware of Merrill's financing

statement against PITTRA.[18]

 Chase's interest was subject to the existing security interest held by Merrill.

   4. <u>Has Merrill established that PITTRA fraudulently transfered its assets to PGB?</u>

 Chase also argues that Merrill has failed to establish that a fraudulent transfer took place between PITTRA and PGB.  This question need not be addressed, as the Court has already determined that Merrill has a continuing interest in PGB's assets.  <u>See</u> Section III.B.3, <u>supra</u>.  The Court, however, notes that Merrill has established that a fraudulent transfer took place between PITTRA and PGB.

 Under the Uniform Fraudulent Transfer Act, N.J. Stat. § 25:2-20 <i>et seq</i>. (2009) ("UFTA"), "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor[.]"  N.J. Stat. § 25:2-25.  The UFTA sets forth a number of factors that courts must consider to determine whether fraudulent intent is established:

[1] The transfer or obligation was to an insider;

[2] The debtor retained possession or control of the property transferred after the transfer;

[3] The transfer or obligation was disclosed or concealed;

[4] Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

[5] The transfer was of substantially all the debtor's assets;

[6] The debtor absconded;

---

[18] Chase contends that <u>Ocean County</u> is distinguishable as that Court did not have to address a situation where the specific collateral could not be identified.  This is inapposite, as the Court determined above that the collateral here includes after-acquired assets, and no tracing of assets is necessary.  <u>See</u> Section III.B.3(ii), <u>supra</u>.

[7]     The debtor removed or concealed assets;

[8]     The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

[9]     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

[10]    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

[11]    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

See N.J. Stat. § 25:2-26.   These factors are known as the "badges of fraud."   Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 732 (Bankr. D.N.J. 2009).  The existence of one badge can "cast suspicion on the transferor's intent…"  Truong, et al. v. Kartzman, et al., 2007 U.S. Dist. LEXIS 48614 at *10 (D.N.J. 2007) (citing Gilchinsky v. Nat'l Westminster Bank, 732 A.2d 482, 490 (1999)).  Where a Court finds "several in one transaction [it] generally provides conclusive evidence of an actual intent to defraud."  Id. (citations omitted).

Merrill asserts that seven (7) of these badges have been satisfied, and that it is therefore entitled to summary judgment on its UFTA claim.  First, the transfer of property was between insiders because the principals of PITTRA and PGB were the same (Badge 1).  Second, these insiders controlled both entities, and therefore the debtors retained control of the property (Badge 2).  Third, Merrill did not have notice of the transfer (Badge 3).  Fourth, substantially all of PITTRA's assets were transferred under the agreement (Badge 5).  Fifth, Kupperman has concealed assets (Badge 7).  Sixth, PGB failed to make payment for the assets transferred (Badge 8).  Seventh, after the transfer, Kupperman induced PITTRA to increase the WCMA line of credit (Badge 10).

Chase responds that summary judgment must be denied because Merrill has not established

the presence of these badges.

First, Chase asserts that PGB may have duly transferred funds to PITTRA in return for the transferred assets. The Asset Purchase Agreement called for $310,000.00 payment from PGB to PITTRA. PITTRA received a number of fund transfers for various amounts from PGB for a sum of $378,240.50 during the two months subsequent to the signing of the asset transfer. Chase asserts that these funds "may have been in payment of the purchase price [for the transferred assets]." Doc. 329, at 8. Merrill replies that none of the money transfers were specifically for $310,000.00, and therefore there is no indication that the funds were specifically paid in exchange for the assets. In light of the ambiguity, Chase asserts that there remains a question of fact as to whether the funds were payments for the assets. As such, Chase argues, Merrill has not demonstrated the presence of Badges 5 and 8.

Next, Chase asserts that Merrill knew of the existence of PGB and the asset agreement prior to extending the $3,750,000.00 line of credit and making a separate loan to PITTRA of $500,000.00. As a result, Chase contends that Badge 10 is irrelevant, because even if the transfer took place immediately prior to a substantial debt being incurred, Merrill was already on notice of the transfer at the time of the extension/new loan.

This Court agrees with Chase that certain of the seven badges of fraud (nos. 5 and 8) asserted by Merrill are subject to factual disputes. The Court also agrees that Badge 10 is probably irrelevant under the facts of this case. These observations, however, do not compel the result urged by Chase—the fact that Merrill can only unambiguously demonstrate the presence of four (4) badges of fraud does not justify denial of summary judgment.

As the New Jersey Supreme Court has explained, "the confluence of several [badges] in one

-46-

transaction generally provides conclusive evidence of an actual intent to defraud." See Gilchinsky, 732 A.2d at 489-90 (explaining that "the Appellate Division made a critical error by giving controlling weight to the absence of two factors in a list of eleven[; because] the proper inquiry is whether the badges of fraud are present, not whether some factors are absent."). Where several badges are established, summary judgment may be entered for a plaintiff. For example, in Truong v. Kartzman, the Court noted that the debtors transferred property to insiders, the debtors maintained control of the property after the transfer, the debtors never disclosed the transfers on their bankruptcy petition, and the transferred property constitutes essentially all of the debtors' assets. See 2007 U.S. Dist. LEXIS 48614, at *12 (D.N.J. July 5, 2007), aff'd 285 Fed. Appx. 837 (3d Cir. N.J. 2008). Furthermore, the debtors had been sued prior to the transaction. Id. at 12-13. Based upon these considerations, the Court found that the Bankruptcy Court properly determined that summary judgment was appropriate, as 5 badges of fraud were conclusively established. Id. at 13. Similarly, here, 4 badges of fraud are present: the transfer of property was between insiders; these insiders controlled both entities (PITTRA and PGB); the debtors retained control of the property; and, finally, Merrill did not have notice of the transfer, in direct contravention of the loan agreement. Considering the presence of these badges of fraud, as well as the undisputed fact that Kupperman maintained a continuous scheme of fraud, PITTRA's sale of assets to PGB constitutes a fraudulent transfer under the UFTA.

This Court finds that the asset transfer to PGB was fraudulent. UFTA claims, such as this, are subject to a variety of relief. A court may order attachment against the asset transferred or other property of the transferee, N.J.S.A. 25:2-29(a)(2); or a money judgment against the transferee where the transfer cannot be undone (as would likely be necessary here), N.J.S.A. 25:2-30(a), (b); and

"[a]ny other relief the circumstances may require." N.J.S.A. 25:2-29(a)(3)(c). As noted above, the Court has decided that Merrill is entitled to a priority interest in PGB's assets on other grounds, and it need not pass upon what remedy would be proper under the UFTA. See Section III.B.3, supra.

> 5. Does Chase have priority as a holder in due course and as a purchaser of instruments with respect to certain PGB accounts that Chase collected directly?

As stated above, Merrill is entitled to summary judgment on its priority claim as it has a valid lien over PGB's assets.[19] Chase asserts, however, that it has priority over the PGB accounts that it collected as a holder in due course and as a purchaser of instruments. That is, it maintains that it has priority interest with respect to $489,321.86 in funds (i.e., from accounts receivable) it collected from PGB upon learning of the company's default.

Merrill responds that these accounts were already subject to Merrill's superior security interest, and, in fact, Chase was aware of Merrill's interest when it collected the funds. As such, Chase was unable to become a holder in due course and a purchaser of instruments. The Court agrees with Merrill.

"A holder in due course is one who takes an instrument for value, in good faith, and without notice of dishonor or any defense against or claim to it on the part of any person." Triffin v. Pomerantz Staffing Servs., LLC, 370 N.J. Super. 301, 851 A.2d 100, 103 (N.J. Super. Ct. App. Div. 2004) (quotation marks and citation omitted); see U.C.C. §§ 9-102(b) and 3-302(a) (defining holder in due course). Subject to those same requirements, a "purchaser of an instrument has priority over a security interest in the instrument perfected by a method other than possession . . . " See §

---

[19] The Court also noted that Merrill may have a lien on certain PGB assets by virtue of the fraudulent nature of the PITTRA-PGB asset transfer.

9-330(d).  A holder in due course or purchaser of instruments, then, has an interest that "take[s] priority over an earlier security interest, even if perfected . . . ."  U.C.C. § 9-331(a).  Although the requirements to become a holder in due course and a purchaser of instruments are similar, there is one significant difference here,

> to be a holder in due course, [a party] must have taken without knowledge that [the senior party] had a security interest in the accounts receivable. See U.C.C. § 3-302(a)(2)(v). Alternatively, "a purchaser who takes even with knowledge of the security interest qualifies for priority under [U.C.C. § 9-330(d)] if it takes without knowledge that the purchase violates the rights of the holder of the security interest."

See id. at § 9-330 cmt. 7.

This Court must determine whether Chase collected on PGB's accounts receivable with notice of Merrill's senior interest, and if so, if Chase had knowledge that the purchase (i.e., collection) violated the rights of Merrill.[20]

The Court finds that Chase does not qualify as a holder in due course, as it collected the accounts receivable (from PGB debtors) after having received notice of Merrill's security interest in those same assets.  See Wawel Savings Bank v. Jersey Tractor Trailer Training Inc., 580 F.3d 147, 159 n.21 (3d Cir. 2009) ("[N]otice of a conflicting security interest precludes a purchaser from becoming a holder in due course").  The Court finds that Chase clearly had notice of Merrill's claim to the funds.   Triffin, 851 A.2d at 103.

The Court also finds that Chase did not collect such funds as a purchaser of instruments.  To

---

[20] "[T]he proper time for determining whether the recipient of an instrument has notice of a claim or defense is determined at the time of negotiation of the instrument to the holder." Agriliance, LLC v. Farmpro Servs., 328 F.Supp. 2d 958, 972 (S.D. Iowa 2003).  Accordingly, the Court must determine whether Chase had notice of Merrill's interest as of the date it collected PGB receivables—not whether Chase had notice years earlier when it conducted its lien search and found no competing interests in the PGB assets.

be considered a purchaser of instruments, a party must have "give[n] value and take[n] possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured party." Wawel, 580 F.3d at 156 (citing U.C.C. § 9-330(d)).   Chase gave value for the accounts receivable that it ultimately collected, namely the funding to PGB, for which it received the security interest.   It also had notice of Merrill's claims to such assets.   Notice of the competing claims, alone, however, does not prevent Chase from being considered a holder in due course:  a party may be considered a purchaser of instruments (and therefore qualify for priority) "if it takes without knowledge that the purchase violates the rights of the holder of the security interest." See id. at § 9-330 cmt. 7.   Under the circumstances here, though, the Court finds that Chase did have knowledge that the collection would violate the rights of the holder of the senior security interest. Not only did Chase receive notice of Merrill's interest, the notice (i.e., the Complaint in this action) specifically requested that the Court "deem [Merrill] to have a first priority right to such assets ahead of all other creditors of PGB, including Chase."   Amended Comp. ¶ 8.   The Court finds this sufficient to give Chase knowledge that its collection of PGB accounts would violate the rights of Merrill.  U.C.C. § 9-330 cmt. 6 ("[I]f a purchaser sees a statement in a financing statement to the effect that a purchase of chattel paper from the debtor would violate the rights of the filed secured party, the purchaser would have such knowledge.").[21]   Chase, therefore, cannot take as a purchaser

---

[21] Moreover, to qualify as a purchaser of instruments, a party must observe "reasonable commercial standards of fair dealing." See UCC § 9-331 cmt. 5 ("In order to qualify as a holder in due course, the junior [secured creditor] . . . not only must act 'honestly' but also must observe 'reasonable commercial standards of fair dealing' under the particular circumstances").   As Comment 5 to § 9-331 states, in some circumstances "the senior secured party is likely to be prejudiced if the debtor is going out of business and the junior secured party collects the accounts by notifying the account debtors to make payments directly to the junior.  Those collections may not be consistent with 'reasonable commercial standards of fair dealing.'"

of instruments.

Chase does not qualify as a holder in due course, or as a purchaser of instruments.  It, accordingly, does not have a priority interest in the $489,321.86 in funds that it collected after receiving notice of Merrill's suit.

> 6.    Do the Writs of Attachment Entered by this Court Modify the Ability of the Parties to Collect on the Judgments Entered against PGB and Kupperman?

Chase, finally, asserts that "insofar as Chase and [Merrill] both seek the entry of judgments against the remaining defendants in this action [PGB and Kupperman], the writs of attachment entered by this Court should benefit both Chase and [Merrill] and both should collect any judgments that may be entered in this action *pro rata* from the attached assets."  The Court cannot agree.

As to PGB's assets, Merrill's judgment has priority over that of Chase, because "a secured creditor who has duly filed a financing statement is entitled to priority over a subsequent lien creditor seeking to levy on or otherwise claim the same collateral."  Mudge v. Sher-Mart Manufacturing Co., 132 N.J. Super. 517, 521, 334 A.2d 357 (App. Div. 1975).  As the Court determined above, Merrill's financing statement as to PITTRA is valid with respect to PGB assets.  Therefore, Merrill's pre-existing security interest in PITTRA/PGB assets, has priority over Chase's judgment in this matter.

Also, as to Kupperman's personal assets, the Court finds that Merrill's interest is superior to that of Chase under the writs of attachment.  First, and most importantly, writs of attachment entered in favor of Merrill prior to entry in favor of Chase, and "a sale under a writ of attachment execution relates back to the issuance of the writ of attachment[.]"  In re Bobolin, 83 B.R. 258, 263 (Bankr. D.N.J. 1988).  Merrill filed on October 5, 2006, and this Court issued writs as to Kupperman (and PGB) on October 6, 2006.  Chase filed a notice of appearance in this action on October 13,

2006.  Second, Kupperman signed a personal guarantee on the Merrill-PITTRA loan, and the guarantee was executed well before Chase's extension of credit to PGB.  Finally, Merrill's initial judgment against Kupperman (on the personal guarantee), predates Chase's judgment against Kupperman.

For these reasons, this Court finds that Merrill has a superior interest in the assets of PGB and Kupperman under the writs of attachment.


## IV.  CONCLUSION

For the reasons set forth above, Merrill's motion for summary judgment on its claims against Kupperman is **granted**;  Chase's motion for summary judgment on its crossclaims against Kupperman is **granted**; Merrill's motion for summary judgment as to its claim of priority over the assets of PGB is **granted**; and, Chase's motion for summary judgment as to its claim of priority over the assets of PGB is **denied**.[22]


 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:        May   27  , 2010
Original:     Clerk's Office
cc:            All Counsel of Record
               File

---

[22] The Court will not separately consider Chase's motion for summary judgment against Merrill regarding priority, as it has been determined that Merrill holds a valid senior interest in the assets of PGB and Kupperman.